[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13843

_____

D.C. Docket No. 9:08-cv-80736-KAM

In re: COURTNEY WILD,

                                                          Petitioner.

_____

On Petition for Writ of Mandamus to the United States District Court for the
Southern District of Florida

_____

(April 15, 2021)

Before WILLIAM PRYOR, Chief Judge, and WILSON, MARTIN, JILL PRYOR,
NEWSOM, BRANCH, LUCK, LAGOA, BRASHER, TJOFLAT, and HULL,
Circuit Judges.*

NEWSOM, Circuit Judge, delivered the opinion of the Court, in which WILLIAM
PRYOR, Chief Judge, and WILSON, LAGOA, BRASHER, and TJOFLAT,
Circuit Judges, joined, and in which in LUCK, Circuit Judge, joined as to Parts IB,
II, III, IVA, IVB1-3a, IVC, IVD1, and V.

--------

* Judges Tjoflat and Hull were members of the en banc Court that heard oral argument in this
case, both having elected to participate in this decision pursuant to 28 U.S.C. § 46(c)(1). Judges
Jordan, Rosenbaum, and Grant are recused.

WILLIAM PRYOR, Chief Judge, filed a concurring opinion, in which NEWSOM, LAGOA, and TJOFLAT, Circuit Judges, joined.

NEWSOM, Circuit Judge, filed a concurring opinion.

TJOFLAT, Circuit Judge, filed a concurring opinion, in which WILLIAM PRYOR, Chief Judge, and WILSON, NEWSOM, and LAGOA, Circuit Judges, joined.

BRANCH, Circuit Judge, filed a dissenting opinion, in which MARTIN, JILL PRYOR, and HULL, Circuit Judges, joined.

HULL, Circuit Judge, filed a dissenting opinion.


NEWSOM, Circuit Judge:

This petition for writ of mandamus arises under the Crime Victims' Rights Act, 18 U.S.C. § 3771. Petitioner Courtney Wild is one of more than 30 women who, according to allegations that we have no reason to doubt and therefore accept as true in deciding this case, were victimized by notorious sex trafficker and child abuser Jeffrey Epstein. In her mandamus petition, Ms. Wild asserts that when federal prosecutors secretly negotiated and executed a non-prosecution agreement with Epstein in 2007, they violated her rights under the CVRA—in particular, her rights to confer with and to be treated fairly by the government's lawyers.

We have the profoundest sympathy for Ms. Wild and others like her, who suffered unspeakable horror at Epstein's hands, only to be left in the dark—and, so it seems, affirmatively misled—by government attorneys. Even so, we find ourselves constrained to deny Ms. Wild's petition. While the CVRA permits a

2

crime victim like Ms. Wild to "mov[e]" for relief within the context of a preexisting proceeding—and, more generally, to pursue administrative remedies—it does not authorize a victim to seek judicial enforcement of her CVRA rights in a freestanding civil action. Because the government never filed charges against Epstein, there was no preexisting proceeding in which Ms. Wild could have moved for relief under the CVRA, and the Act does not sanction her stand-alone suit.

## I

## A

The facts underlying this case, as we understand them, are beyond scandalous—they tell a tale of national disgrace.

Over the course of eight years, between 1999 and 2007, well-heeled and well-connected financier Jeffrey Epstein and multiple coconspirators sexually abused more than 30 young girls, including Ms. Wild, in Palm Beach, Florida and elsewhere in the United States and abroad. Epstein paid his employees to find girls and deliver them to him—some not yet even 15 years old. Once Epstein had the girls, he either sexually abused them himself, gave them over to be abused by others, or both. Epstein, in turn, paid bounties to some of his victims to recruit others into his ring.

Following a tip in 2005, the Palm Beach Police Department and the FBI conducted a two-year investigation of Epstein's conduct. After developing

3

substantial incriminating evidence, the FBI referred the matter to the United States Attorney's Office for the Southern District of Florida.  Beginning in January 2007, and over the course of the ensuing eight months, Epstein's defense team engaged in extensive negotiations with government lawyers in an effort to avoid indictment. At the same time, prosecutors were corresponding with Epstein's known victims. As early as March 2007, they sent letters advising each one that "as a victim and/or witness of a federal offense, you have a number of rights."  The letters, which the government distributed over the course of about six months, went on to enumerate the eight CVRA rights then in force—including, as particularly relevant here, "[t]he reasonable right to confer with the attorney for the [Government] in the case" and "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy."

By May 2007, government lawyers had completed both an 82-page prosecution memo and a 53-page draft indictment alleging that Epstein had committed numerous federal sex crimes.  In July, Epstein's lawyers sent a detailed letter to prosecutors arguing that, in fact, Epstein hadn't broken any federal laws. By mid-September, the sides had exchanged multiple drafts of what would become an infamous non-prosecution agreement (NPA).  Pursuant to their eventual agreement, Epstein would plead guilty in Florida court to two state prostitution offenses, and, in exchange, he and any coconspirators (at least four of whom have

since been identified) would receive immunity from federal prosecution.[1]  In June 2008, Epstein pleaded guilty to the state crimes as agreed and was sentenced to 18 months' imprisonment, 12 months' home confinement, and lifetime sex-offender status.

The district court found that "[f]rom the time the FBI began investigating Epstein until September 24, 2007"—when the government formally executed the NPA with Epstein—federal prosecutors "never conferred with the victims about a[n] NPA or told the victims that such an agreement was under consideration." *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1208 (S.D. Fla. 2019).  Worse, it appears that prosecutors worked hand-in-hand with Epstein's lawyers—or at the very least acceded to their requests—to keep the NPA's existence and terms hidden from victims.  The NPA itself provided that "[t]he parties anticipate that this agreement will not be made part of any public record" and, further, that "[i]f the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure."  Moreover, at approximately the

---

[1] The NPA also contained several provisions concerning Epstein's victims.  The government, for instance, agreed to provide a list of known victims to Epstein and, "in consultation with and subject to the good faith approval of Epstein's counsel," to "select an attorney representative" for the victims, to be "paid for by Epstein."  Epstein waived his right to contest liability or damages "up to an [agreed] amount" in a victim's civil suit, "so long as the identified individual elect[ed] to proceed exclusively under 18 U.S.C. § 2255, and agree[d] to waive any other claim for damages."  An odd set-up—and one that, it seems to us, was likely calculated to quickly and quietly resolve as many victim suits as possible.

same time that the sides concluded the NPA, they began negotiating about what prosecutors could (and couldn't) tell victims about the agreement. Seemingly in deference to Epstein's lawyers' repeated requests, the government held off—for nearly an entire year—on notifying Epstein's victims of the NPA's existence.

And to be clear, the government's efforts appear to have graduated from passive nondisclosure to (or at least close to) active misrepresentation. In January 2008, for example, approximately four months after finalizing and executing the NPA, the government sent a letter to Ms. Wild stating that Epstein's case was "currently under investigation," explaining that "[t]his can be a lengthy process," and "request[ing her] continued patience while [it] conduct[ed] a thorough investigation." The government sent a similar letter to another victim in May 2008, some *eight* months after inking the NPA.[2]

If secrecy was the goal, it seems to have been achieved—there is no indication that any of Epstein's victims were informed about the NPA or his state charges until after he pleaded guilty. On the day that Epstein entered his guilty plea in June 2008, some (but by no means all) victims were notified that the federal investigation of Epstein had concluded. But it wasn't until July 2008—during the

---

[2] The government has contended that these letters were technically accurate because the already-signed NPA remained under review by senior members of the Department of Justice.

course of this litigation—that Ms. Wild learned of the NPA's existence, and until August 2008 that she finally obtained a copy of the agreement.

We are doubtlessly omitting many of the sad details of this shameful story. For our purposes, we needn't discuss the particulars of Epstein's crimes, or the fact that the national media essentially ignored for nearly a decade the jailing of a prominent financier for sex crimes against young girls.[3]  Today, the public facts of the case are well known—Epstein was eventually indicted on federal sex-trafficking charges in the Southern District of New York, and in August 2019, while awaiting trial, he was found dead in his jail cell of an apparent suicide.

**B**

In July 2008, Ms. Wild brought suit in the United States District Court for the Southern District of Florida, styling her initial pleading—which she filed *ex parte*, without naming a defendant—an "Emergency Victim's Petition for Enforcement of Crime Victim's Rights Act."  As the district court explained, "because no criminal case was pending" at the time—no federal charges having been filed against Epstein or anyone else—Ms. Wild "filed [her] petition as a new matter . . . which the Clerk of Court docketed as a civil action" against the United

---

[3] *Cf.* David Folkenflik, *A Dead Cat, A Lawyer's Call And A 5-Figure Donation: How Media Fell Short on Epstein*, National Public Radio (Aug. 22, 2019, 6:06 PM), https://www.npr.org/2019/08/22/753390385/a-dead-cat-a-lawyers-call-and-a-5-figure-donation-how-media-fell-short-on-epstei.

States. *Does v. United States*, 817 F. Supp. 2d 1337, 1341 n.4 (S.D. Fla. 2011). Ms. Wild alleged that she was a "crime victim" within the meaning of the CVRA and that by keeping her in the dark about their dealings with Epstein, federal prosecutors had violated her rights under the Act—in particular, her rights "to confer with the attorney for the Government in the case," 18 U.S.C. § 3771(a)(5), and "to be treated with fairness and with respect for [her] dignity and privacy," *id*. § 3771(a)(8).[4] She asked the court to "order the United States Attorney to comply with the provisions of the CVRA . . . ."

Over the course of the ensuing decade, the district court issued a number of significant rulings. For our purposes, three of the court's orders are particularly important.

Initially, in 2011 the district court "addresse[d] the threshold issue whether the CVRA attaches before the government brings formal charges against the defendant." *Does*, 817 F. Supp. 2d at 1341. The court held that "it does because the statutory language clearly contemplates pre-charge proceedings." *Id*. Having made that determination, the district court "defer[red]" ruling on the question whether federal prosecutors had violated the Act until the parties could conduct additional discovery. *Id*. at 1343.

---

[4] A second petitioner joined the suit shortly after it was filed. For simplicity's sake, we will refer to the present action as "Ms. Wild's" suit.

Following another eight years of litigation, the district court issued a pair of rulings that prompted the mandamus petition now before us.  In February 2019, the court found that the government had infringed Ms. Wild's CVRA rights.  *See Doe 1*, 359 F. Supp. 3d at 1222.  In particular, the court held that federal prosecutors violated the Act by "enter[ing] into a[n] NPA with Epstein without conferring with [Ms. Wild] during its negotiation and signing."  *Id*. at 1218.  "Had [Ms. Wild] been informed about the Government's intention to forego [sic] federal prosecution of Epstein in deference to him pleading guilty to state charges," the district court emphasized, she "could have conferred with the attorney for the Government and provided input."  *Id*.  The court concluded that it was precisely "this type of communication between prosecutors and victims that was intended by the passage of the CVRA."  *Id*. at 1219.

Having found CVRA violations, the court directed the parties—which by then included Epstein as an intervenor—to address "the issue of what remedy, if any, should be applied."  *Id*. at 1222.  In response, Ms. Wild proposed multiple remedies, including: (1) rescission of the NPA; (2) an injunction against further CVRA violations; (3) an order scheduling a victim-impact hearing and a meeting between victims and Alexander Acosta, the former United States Attorney for the Southern District of Florida; (4) discovery of certain grand-jury materials, records regarding prosecutors' decision to enter into the NPA, and files concerning law-

9

enforcement authorities' investigation of Epstein; (5) mandatory CVRA training for employees of the Southern District's United States Attorney's office; and (6) sanctions, attorneys' fees, and restitution. In August 2019, while the court was considering the parties' briefing regarding remedies, Epstein died of an apparent suicide; his death prompted another round of briefing on the issue of mootness.

In September 2019, having considered the parties' briefing and the impact of Epstein's death, the district court dismissed Ms. Wild's suit, denying each of her requested remedies. *See Doe 1 v. United States*, 411 F. Supp. 3d 1321 (S.D. Fla. 2019). In its order, the district court made a number of rulings. First, it held that Epstein's death mooted any claim regarding the NPA's continuing validity, as he was no longer subject to prosecution. *See id*. at 1326. Relatedly, the court concluded that it lacked jurisdiction to consider Ms. Wild's claim regarding the validity of the NPA as it applied to Epstein's coconspirators; any opinion regarding that issue, the court determined, would be merely advisory because the coconspirators—as non-parties to the suit—couldn't be estopped from asserting the NPA's validity at any future prosecution. *See id*. at 1326–27. Second, the court denied Ms. Wild's request for an injunction on the ground that she had failed to show "continuing, present adverse effects" or any "real and immediate" threat of future CVRA violations. *Id*. at 1328. Third, the court rejected Ms. Wild's requests for a victim-impact hearing and a meeting with Acosta on the grounds that it

lacked jurisdiction over Acosta, that she had already had the opportunity to participate in an Epstein-related hearing in New York, that the Epstein prosecution had concluded, and that the government had already agreed to confer with victims concerning any ongoing investigation of Epstein's coconspirators. *See id.* at 1328–29. Fourth, the court denied Ms. Wild's discovery requests for grand-jury materials and investigative files. *See id.* at 1329–30. Fifth, the court declined to order "educational remedies," as the government had already agreed to implement CVRA training for employees of the Southern District's United States Attorney's office. *Id.* at 1330. And finally, the court rejected Ms. Wild's request for sanctions, fees, and restitution. *See id.* at 1330–31.

Seeking review of the district court's order refusing every remedy that she had sought, Ms. Wild filed—as the CVRA directs—a petition for writ of mandamus with this Court. *See* 18 U.S.C. § 3771(d)(3) (stating that "[i]f the district court denies the relief sought," a victim "may petition the court of appeals for a writ of mandamus"). The government filed a "brief in response" in which it not only opposed Ms. Wild's arguments on the merits, but also raised several threshold arguments concerning the scope of the CVRA and the circumstances in which rights under the Act are judicially enforceable.[5]

---

[5] Although the CVRA instructs the court of appeals to "take up and decide" any mandamus petition "forthwith within 72 hours," the Act also authorizes parties to stipulate, as they did here, to "a different time period for consideration." 18 U.S.C. § 3771(d)(3).

11

A divided panel of this Court denied Ms. Wild's mandamus petition, holding "that the CVRA does not apply before the commencement of criminal proceedings—and thus, on the facts of this case, does not provide [Ms. Wild] any judicially enforceable rights." *In re Wild*, 955 F.3d 1196, 1220 (11th Cir. 2020), *reh'g en banc granted, opinion vacated*, 967 F.3d 1285 (11th Cir. 2020).

A majority of the active judges of this Circuit voted to rehear the case en banc, and we directed the parties to address two questions: (1) Whether the CVRA creates rights that attach and apply before the formal commencement of criminal proceedings; and (2) Whether, even assuming that it does so, the CVRA further creates a private right of action, such that any pre-charge right is judicially enforceable in a freestanding lawsuit.

In response to those questions, Ms. Wild contends that her rights "to confer with the attorney for the Government in the case," 18 U.S.C. § 3771(a)(5), and "to be treated with fairness," *id*. § 3771(a)(8), attached even before the commencement of—and as it turns out, in the absence of—any criminal proceedings against Epstein and, further, that the CVRA authorized her to seek judicial enforcement of those rights in a stand-alone civil action. The government disputes both propositions.[6]

---

[6] In its en banc brief, the government also (for the first time) contested our jurisdiction to consider Ms. Wild's mandamus petition. The 2015 version of the CVRA—which was in effect at the time Ms. Wild sought review in this Court—provides that a crime victim may file a

We conclude that we needn't decide whether, in the abstract, the rights to

confer and to be treated with fairness might attach prior to the formal

commencement of criminal proceedings or whether, if they do, they might be

enforceable through, say, political or administrative channels.  Nor, for that matter,

need we even decide whether, if the rights to confer and to be treated fairly apply

pre-charge, a victim could later seek to vindicate them during the course of an

ongoing criminal prosecution.[7]  Here, the only issue we have to confront is

whether the CVRA authorizes Ms. Wild to file a freestanding civil suit seeking

---

mandamus petition in the "court of appeals," which it defines as "the United States court of appeals for the judicial district in which a defendant is being prosecuted."  18 U.S.C. § 3771(e)(1)(A).  According to the government, that means that a victim may seek mandamus relief only if (and while) a criminal defendant "is being prosecuted."  Because that's not the case here, the argument goes, we lack jurisdiction even to entertain Wild's petition.  We disagree for three reasons.  First, § 3771(e)(1)(A) is more properly understood as a venue provision than a jurisdictional provision—it specifies *in which* "court of appeals" a victim should file.  *Cf. United States v. Ross*, 963 F.3d 1056, 1063 (11th Cir. 2020) (en banc) (noting "the Supreme Court's directive that courts should avoid 'jurisdictionalizing' issues" that are more properly framed in other terms).  Second, the government's position would render the CVRA internally inconsistent.  By its terms, the Act clearly applies in the context of habeas corpus proceedings.  *See* 18 U.S.C. § 3771(b)(2).  But, of course, no one "is being prosecuted" in a habeas proceeding.  So the government's position would imply that there is no mandamus jurisdiction to address a violation that occurs during a habeas proceeding, which the Act plainly covers.  Finally, the government's position defies common sense.  If Ms. Wild had sought mandamus relief in 2014, there would undoubtedly have been no bar to our review—there being no restrictive definition of "court of appeals" at that time.  But, the government asserts, with the passage of the 2015 amendment—which all agree was meant to *enhance* victims' rights—that jurisdiction somehow evaporated.  That seems exceedingly unlikely.

[7] This was the posture in which the "attachment" issue arose in *In re Dean*, 527 F.3d 391 (5th Cir. 2008), on which our dissenting colleagues rely.  *See* Branch Dissenting Op. at 118.  Because the question we answer is different from the one presented in *Dean*, our decision creates no circuit split, as our dissenting colleagues imply.

judicial enforcement of her rights under the CVRA in the absence of any underlying proceeding.[8]  For reasons we'll explain, we hold that it does not.[9]

Before jumping into the merits, we begin with an introductory summary of the CVRA's key provisions.

## II

The CVRA is a compact statute, occupying but one section (and only three pages) of the United States Code.  *See* 18 U.S.C. § 3771.  The entire Act comprises just six subsections, the pertinent portions of which we will outline briefly.

The CVRA opens, in subsection (a), with a catalogue of "rights" that federal law guarantees to "crime victims."  (The Act separately defines the term "crime victim" to mean "a person directly and proximately harmed as a result of the commission of a Federal offense."  *Id*. § 3771(e)(2)(A).)  The version of the CVRA

---

[8] The CVRA (as amended in 2015) provides that this Court "shall apply ordinary standards of appellate review" to the issues presented in a mandamus petition under the Act.  18 U.S.C. § 3771(d)(3).  Because the issues presented here are questions of law, we review them de novo. *See, e.g.*, *De Sandoval v. U.S. Att'y Gen.*, 440 F.3d 1276, 1278 (11th Cir. 2006).

[9] Our dissenting colleagues accuse us of "blithely" "skip[ping] over" the first of the two questions specified in our briefing order in favor of the second.  *See* Hull Dissenting Op. at 157; *see also* Branch Dissenting Op. at 111.  With respect, our path results from a shared conviction that courts should decide cases narrowly wherever possible.  Our charge here is simply to resolve the parties' dispute, not to answer questions that don't (and can't) affect the outcome.  *Cf. District of Columbia v. Wesby*, 138 S. Ct. 577, 589 n.7 (2018) (encouraging courts addressing qualified-immunity cases to bypass the merits of the logically antecedent constitutional question in favor of the logically subsequent "clearly established law" question).  Because we don't need to address the first, "attachment" question, we won't do so and, accordingly, won't engage our dissenting colleagues' extended analyses of the issues that it presents.  *See* Branch Dissenting Op. at 111–120; Hull Dissenting Op. at 157–164.

14

in effect during the events in question here—between 2006 and 2008—stated as follows:

> **(a) Rights of crime victims.**—A crime victim has the following rights:
>
> **(1)** The right to be reasonably protected from the accused.
>
> **(2)** The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
>
> **(3)** The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.
>
> **(4)** The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
>
> **(5)** The reasonable right to confer with the attorney for the Government in the case.
>
> **(6)** The right to full and timely restitution as provided in law.
>
> **(7)** The right to proceedings free from unreasonable delay.
>
> **(8)** The right to be treated with fairness and with respect for the victim's dignity and privacy.

*Id.* § 3771(a).

Subsection (b), titled "Rights afforded," focuses specifically on courts' responsibilities under the Act. Subsection (b)(1) states that "[i]n any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a)." *Id.*

15

§ 3771(b)(1). Subsection (b)(2) pertains to "Federal habeas corpus proceeding[s]" and provides that the "court shall ensure" that the victim is afforded a more limited set of rights. *Id.* § 3771(b)(2).

Subsection (c), titled "Best efforts to accord rights," imposes obligations on *non*-judicial actors. One of its constituent clauses—which Ms. Wild calls the "coverage" provision—states as follows:

> Officers and employees of the Department of Justice and other departments and agencies of the United States engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a).

*Id.* § 3771(c)(1).

Subsection (d) addresses "Enforcement and limitations." It opens by stating that either the crime victim, her authorized representative, or the government "may assert the rights described in subsection (a)." 18 U.S.C. § 3771(d)(1). The balance of subsection (d) prescribes exactly how, when, and where those rights may be asserted, as well as the limitations on judicial enforcement. In that connection, several of subsection (d)(3)'s provisions are particularly relevant here. First, and most obviously given its title—"Motion for relief and writ of mandamus"— subsection (d)(3) gives victims a "motion" remedy in the district court and a mandamus remedy in the court of appeals. With respect to the former, subsection (d)(3) states that "[t]he district court shall take up and decide any motion asserting

16

a victim's right forthwith." *Id*. § 3771(d)(3). And with respect to the latter, it provides that "[i]f the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus." *Id*. Another of subsection (d)(3)'s provisions—which Ms. Wild calls the "venue" provision—states that "[t]he rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred." *Id.* § 3771(d)(3).

Subsection (d)(6), titled "No cause of action," also contains two pertinent provisions. First, it states that "[n]othing in this chapter shall be construed to authorize a cause of action for damages." *Id.* § 3771(d)(6). Second, and separately, it emphasizes that "[n]othing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." *Id.*

Finally, subsection (f) instructs the Attorney General to "promulgate regulations to enforce the rights of crime victims and to ensure compliance by responsible officials with the obligations" concerning those victims. *Id.* § 3771(f)(1). (We've already introduced subsection (e), which defines the term "crime victim.") Subsection (f) specifies that the regulations "shall"—among other things—(1) "designate an administrative authority within the Department of Justice

17

to receive and investigate complaints relating to the provision or violation of the rights of a crime victim," (2) "contain disciplinary sanctions, including suspension or termination from employment, for employees of the Department of Justice who willfully or wantonly fail to comply with provisions of Federal law pertaining to the treatment of crime victims," and (3) "provide that the Attorney General" or his designee "shall be the final arbiter of the complaint" and that "there shall be no judicial review" of his decision.  *Id*. § 3771(f)(2).

Pursuant to subsection (f)'s directive, the Attorney General adopted administrative-enforcement regulations, which are codified at 28 C.F.R. § 45.10. The regulations establish "Victims' Rights Ombudsman" and "point of contact" offices within the Department of Justice and create a detailed administrative "[c]omplaint process."  28 C.F.R. § 45.10(b)–(c).  They require an alleged victim's complaint to include, among other information, "[t]he district court case number" and "[t]he name of the defendant in the case."  *Id*. § 45.10(c)(2)(iii)–(iv).  Upon receipt of a complaint, the designated point of contact "shall investigate the allegation(s) . . . within a reasonable period of time" and then "report the results of the investigation to" the Ombudsman, who, in turn, may conduct any "further investigation" that he deems warranted.  *Id*. § 45.10(c)(4)–(6).  If the Ombudsman determines that a victim's rights have been violated, he "shall require" the offending employee "to undergo training on victims' rights," and if the

18

Ombudsman finds a willful violation, he "shall recommend" to the offending employee's superior an additional "range of disciplinary sanctions." *Id*. § 45.10(d)–(e). As required by statute, the regulations provide that the Ombudsman's decision is final and that "[a] complainant may not seek judicial review of the [Ombudsman's] determination regarding the complaint." *Id*. § 45.10(c)(8).

With that primer, we proceed to address Ms. Wild's case.[10]

### III

As already noted, Ms. Wild initiated this litigation by filing, *ex parte*, a document styled an "Emergency Victim's Petition for Enforcement of Crime

---

[10] Before considering the merits of Ms. Wild's petition, we must briefly address a front-end procedural issue. Ms. Wild contends that the government waived any argument that the CVRA doesn't provide for pre-charge judicial enforcement here when it failed to file a "cross-appeal" from the district court's 2011 order, which (as already explained) held "as a matter of law [that] the CVRA can apply before formal charges are filed." *Does*, 817 F. Supp. 2d at 1343. We reject Ms. Wild's waiver argument. It's true that in the usual case, the government's failure to cross-appeal the district court's adverse 2011 order might well have precluded our review of that decision. *See Greenlaw v. United States*, 554 U.S. 237, 244–45 (2008). This, though, isn't the usual case. Ms. Wild didn't file an "appeal"; rather, as the CVRA requires, she filed a petition for writ of mandamus. *See* 18 U.S.C. § 3771(d)(3); *see also* 16 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3932 (3d ed. 2019) (explaining that a mandamus petition is "an original application to the court of appeals"). The question before us, therefore, isn't whether to affirm or reverse the district court's orders, but rather whether to grant or deny Ms. Wild's mandamus petition—and the government is entitled to raise any argument it likes in support of its position that we should deny. And while the CVRA (as amended in 2015 to resolve a then-existing circuit split) directs us to "apply ordinary standards of appellate review" in deciding the mandamus petition, *see* 18 U.S.C. § 3771(d)(3)—rather than the heightened "clear usurpation of power or abuse of discretion" standard that typically applies in the mandamus context, *In re Loudermilch*, 158 F.3d 1143, 1145 (11th Cir. 1998)—it doesn't direct us to employ the *rules of procedure* that would apply if this were a typical appeal.

19

Victim's Rights Act."  As the district court explained, "because no criminal case

was pending" at the time, Ms. Wild "filed [her] petition as a new matter," which

the court clerk "docketed as a civil action" against the United States.  *Does*, 817 F.

Supp. 2d at 1341 n.4.  A threshold—and we find dispositive—question is whether

the CVRA authorized Ms. Wild to file what was, in essence, a freestanding

lawsuit, before the commencement of (and in the absence of) any preexisting

criminal proceeding.

In determining whether any federal statute empowers a would-be plaintiff to

file suit to vindicate her rights, our lodestar is *Alexander v. Sandoval*, in which the

Supreme Court (reversing an erroneous decision of ours) unequivocally "swor[e]

off" its old "habit of venturing beyond Congress's intent" to liberally "imply"

private rights of action in favor of a rigorous attention to statutory text and

structure.  532 U.S. 275, 287 (2001).  "Like substantive federal law itself," the

Court explained there, "private rights of action to enforce federal law must be

created by Congress."  *Id.* at 286.  Accordingly, the Court emphasized, "[t]he

judicial task" is straightforward:  A reviewing court must "interpret the statute

Congress has passed to determine whether it displays an intent to create not just a

private right *but also a private remedy*."  *Id.* (emphasis added).  In making the

latter determination, the Supreme Court said, "[s]tatutory intent . . . is

determinative."  *Id*.  Absent a clear expression of congressional intent to authorize

20

a would-be plaintiff to sue, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87.  Moreover, a reviewing court may not plumb a statute's supposed purposes and policies in search of the requisite intent to create a cause of action; rather, the inquiry both begins and ends with a careful examination of the statute's language. *Id.* at 288.  Finally—and as it turns out importantly here—the Supreme Court observed that "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id*. at 290.[11]

In the two decades since *Sandoval* was decided, we have faithfully heeded the Supreme Court's directives and have demanded clear evidence of congressional intent as a prerequisite to a private right of action. *See, e.g.*, *Love v. Delta Air Lines*, 310 F.3d 1347, 1358–59 (11th Cir. 2002) (conducting *Sandoval* analysis of Air Carrier Access Act); *see also, e.g.*, *Bellitto v. Snipes*, 935 F.3d 1192, 1202–03 (11th Cir. 2019) (Help America Vote Act); *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1296–97 (11th Cir. 2015) (Indian Gaming

---

[11] Our dissenting colleagues come perilously close to saying that "rights-creating" language is a sufficient basis for recognizing a private right of action. *See* Branch Dissenting Op. at 124–128; Hull Dissenting Op. at 174–75.  That is incorrect, at least under *Sandoval*.  To be sure, such language is a *necessary* condition to a cause of action's existence, but it's not *sufficient*.  To the contrary, as the *Sandoval* Court clarified—and as we have emphasized here in text—"[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create *not just a private right but also a private remedy*."  532 U.S. at 286 (emphasis added).

21

Regulatory Act); *DirecTV, Inc. v. Treworgy*, 373 F.3d 1124, 1129 (11th Cir. 2004) (Wiretap Act); *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 723 (11th Cir. 2002) (Federal Insurance Contributions Act).

So the question here, all must agree, is whether in enacting the CVRA Congress clearly and affirmatively manifested its intent—as reflected in the Act's text and structure—to create a private right of action by which a crime victim can (as Ms. Wild did here) initiate a freestanding lawsuit to enforce her rights before the formal commencement of any criminal proceeding.

## IV

To answer that question, we naturally train our focus on the provisions of the CVRA that prescribe—and circumscribe—judicial involvement and enforcement. Doing so, we find no clear evidence that Congress intended to authorize crime victims to seek judicial enforcement of CVRA rights prior to the commencement of criminal proceedings.

Only two provisions of the Act speak directly to the issue of judicial enforcement—§ 3771(b) and § 3771(d). Neither, we conclude, indicates that CVRA-protected rights are judicially enforceable outside the confines of an existing proceeding, let alone that the Act creates a private right of action to enforce those rights before the commencement of criminal proceedings. And the evidence from the remainder of the CVRA—in particular from § 3771(f), which

22

prescribes and details a mechanism for *administrative* enforcement—confirms our conclusion that Congress didn't clearly manifest its intent to authorize crime victims to file stand-alone civil actions.

**A**

First up is § 3771(b), which is titled "Rights afforded."  To the extent that § 3771(b) bears on the question before us, it strongly indicates that the CVRA does *not* authorize judicial enforcement outside the context of a preexisting proceeding.

Subsection (b)(1) states that "[i]n any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a)."  Separately, subsection (b)(2) states that "[i]n a Federal habeas corpus proceeding arising out of a State conviction"—*i.e.*, a proceeding under 28 U.S.C. § 2254—"the court shall ensure that a crime victim is afforded the rights described in paragraphs (3), (4), (7), and (8) of subsection (a)."

Section 3771(b) is the only provision of the CVRA that expressly directs the judiciary, in particular, to "ensure" that victims' rights are protected, and it contains *no* suggestion that the Act provides for judicial enforcement of crime victims' rights outside the confines of a preexisting "proceeding."  Quite the contrary, subsection (b) indicates that courts' responsibilities to enforce victims' rights (as distinct from the responsibilities of other government actors) arise only in the context of the "proceeding[s]" pending before them.

23

**B**

Far more important to our inquiry is § 3771(d), on which Ms. Wild principally relies. Subsection (d) is titled "Enforcement and limitations," and it prescribes the logistics and limits of judicial enforcement of victims' CVRA rights.

**1**

As evidence that the CVRA creates a private right of action, Ms. Wild points to § 3771(d)(1), which provides, in relevant part, that "[t]he crime victim . . . may assert the rights described in subsection (a)." *See* Oral Arg. at 58:05. But Ms. Wild needs more than just a mechanism for "assert[ing]" her rights in court. Given the manner in which she sought to assert those rights here—again, in what she styled an "Emergency Victim's Petition," which she filed "as a new matter" in the district court, outside the context of any preexisting criminal prosecution, *see Does*, 817 F. Supp. 2d at 1341 n.4—she must demonstrate that the CVRA creates a mechanism for vindicating her rights in a stand-alone civil action.

We hold that subsection (d) does not create a private right of action by which a victim can initiate a freestanding lawsuit, wholly unconnected to any preexisting criminal prosecution and untethered to any proceeding that came before it. That is so for several reasons, which we will examine in detail before turning to Ms. Wild's counterarguments.

24

**2**

Perhaps most compellingly, subsection (d)(3) specifies that a crime victim's vehicle for "assert[ing]" her CVRA rights is a "[m]otion for relief" in the district court and, further, that "[t]he district court shall take up and decide any motion asserting a victim's right forthwith."

"As in all cases involving statutory construction . . . we assume that the legislative purpose is expressed by the ordinary meaning"—not the idiosyncratic meaning—"of the words used." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) (quotation marks and citation omitted). The term "motion" is—and long has been—commonly understood to denote a request filed within the context of a preexisting judicial proceeding. *See, e.g.*, *Motion*, *Black's Law Dictionary* (10th ed. 2014) ("Frequently, *in the progress of litigation*, it is desired to have the court take some action which is incidental to the main proceeding . . . . Such action is invoked by an application usually less formal than the pleadings, and called a motion." (quoting John C. Townes, *Studies in American Elementary Law* 621 (1911) (emphasis added)); *see also* 56 Am. Jur. 2d *Motions, Rules, and Orders* § 1 (2020) ("The term 'motion' generally means an application made to a court or judge to obtain a rule or order directing some act to be done in the applicant's favor *in a pending case*." (footnotes omitted and emphasis added)); 60 C.J.S. *Motions and Orders* § 1 (2020) ("The term 'motion' generally means an application made

25

to a court or judge for the purpose of obtaining a rule or order directing some act to be done in favor of the applicant *in a pending case*.  A motion is a request for relief, usually interlocutory relief, *within a case*." (footnotes omitted and emphasis added)); *Motion (Movant or Move)*, *The Wolters Kluwer Bouvier Law Dictionary: Desk Edition* (Stephen Michael Sheppard, ed., 2012) ("A motion is presented to a court *in a pending action. . . .*" (emphasis added)).

Just as importantly here—if not more so—the term "motion" has *never* been commonly understood to denote a vehicle for initiating a new and freestanding lawsuit.  As one legal encyclopedia summarizes matters:  "The function of a motion *is not to initiate new litigation*, but to bring before the court for ruling some material but incidental matter arising in the progress of the case in which the motion is filed.  *A motion is not an independent right or remedy . . . .*" 56 Am. Jur. 2d, *supra*, § 1 (footnotes omitted and emphasis added).  A new suit is generally commenced through a "complaint," which (per the Federal Rules of Civil Procedure) is a form of "pleading" and thus distinct from a "motion."  *See* Fed. R. Civ. P. 3, 7.  "[A] motion," put simply, "is not a pleading."  *Garner's Dictionary of Legal Usage* 591 (3d ed. 2011).[12]

---

[12] Our dissenting colleagues insist that they have the "common, ordinary" meaning of the word "motion" on their side—so much so, in fact, that they claim to have "dismantle[d]" our "tortured construction" of the term.  *See* Branch Dissenting Op. at 129–130; Hull Dissenting Op. at 177 n.7.  Conspicuously, though, they offer no response to our exhaustive analysis of that word's accepted usage, as confirmed by legal dictionaries and encyclopedias.

The closest that the law seems to have come to using the word "motion" to signify an instrument for initiating a new action is 28 U.S.C. § 2255, which authorizes a federal prisoner to file a "motion" to "vacate, set aside or correct" his criminal sentence.  But § 2255 doesn't truly reflect an understanding of the term "motion" as a means of commencing a stand-alone lawsuit, because—and to be clear, our dissenting colleagues don't dispute any of this—a convicted defendant files his so-called "motion" in "the court which imposed [his] sentence" and, indeed, *in his closed criminal case.*  28 U.S.C. § 2255(a)–(f); *see also* Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 3(b) (stating that once the inmate has filed his motion with the clerk, "[t]he clerk must file the motion and enter it on the criminal docket of the case in which the challenged judgment was entered").  Accordingly, "a motion under § 2255 is a further step in the movant's criminal case and *not a separate civil action.*"  *Id.*, Rule 1 advisory committee's note (emphasis added).  So even a § 2255 "motion" presupposes a preexisting criminal proceeding.[13]

---

[13] We've been pointed to only two other instances, both arising out of the Federal Rules of Criminal Procedure, in which the term "motion" is even arguably used to initiate legal proceedings:  Under Rule 41(g), which establishes the procedures governing searches during investigations, a third party may file a "motion" to enforce her rights before a criminal prosecution is formally commenced; and under Rule 17(c)(2), a witness may file a "motion" to quash a grand-jury subpoena before an indictment is handed down.  Even setting aside the fact that both arise in altogether different contexts, those two examples don't alter our view that the term "motion" has never been *commonly* understood to denote a vehicle for initiating litigation, let alone as the vehicle for initiating a stand-alone civil action of the sort that Ms. Wild seems to

Moreover, it's not just that Ms. Wild's position would require us to give the word "motion" a peculiar meaning, but also (and worse) that it would require us to give that word—not the same word repeated twice in the same sentence or paragraph,[14] but the very same word—two *different* meanings, depending on the circumstances. If (as the statute plainly envisions) a crime victim asserts her rights in the course of a preexisting proceeding, then the term "motion" in § 3771(d)(3) carries its ordinary meaning—*i.e.*, a request for relief made in a pending action. If, by contrast, a victim were to seek to assert her rights before any criminal prosecution has commenced, then the term would take on the specialized, decidedly *un*-ordinary meaning that the legal dictionaries and encyclopedias expressly condemn. We are loathe to ascribe an idiosyncratic meaning to the word "motion," and we are doubly loathe to ascribe such different meanings to the very same word.[15]

---

envision—let alone the sort of *Sandoval*-qualifying clear expression of an intent required to create a private right of action.

[14] *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text . . . ."); *cf. also Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) (rejecting interpretation that would "giv[e] the word 'filed' two different meanings in the same section of the statute").

[15] This case's procedural history provides still further evidence that subsection (d)(3)'s "motion" remedy doesn't authorize a crime victim to file a freestanding civil action, outside the confines of a preexisting proceeding. Although the Act specifies a "motion" as its lone judicial-enforcement mechanism, Ms. Wild filed a document called an "Emergency Victim's Petition" in the district court, and she did so without naming a defendant. No doubt confused, the clerk of the district court docketed Ms. Wild's "Petition" as a civil action against the United States. *See Does*, 817 F. Supp. 2d at 1339–41 & n.4. The obvious problem: Absent a waiver, the United States is immune from suit. If the CVRA was intended to provide a vehicle for initiating a freestanding

Additional context from subsection (d)(3) confirms our ordinary-meaning conclusion that the CVRA's "motion" remedy specifies a means of judicial enforcement within the confines of a preexisting proceeding. The subsection's third sentence begins, "If the district court denies the relief sought, the movant"—note, *not* "the plaintiff"—"may petition the court of appeals for a writ of mandamus." 18 U.S.C. § 3771(d)(3). The subsection then directs the court of appeals (at least in the absence of the sort of agreement the parties reached here) to "take up and decide" the mandamus petition "within 72 hours." *Id.* Importantly here, the provision continues by stating that "[i]n no event shall *proceedings* be stayed or subject to a continuance of more than five days for purposes of enforcing this chapter." *Id*. (emphasis added). That last sentence further demonstrates that Congress envisioned that judicial involvement and enforcement in CVRA matters would occur only in the context of preexisting "proceedings." *Id.*

In sum, Congress has given crime victims a specific means of judicial enforcement, a "motion"—which both plain-meaning and contextual considerations confirm denotes a vehicle for seeking relief within the context of a

---

action against the government, it would have had to waive the United States' sovereign immunity, which, so far as we can tell, it didn't. *See Lane v. Pena*, 518 U.S. 187, 192 (1996) (explaining that a waiver of the United States' sovereign immunity "must be unequivocally expressed in statutory text"); Scalia & Garner, *Reading Law* at 281 ("A statute does not waive sovereign immunity . . . unless that disposition is unequivocally clear.").

preexisting case, not for initiating a freestanding civil action. And as the Supreme Court emphasized in *Sandoval*—and as we will further unpack shortly in examining the CVRA's administrative-enforcement apparatus—"[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." 532 U.S. at 290; *see also, e.g.*, *PCI Gaming Auth.*, 801 F.3d at 1295 (observing that when Congress has expressly created an alternative remedy for enforcing federal rights, "we ought not imply a private right of action" (quotation marks omitted)).

**3**

Subsection (d)(6), which is conspicuously titled "No cause of action," bolsters our view that the CVRA doesn't authorize a crime victim to file a freestanding civil action to assert her rights even before the commencement of— and in the absence of—criminal proceedings.

**a**

Perhaps most starkly, subsection (d)(6)'s first sentence states that "[n]othing in this chapter shall be construed to authorize a cause of action for damages . . . ." Far from a *Sandoval*-qualifying clear statement of congressional intent to create a private right of action, that provision very nearly forecloses one. Of course, one might object—as our dissenting colleagues do—that subsection (d)(6) doesn't expressly rule out a private suit for declaratory or injunctive relief. But under

30

*Sandoval* and its progeny, the question isn't whether Congress "intended to preclude" a private right of action, *see* Branch Dissenting Op. at 141–42, but rather, whether it *intended to provide* one. There is certainly nothing in subsection (d)(6)'s first sentence to suggest that it did.

Contrast, by way of example, 18 U.S.C. § 2255, which expressly creates a "[c]ivil remedy for personal injuries" arising out of particular child-sex crimes. That statute specifies that a minor victim "who suffers personal injury" as a result of a violation of any of various federal criminal statutes can "sue in any appropriate United States District Court" and recover compensatory and punitive damages and, if appropriate, "preliminary and equitable relief," as well as fees and costs. *Id.* § 2255(a). The statute goes on to prescribe a statute of limitations and rules governing service of process. *Id.* § 2255(b), (c). Clearly, Congress knows how to give crime victims a private cause of action when it wants to. Had it intended to do so in the CVRA, it presumably would have enacted some provision that resembles § 2255. It didn't even come close, and its "silence" in that respect "is controlling." *Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1209 (11th Cir. 2009).

**b**

Subsection (d)(6)'s second sentence weighs even more heavily in our calculus: "Nothing in this chapter shall be construed to impair the prosecutorial

31

discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6). To imply a private right of action authorizing a crime victim to file a freestanding lawsuit, even before the commencement of criminal proceedings, we would have to sanction a regime in which a federal court can order a federal prosecutor, presumably on pain of contempt, to conduct her criminal investigation in a particular manner. For reasons we will explain, Ms. Wild's "constru[ction]" of the CVRA would seriously "impair . . . prosecutorial discretion," in direct contravention of the Act's plain terms.

Broadly defined, the term "prosecutorial discretion" refers to the soup-to-nuts entirety of "[a] prosecutor's power to choose from the options available in a criminal case, such as filing charges, prosecuting, not prosecuting, plea-bargaining, and recommending a sentence to the court." *Prosecutorial Discretion*, *Black's Law Dictionary* (10th ed. 2014). The core of prosecutorial discretion, though—its essence—is the decision whether or not to charge an individual with a criminal offense in the first place. The Supreme Court has repeatedly reaffirmed the principle—which dates back centuries—that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United*

*States v. Nixon*, 418 U.S. 683, 693 (1974) (citing *Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1869)).[16]

Ms. Wild's interpretation of the CVRA risks "impair[ing] . . . prosecutorial discretion" in at least two fundamental ways, which we will examine in turn.

**i**

As an initial matter, consider that the *very first* determination that a court must make when asked to enforce the CVRA is whether the party seeking the Act's benefit is a "crime victim." That's because the CVRA's opening provision makes clear that the Act's protections—the rights enumerated therein—are available *only* to "crime victim[s]." 18 U.S.C. § 3771(a) ("A crime victim has the following rights . . . ."). Notably for our purposes, the CVRA defines the term

---

[16] This prosecutorial discretion "flows not from a desire to give carte blanche to law enforcement officials but from recognition of the constitutional principle of separation of powers." *United States v. Ream*, 491 F.2d 1243, 1246 n.2 (5th Cir. 1974). As we said in *Ream*—

> The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.

*Id.* (quoting *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965)); *accord, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("[T]he decision of a prosecutor in the Executive Branch not to indict . . . has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 3)).

"crime victim" to mean "a person directly and proximately harmed as a result of the commission of a Federal offense." *Id.* § 3771(e)(2)(A). Accordingly, any individual asserting rights under the CVRA must, at the very outset, demonstrate to the district court that she is a "crime victim" entitled to statutory protection. And, given the statutory definition's terms, in order to determine whether the individual has made the requisite showing, the court must decide whether a "Federal offense" has occurred. When a prosecutor has already commenced criminal proceedings against an identifiable individual for a specific crime, that prosecutor has made at least a presumptive determination that the individual has in fact committed a "Federal offense." So, as applied in the context of a preexisting criminal proceeding, the "crime victim" determination is straightforward: An individual who has been "directly and proximately harmed" as a result of the conduct charged by the government is entitled to CVRA protection and may assert her rights in court accordingly.

Not so outside the context of a preexisting criminal proceeding. In that circumstance, if an individual were to assert CVRA rights as a "crime victim," the court would first have to determine—but this time without any initial determination by the government in the form of a charging decision and, indeed, presumably while the government's investigation remains ongoing—whether or not a "Federal offense" has been committed. That scenario—which is a necessary

34

consequence of Ms. Wild's interpretation—presents at least three intractable problems.

First, and most obviously, that reading puts the cart before the horse: When else, if ever, is a court called on to decide whether an "offense" (*i.e.*, a crime) has occurred—as opposed to a moral wrong more generally—*before* the government has even decided to press charges? The answer, so far as we are aware, is never. Second, how, in the absence of a charging decision, would the court even go about ascertaining whether an "offense" had occurred? What would that proceeding look like? A mini- (or perhaps not-so-mini-) trial in which the court finds facts and makes legal determinations regarding an "offense" yet to be named? Finally, and in any event, it seems obvious to us that simply by conducting such a proceeding and by concluding (up front) that an "offense" has—or hasn't—occurred, the court would not only exert enormous pressure on the government's charging decisions, but also likely frustrate the government's ongoing investigation. The "impair[ment]" of prosecutorial discretion would be palpable.[17]

---

[17] To be clear, it's no answer to say—as our dissenting colleagues do—that because government prosecutors identified Ms. Wild and others as "crime victim[s]" in the 2007 victim-notification letters, requiring a court to make a "crime victim" determination prior to any charging decision wouldn't pose a problem. *See* Branch Dissenting Op. at 152–53. Needless to say, a prosecutor doesn't "impair [her own] discretion" by sending a victim-notification letter. By contrast, were a federal court to determine before the fact—literally, to prejudge—that a criminal "offense" had (or hadn't) occurred, it would be stepping all over prosecutors' toes. That very real concern is hardly a "red herring[]." *Id*. at 152.

**ii**

Separately, even if the threshold "crime victim" barrier could be overcome, the judicial *enforcement* of CVRA rights in the pre-charge phase would risk unduly impairing prosecutorial discretion. Consider first, as a baseline, how CVRA enforcement ordinarily occurs—post-charge, during the course of an ongoing prosecution. There, a crime victim who believes that government lawyers have violated her rights is quite unlikely to request the sort of extraordinary affirmative injunction that Ms. Wild sought here—a directive "order[ing]" prosecutors to confer with her and treat her fairly. Instead, she will simply ask the court to decline to take some action that prosecutors (or the defendant, or perhaps both) have advocated, on the ground that her statutory rights haven't been respected. So, for instance, a victim complaining that government lawyers set a hearing without properly notifying her, *see* 18 U.S.C. § 3771(a)(2)–(4), will ask the court to delay the hearing. A victim who asserts that prosecutors struck a plea deal without consulting her, *see id*. § 3771(a)(5), will ask the court to reject the agreement. Importantly here, while such requests provide the victim complete relief, they don't meaningfully impinge on post-charge prosecutorial prerogatives because a district court already has near-plenary control over its own docket and substantial discretion over whether to accept or reject a plea deal. Any marginal "impair[ment of] prosecutorial discretion" is therefore negligible.

36

Outside the context of a preexisting criminal proceeding, by contrast, the situation is starkly different, and the intrusion is significantly greater. It is in *that* circumstance, as the facts and procedural history of this case demonstrate, that a victim—there being no hearing to delay or agreement to challenge—will be left to ask the court (as Ms. Wild did here) to "order" prosecutors to confer with her or to treat her "fair[ly]." It is hard to imagine a more significant "impair[ment of] prosecutorial discretion" than a district court's injunction affirmatively ordering government lawyers (presumably on pain of contempt) to conduct their prosecution of a particular matter in a particular manner.

To be clear, even if all that Ms. Wild's interpretation risked was pre-charge judicial intervention in ongoing criminal investigations, the threat it posed to prosecutorial discretion would be reason enough to reject it. Freed from any line limiting judicial enforcement to the post-charge phases of a prosecution, courts would be empowered to issue injunctions requiring consultation with victims (to name just a few examples) before law-enforcement raids, warrant applications, arrests, witness interviews, lineups, and interrogations. Needless to say, that would work an extraordinary expansion of an already-extraordinary statute. But there's even more at stake here. What about the circumstance in which a prosecutor has declined to bring charges because she has determined that no crime was committed? Or, as in this case, where the prosecutor has simply made the decision

37

(right or wrong) that it isn't a wise use of government resources to litigate whether a federal crime occurred because the presumed perpetrator is already slated to serve time in state prison?  Ms. Wild's reading of the CVRA would permit a putative victim to challenge the correctness, in either case, of the prosecutor's no-charge decision in court—effectively appealing the prosecutor's exercise of discretion to a federal district judge.  Judicial review of a prosecutor's decision whether to prosecute is the very quintessence of an "impair[ment of] prosecutorial discretion."[18]

\*     \*     \*

The commencement of criminal proceedings marks a clear and sensible boundary on the prosecutorial-discretion spectrum.  Before charges are filed—when the government is still in the process of investigating and deciding "whether to prosecute"—its authority and discretion are understood to be "exclusive" and "absolute."  *Nixon*, 418 U.S. at 693.  By contrast, once the charging decision is made, the prosecutor steps into the court's jurisdiction—its "house," so to speak—and thus necessarily cedes some of her control of the course and management of

---

[18] Just a brief word in response to our dissenting colleagues' prosecutorial-discretion argument: They seem to say that their interpretation of the CVRA doesn't impair prosecution because § 3771(d)(6) states—as of course it does—that nothing in the Act "'shall be construed to impair prosecutorial discretion of the Attorney General or any officer under his direction.'"  Branch Dissenting Op. at 153–54.  To be clear, though, § 3771(d)(6) is not a panacea against "constru[ctions]" of the Act that, in actual operation, impair prosecutorial discretion—it is a prohibition of such constructions.  Subsection (d)(6), therefore, doesn't save our dissenting colleagues' interpretation, but rather condemns it.

38

the case. From that point forward, the court will "assume a more active role in administering adjudication of a defendant's guilt and determining the appropriate sentence." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 737 (D.C. Cir. 2016). Interpreting the CVRA to authorize judicial enforcement only in the context of a preexisting proceeding—as its terms plainly permit—thus squares with the background expectation of judicial involvement. Reading the Act to provide a private right of action for pre-charge judicial enforcement, by contrast, contravenes the background expectation of executive exclusivity.[19]

## C

The CVRA's final provision—§ 3771(f)—further demonstrates that the Act doesn't create a private right of action authorizing a crime victim to file a freestanding, pre-charge lawsuit to vindicate her statutory rights. In addition to the limited "motion" remedy specified in subsection (d)(3) and discussed already, subsection (f)—titled "Procedures to promote compliance"—mandates the

---

[19] Our dissenting colleagues' assertion that "concern[s] about impairment of prosecutorial discretion appl[y] equally post-indictment" (Branch Dissenting Op. at 153) ignores what we have called the "clear and sensible boundary" that is marked by the formal initiation of criminal proceedings and that Chief Judge Srinivasan astutely recognized for the D.C. Circuit in *Fokker Services*. There is a world of difference between a court insinuating itself into a prosecutor's case before charges are filed and stepping in to "administer[]" the case thereafter. 818 F.3d at 737.

Our dissenting colleagues accuse us of "drawing" our own line between the pre- and post-charge phases—*i.e.*, between detection and investigation, on the one hand, and formal prosecution, on the other. *See* Branch Dissenting Op. at 155; *see also* Hull Dissenting Op. at 177. That is incorrect. We have simply acknowledged—and enforced—the line that the CVRA itself embodies, and recognized that it (perhaps not surprisingly) is a sensible one.

promulgation of regulations to administratively "enforce the rights of crime victims and to ensure compliance by responsible officials" with CVRA rights, and then goes on to require that those regulations include a mechanism for "receiv[ing] and investigat[ing] complaints," for prescribing "training" for non-compliant DOJ employees, and for imposing "disciplinary sanctions" on willful violators. 18 U.S.C. § 3771(f)(1)–(2). As already explained, the Attorney General implemented subsection (f)'s directive by adopting regulations that not only prescribe a detailed administrative "[c]omplaint process" but also require DOJ officials to promptly "investigate" any alleged CVRA violations, "report the results of the investigation" up the chain, and, if violations are found, to impose a "range of disciplinary sanctions." 28 C.F.R. § 45.10(b)–(e). Both the Act and its implementing regulations expressly forbid "judicial review" of any administrative determination. *See* 18 U.S.C. § 3771(f)(2); 28 C.F.R. § 45.10(c)(8).

Congress's decision to direct the establishment of a robust administrative-enforcement scheme severely undermines any suggestion that (without saying so) it intended to authorize crime victims to file stand-alone civil actions in federal court. Our post-*Sandoval* decision in *Love v. Delta Air Lines*, 310 F.3d 1347 (11th Cir. 2002), illustrates that very point, against a remedial backdrop that bears some similarity to the CVRA. There, we held that Congress had not created a private right of action to enforce the prohibition on disability-based discrimination under

40

the Air Carrier Access Act. *Id*. at 1358–59. We reiterated *Sandoval*'s teaching that "[s]tatutory intent" to create a private remedy "is determinative," and we recalled our own earlier observation that "[t]he bar for showing [the required] legislative intent is high." *Id*. at 1352–53 (quotation marks and citations omitted). Most notably for present purposes, we observed (once again echoing *Sandoval*) that if a statute "provides a discernible enforcement mechanism . . . we ought not imply a private right of action because '[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Id*. at 1353.

We emphasized in *Love* that the Air Carriers Access Act embodied its own remedial apparatus, which we described as having two parts. First, the Act created "an elaborate administrative enforcement scheme"—which, among other things, permitted aggrieved individuals to file complaints with the Department of Transportation, required the Department to investigate those complaints, and authorized the Department to impose a range of sanctions. *Id*. at 1354–55, 1358. Second, the Act authorized what we called "a *limited* form of judicial review"—in particular, it permitted "an individual with 'a substantial interest' in a DOT enforcement action [to] petition for review in a United States Court of Appeals." *Id*. at 1356, 1358. That two-track remedial regime, we concluded, "belie[d] any congressional intent" to create a freestanding "private right to sue in a federal

41

district court." *Id.* at 1354. Finding ourselves bound by Congress's intent—as reflected in statutory text and structure—we held that we couldn't "create by implication a private right of action, no matter how socially desirable or otherwise warranted the result may be." *Id.* at 1359–60.

*Love*'s rationale—which, as noted, follows straightaway from *Sandoval*—maps onto this case pretty closely. Just as it did in the Air Carrier Access Act, in the CVRA Congress created both a robust administrative-enforcement regime—complete with "complaints," "investigat[ions]," "decision[s]," and "sanctions"—and a "limited" means of judicial review—namely, subsection (d)(3)'s "motion" remedy. The same conclusion that we reached in *Love* thus likewise follows here: Congress's "express provision of one method of enforcing a substantive rule"—or as in *Love*, *two* methods—"suggests that [it] intended to preclude others." *Love*, 310 F.3d at 1353 (quotations marks omitted) (quoting *Sandoval*, 532 U.S. at 290).

And indeed, as the Supreme Court emphasized in *Sandoval*, "[s]ometimes th[at] suggestion is so strong that it precludes a finding of congressional intent to create a private right of action . . . ." 532 U.S. at 290. Just so here. First, the only form of judicial "relief" that the CVRA expressly references is "a motion to re-open a plea or sentence"—which, it goes without saying, contemplates a preexisting criminal proceeding. 18 U.S.C. § 3771(d)(5). In particular, the Act states that a victim may move to re-open a plea or sentence "only if," among other

things, she "asserted the right to be heard before or *during the proceeding at issue* and such right was denied." *Id.* (emphasis added). In contrast to that remedial mismatch with Ms. Wild's requests, the administrative-enforcement process specifically provides for some of the very forms of relief that Ms. Wild sought here. *See id.* § 3771(f)(2) (requiring administrative-enforcement regulations to provide for "training" and "disciplinary sanctions"); *see also* 28 C.F.R. § 45.10(d)–(e) (providing for same).

Second, and relatedly, Ms. Wild's interpretation—that the CVRA authorizes her to bring a stand-alone civil action—contravenes the Act's clear statement that "there shall be no judicial review of the final decision of the Attorney General by a complainant." 18 U.S.C. § 3771(f)(2)(D); *see also* 28 C.F.R. § 45.10(c)(8) ("A complainant may not seek judicial review of the [Victims' Rights Ombudsman's] determination regarding the complaint."). On Ms. Wild's reading, any victim dissatisfied with the result of her administrative-complaint process could simply file a freestanding suit seeking the same relief, thereby circumventing the Act's prohibition on judicial review of agency determinations.

It is difficult—if not impossible—to reconcile Ms. Wild's freestanding pre-charge suit for judicial enforcement of her CVRA rights with the administrative-enforcement scheme that the Act establishes for addressing alleged violations. That difficulty constitutes still further evidence that Congress hasn't clearly

43

manifested its intent to authorize stand-alone civil actions of the sort that Ms. Wild filed here.[20]

*    *    *

In sum, we find that numerous aspects of the CVRA—among them, subsection (d)(3)'s specification of a "motion" remedy and warning against appellate review unduly delaying ongoing "proceedings," subsection (d)(6)'s "[n]o cause of action" language and prohibition on any construction of the Act that would "impair . . . prosecutorial discretion," and subsection (f)'s establishment of a detailed administrative-enforcement apparatus—preclude any conclusion that the Act reflects a *Sandoval*-qualifying clear expression of congressional intent to authorize a crime victim to file a freestanding civil action.

---

[20] With respect, we think that our dissenting colleagues misunderstand the relevance of the fact that, in addition to its (in-proceeding) "motion" remedy, the CVRA specifies a means of administrative enforcement. They reason backwards from the premises (which may or may not be correct) that "the administrative-enforcement scheme in the CVRA is not available to the victims in this case," and that "Epstein's victims [are thus] completely without a remedy," to the conclusion that a pre-charge cause of action *must* exist. Branch Dissenting Op. at 145, 148. To be sure, that mode of reasoning—if there's no other viable remedy, the courts should fashion one—prevailed in what the Supreme Court in *Sandoval* called the "*ancien regime*." 532 U.S. at 287. But the *Sandoval* Court couldn't have been much clearer that it was "sw[earing] off" its old way of thinking and establishing a new, more rigorous standard: Absent clear "statutory intent" to "create not just a private right but also a private remedy," a "cause of action does not exist and courts may not create one, no matter how desirable that might be as a matter of policy matter, or how compatible with the statute." *Id*. at 286–87. The point for present purposes is that in the *Sandoval* era the significance of an administrative apparatus is that it "suggests that Congress intended to preclude other" means of enforcement. *Id*. at 290.

44

**D**

Against all this, Ms. Wild relies on two provisions of the CVRA that, she insists, authorize her to seek pre-charge judicial enforcement of her statutory rights. Neither, we conclude, clearly demonstrates Congress's intent to create a private right of action.

**1**

First, and most prominently, Ms. Wild points to a single sentence—or, more precisely, a single comma phrase—in § 3771(d)(3), which she calls the Act's "venue" provision: "The rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, *if no prosecution is underway*, in the district court in the district in which the crime occurred." Basically, Ms. Wild's contention—which the district court adopted—is that the "no prosecution is underway" clause *must* mean that CVRA rights can be enforced in court before the commencement of criminal proceedings and, therefore, that subsection (d)(3)'s "motion" remedy *must* constitute a *Sandoval*-qualifying expression of clear congressional intent to create a private right of action that would authorize a stand-alone pre-charge civil action. We respectfully disagree. Subsection (d)(3) could just as easily—and far more sensibly, given the statutory context and the practical and constitutional problems that Ms. Wild's

interpretation would entail—be understood to refer to the period after a "prosecution" has run its course and resulted in a final judgment of conviction.

Ms. Wild and the district court read the "no prosecution is underway" clause to say, in effect, "no prosecution is [*yet*] underway"—thereby necessarily pointing to the period before the prosecution's commencement. But subsection (d)(3) is temporally agnostic—on its face, it could well mean that "no prosecution is [*still*] underway." *Cf. Underway,* Oxford English Dictionary, https://oed.com (last visited Jan. 8, 2021) (defining "underway" as it pertains to "a process, project, [or] activity" to mean "set in progress; in the course of happening or being carried out"); *Under way*, Merriam-Webster's Collegiate Dictionary 1365 (11th ed. 2014) (defining "under way" to mean "in progress: AFOOT"). So understood, the CVRA would sensibly permit a victim to file a *post*-prosecution motion alleging that the government violated her rights during the course of the prosecution and asking the court, for instance, to "re-open a plea or sentence." 18 U.S.C. § 3771(d)(5).[21]

---

[21] Ms. Wild objects that it would be odd, under the "no prosecution is underway" clause, to require a victim to file a post-prosecution CVRA motion in the "district in which the crime occurred" *rather than* the "district court in which the defendant is being prosecuted." But any supposed oddity is alleviated by the fact that under the Sixth Amendment, those two districts will almost always be the same: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI; *see also* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.").

**2**

Second, and separately, Ms. Wild points to § 3771(c)(1)— the so-called "coverage" provision—which states that "[o]fficers and employees of the Department of Justice and other departments and agencies of the United States engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a)." From the premise that the CVRA applies to "federal

---

We should note that there is still another way of understanding § 3771(d)(3)'s "no prosecution is underway" clause. That clause could be read to apply to the period of time between the initiation of criminal proceedings—which may occur as early as the filing of a criminal complaint under Federal Rule of Criminal Procedure 3—and the levying of formal charges in an indictment. The word "prosecution"—on which subsection (d)(3) pivots—is a legal term of art; in relevant part, it refers to "[t]he institution and continuance of a criminal suit [and] the process of exhibiting formal charges against an offender before a legal tribunal, and pursuing them to final judgment on behalf of the state or government, as by indictment or information." *Prosecution*, *Webster's New International Dictionary* (2d ed. 1944). Moreover, the law is clear, at least for Sixth Amendment right-to-counsel purposes, that a "prosecution" does *not* begin with the criminal complaint's filing. *See United States v. Langley*, 848 F.2d 152, 153 (11th Cir. 1988) (explaining that, with respect to a defendant's Sixth Amendment right to counsel, prosecution begins "only after the government initiates adversarial judicial proceedings," not with "[t]he mere filing of a complaint"); *see also, e.g.*, *United States v. States*, 652 F.3d 734, 741–42 (7th Cir. 2011) (same); *United States v. Boskic*, 545 F.3d 69, 82–84 (1st Cir. 2008) (same); *United States v. Alvarado*, 440 F.3d 191, 199–200 (4th Cir. 2006) (same). Rather, the Sixth Amendment right doesn't attach—because a "prosecution" doesn't begin—until, at the earliest, a suspect's "initial appearance before a judicial officer." *Rothgery v. Gillespie County*, 554 U.S. 191, 199 (2008). All of which is to say that even if Ms. Wild and the district court were correct that the "no prosecution is underway" clause meant that CVRA rights apply—and that a freestanding lawsuit may be initiated—before formal charges are filed, they may yet be incorrect that those rights can be judicially enforced during a pre-complaint investigation. Subsection (d)(3) can be read sensibly enough to apply (and to give victims a judicially enforceable right, for example, to "confer" with prosecutors, § 3771(a)(5)) between the filing of the criminal complaint and the suspect's initial appearance before a judge. That would, for instance, allow victims to express their views to prosecutors about whether the defendant should be granted pretrial release. *See* Fed. R. Crim. P. 5(d)(1)(C) (noting that pretrial-release decisions are made at the "initial appearance").

47

officers 'engaged in the detection, investigation, or prosecution of crime'"—with an emphasis on the provision's "detection" and "investigation" components—Ms. Wild reasons to the conclusion that "the Act protects victims before charges are filed."  En Banc Reply Br. of Petitioner at 21.

Ms. Wild's reliance on subsection (c)(1) is misplaced for three reasons. First, and most obviously, that provision doesn't speak to judicial enforcement at all.  Rather, unlike subsections (b) and (d), which address courts' responsibilities under the Act, subsection (c)(1) address *non*-judicial actors, requiring them to "make their best efforts" to ensure that crime victims' rights are respected. Accordingly, whatever § 3771(c)(1) may say about when CVRA rights attach, in the abstract—an issue that we have said we needn't decide—it can't provide the basis for discerning a private right of action to seek pre-charge judicial enforcement of those rights.

Second, and in any event, understood in proper context, it is clear to us that § 3771(c)(1) is a "to whom" provision, not a "when" provision.  That is, it merely clarifies that CVRA obligations extend beyond the officers and employees of "the Department of Justice" to include, as well, the officers and employees of "other departments and agencies of the United States" that (like DOJ) are "engaged in the detection, investigation, or prosecution of crime"—*e.g.*, IRS, ICE, and TSA. Those agencies' employees, like DOJ's, must "make their best efforts to see that

48

crime victims" are afforded CVRA rights. If subsection (c)(1) were intended to be a "when" provision, then the phrase "in the detection, investigation, or prosecution of crime" presumably would have been situated differently in the provision, such that the full sentence would read: "Officers and employees of the Department of Justice and other departments and agencies of the United States ~~engaged in the detection, investigation, or prosecution of crime~~ shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a) <u>in the detection, investigation, or prosecution of crime</u>."[22]

Finally, Ms. Wild's reliance on § 3771(c)(1) proves entirely too much. If, as Ms. Wild thinks subsection (c)(1) shows, CVRA rights are subject to judicial enforcement during the "detection" and "investigation" of crime, then there is no

---

[22] Ms. Wild contends that this interpretation of § 3771(c)(1) can't explain "why Congress found it necessary to break out three separate phases of the criminal justice process: the 'detection,' 'investigation,' and 'prosecution' of crime." En Banc Br. of Petitioner at 21–22. If, she argues, Congress's intent was simply to cover federal agents during the post-charging phase of a case, it could have simply omitted the words "detection" and "investigation" from the Act, because any agent "who is in some way connected to the 'prosecution'—and, thus, in some way connected to crime victims—is already covered by the CVRA's language applying the Act to agencies engaged in 'prosecution.'" *Id.* at 22. Thus, she says, our interpretation impermissibly renders the terms "detection" and "investigation" meaningless. *Id.*; s*ee also* Paul G. Cassell et al., *Crime Victims' Rights During Criminal Investigations? Applying the Crime Victims' Rights Act Before Criminal Charges Are Filed*, 104 J. Crim. L. & Criminology 59, 87 (2014). We don't think so. We read subsection (c)(1) not as "break[ing] out" three different phases, but rather as attempting to broadly cover all necessary government-employee participants—in short, to ensure that the Act's protection extends beyond prosecutors. "Doublets and triplets abound in legalese," especially given that Congress often uses a "belt-and-suspenders" approach when drafting statutes. *See* Scalia & Garner, *Reading Law* at 176–77 (cautioning that the surplusage canon must be applied "with careful regard to context" and that "a court may well prefer ordinary meaning to an unusual meaning that will avoid surplusage").

meaningful basis—at least no meaningful *textual* basis—for limiting the Act's pre-charge application. To the contrary, Ms. Wild's reading of the term "investigation" in subsection (c)(1) would—as already noted—require law-enforcement officers to "confer" with victims, subject only to a squishy "reasonable[ness]" limitation, *see* § 3771(a)(5), before conducting a raid, seeking a warrant, making an arrest, interviewing a witness, convening a lineup, or conducting an interrogation. Moreover, every cop on the beat is involved in crime "detection"—even before any crime is committed. Of course, there can't be a "crime victim" until a crime occurs, so the inclusion of "detection" in the coverage provision just further demonstrates the misfit here. In other words, Ms. Wild's reading of "detection"—which would apply even before a crime's commission—renders the clause not just unreasonably extreme but also incoherent. Absent a much clearer indication, we cannot assume that Congress intended such a jarring result.

Presumably sensing the slipperiness of her position—which is inherent in her reliance on both § 3771(d)(3)'s "venue" provision and § 3771(c)'s "coverage" provision—Ms. Wild understandably seeks to draw a line that would capture this case only, without risking a landslide: "At least," she says, "in circumstances where a case has matured to the point where an investigation has been completed, federal charges have been drafted, and prosecutors and defense attorneys are

engaging in negotiations about disposition of those charges, prosecutors must confer with the victims as well." En Banc Br. of Petitioner at 33. That is a line, to be sure—and a line that happens to include this case—but it has no footing in the text of the provisions that she invokes for support. We cannot re-write, or arbitrarily circumscribe, the CVRA's text simply to accommodate a particular result.

*    *    *

Even giving Ms. Wild's "venue"- and "coverage"-provision arguments every benefit of every doubt, we don't see in either a *Sandoval*-qualifying clear expression of congressional intent to authorize a freestanding private right of action to enforce CVRA rights before the commencement of criminal proceedings. To the contrary, we find that the textual and structural evidence overwhelmingly demonstrates that the CVRA provides a mechanism for judicial enforcement only in the context of a preexisting proceeding. To the extent that the Act's language and structure leave any doubt about its proper scope, we presume that Congress "acted against the backdrop of long-settled understandings about the independence of the Executive with regard to charging decisions." *Fokker Servs.*, 818 F.3d at 738. Had Congress intended to upend (rather than reinforce) those "long-settled understandings" by authorizing a crime victim to file a pre-charge suit seeking to enjoin prosecutors to conduct their investigation in a particular manner, we can

51

only assume it would have expressed itself more clearly. *See, e.g., Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1947 (2016) ("Congress 'does not, one might say, hide elephants in mouseholes.'" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001))).

## V

For the foregoing reasons, we hold that the CVRA does not provide a private right of action authorizing crime victims to seek judicial enforcement of CVRA rights outside the confines of a preexisting proceeding. We have searched the Act's language and structure, and we simply cannot discern a clear expression of congressional intent to authorize the sort of stand-alone civil action that Ms. Wild filed here.

We are aware, of course, that many will misunderstand today's decision. To be clear, the question before us is not whether Jeffrey Epstein was a bad man. By all accounts, he was. Nor is the question before us whether, as a matter of best practices, prosecutors *should* have consulted with Ms. Wild (and other victims) before negotiating and executing Epstein's NPA. By all accounts—including the government's own—they should have. Our sole charge is to determine, on the facts before us, whether the CVRA provides Ms. Wild with a private right of action to enforce her rights outside of the context of a preexisting criminal proceeding. Despite our sympathy for Ms. Wild—and the courage that she has

shown in pursuing this litigation—we find ourselves constrained to hold that it

does not.

**PETITION DENIED.**

WILLIAM PRYOR, Chief Judge, joined by NEWSOM, LAGOA, and TJOFLAT, Circuit Judges, concurring:

I join the majority's opinion in full. I write separately to respond to three fundamental errors in the dissenting opinions. First, by urging us to decide an issue that does not affect the outcome of this mandamus petition, our dissenting colleagues have forgotten that we do not issue advisory opinions. Second, the dissents commit the most common error of statutory interpretation by reading individual subsections in isolation instead of reading the whole text of the statute. Finally, the dissents misunderstand what it means to interpret statutes with a presumption against implied rights of action. I address each mistake in turn.

### A. Federal Courts Lack the Power to Issue Advisory Opinions.

When we ordered rehearing en banc, we asked the parties to answer two questions in their briefs. First, does the Crime Victim Rights' Act, 18 U.S.C. § 3771, "grant[] a crime victim any statutory rights that apply before the filing of a formal criminal charge by the government prosecutor?" And second, "[i]f a crime victim has statutory rights under the [Act] that apply pre-charge, does the [Act] also grant a crime victim a statutory remedy to enforce a violation of their statutory rights?"

The majority opinion sensibly collapses these two questions into one: does the Act grant a crime victim the right "to file a freestanding civil suit seeking judicial enforcement of her rights under the [Act] in the absence of any underlying

54

proceeding"? Maj. Op. at 13–14. It explains that we need not decide whether the Act confers rights that attach before the commencement of criminal proceedings and that might be enforceable through non-judicial channels. *Id.* at 13. That determination would have no bearing on the outcome of this petition.

The dissents take issue with this approach and accuse us of "blithely" skipping over the first issue. Hull Dissenting Op. at 157; *see also* Branch Dissenting Op. at 111 ("This issue, which was the basis of the prior panel's decision, is an important legal question of first impression in our Circuit. Nevertheless, the Majority declines to address it in its *en banc* decision."). One of our dissenting colleagues is candid about her motivations. She urges us to answer the first question because of the "victims' perseverance in litigating the rights issue for a decade and obtaining en banc review of the rights issue," "the seriousness of the federal sex-trafficking crimes against petitioner Wild and the other 30-plus minor victims," "the government's egregious misconduct," and "the fact that if the Epstein victims' . . . rights attached pre-charge, the government's misconduct undisputedly violated them." *Id.* at 159–60. Conspicuously, the dissenters do not assert that answering the first question would change how we resolve the underlying case or controversy.

There is a well-known term for judicial opinions that interpret laws without resolving cases or controversies: advisory opinions. The federal judicial power is

55

limited to resolving actual "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "No principle is more fundamental to the judiciary's proper role in our system of government than [this] constitutional limitation[.]" *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976). The prohibition against advisory opinions is "the oldest and most consistent thread in the federal law of justiciability." *Flast v. Cohen*, 392 U.S. 83, 96 (1968) (internal quotation marks omitted). Today, it is "taken for granted" as "an uncontroversial and central element of our understanding of federal judicial power." Richard H. Fallon, Jr. et al., *Hart and Wechsler's The Federal Courts and the Federal System* 50 (7th ed. 2015).

The rule that federal courts do not issue advisory opinions can be traced back to the Founding era. In 1793, after Secretary of State Thomas Jefferson sent the Supreme Court questions about the rights and obligations of the United States to remain neutral toward the warring nations of Europe, the Court made clear that the Constitution prohibited it from advising the Executive Branch. 3 *Correspondence and Public Papers of John Jay* 486–89 (Henry P. Johnston ed. 1891). As the Justices explained in a letter to President George Washington, "the lines of separation drawn by the Constitution between the three departments of the government . . . and our being judges of a court in the last resort[] are

considerations which afford strong arguments against the propriety of our extra-judicially deciding the questions alluded to." *Id.* at 488.

The prohibition against issuing advisory opinions also runs through our caselaw all the way back to *Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792). A federal statute authorized courts to determine disability pensions for Revolutionary War veterans. *Mistretta v. United States*, 488 U.S. 361, 402 (1989) (describing *Hayburn's Case*). These determinations were subject to review by the Secretary of War. *Id.* The Supreme Court was presented with a mandamus petition asking it to order a federal circuit court to consider a pension request. *Hayburn's Case*, 2 U.S. (2 Dall.) at 409. It decided not to take up the petition until the next term. *Id.* By then, Congress had amended the statute and rendered the controversy moot. *Id.* at 409–10. Although the Supreme Court never issued an opinion, five justices considered the statute while riding circuit, and the Supreme Court reporter included their opinions in a footnote. *Id.* at 410 n.†. All agreed that requiring a federal court to issue nonbinding opinions advising the Executive on how to perform its duties breached the separation of powers inherent in the constitutional structure. *Id.* The circuit court for the district of North Carolina, which included Justice James Iredell, doubted "the propriety of giving an opinion in a case which has not yet come regularly and judicially before" it. *Id.* at 414 n.†. "None can be more sensible," the court wrote, "than we are of the necessity of judges being in

general extremely cautious in not intimating an opinion in any case extra-judicially[.]" *Id.*

Like the pension recommendations that federal courts were asked to provide in *Hayburn's Case*, the dissents would have us advise the Executive Branch about what rights it must provide a crime victim going through political or administrative channels before the commencement of criminal proceedings. In other words, they would have us issue an advisory opinion about the powers and duties of the Executive. Although the dissents may disagree with our more modest approach to resolving this mandamus petition, there is nothing "blithe" about refraining from extra-judicial pronouncements and respecting our limited role under the Constitution.

The dissents respond to a strawman version of this concern by turning it into a jurisdictional issue. Hull Dissenting Op. at 160–64. Lest there be any confusion, I acknowledge that we have jurisdiction to decide whether the Act confers pre-charge rights, just as the original panel did. But because the majority opinion correctly decides that the Act does not confer any judicially enforceable rights before the commencement of criminal proceedings, nothing that we could say about pre-charge rights that might be enforceable through non-judicial channels would change the outcome of this petition.

The dissents counter that we could resolve the first question as an alternative holding. *Id.* at 162–64. But our answer to the first question would be an alternative holding only if we rejected the dissents' interpretation of the Act and concluded that the Act does not confer any pre-charge rights, judicially enforceable or otherwise. If, on the other hand, we were to agree with the dissents and say that the Act does confer pre-charge rights, those rights would not be judicially enforceable and our resolution of this petition for a writ of mandamus would not change. Moreover, our opinion about pre-charge rights would not be binding on the Executive in the same way that the opinions about pension requests were not binding in *Hayburn's Case*.

### B. We Construe Statutes by Reading the Whole Text, Not Individual Subsections in Isolation.

The dissents repeatedly assert that their interpretation of the Act follows from the "plain and unambiguous meaning" of subsections (a)(5), (a)(8), and (d)(3). Branch Dissenting Op. at 114, 154 (internal quotation marks omitted). They accuse us of "do[ing] violence to the statutory text" by "drawing a line limiting judicial enforcement to the post-charge phases of a prosecution." *Id.* at 155 (internal quotation marks omitted). Our role as judges, they remind us, is to interpret and follow the law regardless of the outcome. *Id.* (citing *Bostock v. Clayton County*, 140 S. Ct. 1731, 1823 (2020) (Kavanaugh, J., dissenting)).

Our dissenting colleagues' professed commitment to textualism is laudable. But it is one thing to recite the canons of statutory interpretation, and it is an entirely different matter to apply them correctly. *See Bostock*, 140 S. Ct. at 1755–56 (Alito, J., dissenting) ("The Court's opinion is like a pirate ship. It sails under a textualist flag, but what it actually represents is a theory of statutory interpretation that Justice Scalia excoriated . . . .").

The dissents commit a basic error of statutory interpretation by reading subsections (a)(5), (a)(8), and (d)(3) in isolation without looking to the rest of the Act. "Statutory construction . . . is a holistic endeavor." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 18 (1981) (internal quotation marks omitted). "Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167 (2012). And although the dissents cite the whole-text canon, Branch Dissenting Op. at 114, they fail to apply it in their analysis.

60

The dissents' error manifests itself in several ways. Take, for example, the dissents' focus on subsection (a), which provides a list of crime victims' rights. 18 U.S.C. § 3771(a). Most of these rights make sense only in the context of ongoing criminal proceedings, which supports the majority's view that crime victims cannot seek judicial enforcement of these rights until after criminal charges are filed. The dissents point out that two of these rights, read in isolation from the rest of the statute, could apply before the filing of criminal charges: "[t]he reasonable right to confer" with the government attorney and "[t]he right to be treated with fairness and with respect." *Id.* § 3771(a)(5), (a)(8). But the dissents fail to account for other provisions of the Act that make clear that the rights in subsection (a) can be asserted only in the context of ongoing criminal proceedings. The paragraph immediately after the list of crime victims' rights provides that a "court shall ensure that the crime victim is afforded the rights described in subsection (a)" "[i]n any *court proceeding* involving an offense against a crime victim." *Id.* § 3771(b)(1) (emphasis added). And the Act later provides that a crime victim may assert his or her rights in subsection (a) by filing a "motion" "in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred." *Id.* § 3771(d)(3).

The dissents' answer to the problems posed by these provisions is to interpret the word "motion" in subsection (d)(3) as establishing a cause of action to launch a freestanding civil action. But the dissents do not dispute that the Act allows a crime victim to move the district court to assert his or her rights in an ongoing criminal proceeding. So the dissents have to interpret the word "motion" to mean two different things at the same time. In the context of an ongoing criminal proceeding, the dissents agree that a motion is an ordinary filing with the district court. But in the absence of a criminal proceeding, the dissents contend that the "motion" serves as a complaint that commences a civil action against the government. Subsection (d)(3) also provides that "[i]f the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus." *Id.* Under the dissents' interpretation, a "movant" again means either one of two different things: the victim in a criminal proceeding or the plaintiff in a civil action. To further complicate matters, the Act uses the word "motion" again only two paragraphs later but with only one possible meaning. Subsection (d)(5) provides that "[a] victim may make a motion to re-open a plea or sentence," which makes sense only in the context of a criminal proceeding. *Id.* § 3771(d)(5). So the dissents treat the word "motion" as if it is a linguistic chameleon that changes its meaning in different circumstances to serve whatever purpose they favor, but we presume "that identical words used in different parts of the same act are intended

to have the same meaning." Scalia & Garner, *Reading Law* § 25, at 170 (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). The dissents have no explanation for their incongruous reading of the whole statute.

The dissents' interpretation of "motion" in subsection (d)(3) as sometimes creating a civil cause of action is also difficult to reconcile with subsection (d)(6), which is titled "No cause of action." 18 U.S.C. § 3771(d)(6). To be sure, the first sentence in subsection (d)(6) refers to a cause of action for damages only, which could leave open the possibility of declaratory or injunctive relief. But the second sentence provides, "Nothing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." *Id.* And as Judge Tjoflat meticulously explains in his concurring opinion, allowing an individual to initiate a freestanding civil action seeking declaratory or injunctive relief under the Act in the absence of an ongoing criminal proceeding would unquestionably impair prosecutorial discretion. Tjoflat Concurring Op. at 84–96.

Finally, the dissents have no answer to the majority's point that the United States has not clearly waived sovereign immunity. Maj. Op. at 28 n.15. As a leading treatise explains, "A statute does not waive sovereign immunity . . . unless that disposition is unequivocally clear." Scalia & Garner, *Reading Law* § 46, at 281. No provision of the Act plausibly, much less unequivocally, suggests that the

63

United States has consented to be sued in a civil action by a crime victim seeking to enforce his or her rights under the Act.

By failing to read the whole text of the Act, the dissents commit a common error of statutory interpretation. When read in the context of the entire statute, their interpretation of subsections (a)(5), (a)(8), and (d)(3) is implausible.

### C. Statutes Are Interpreted with a Presumption Against Implied Rights of Action.

The dissents expend significant time and energy asserting that the majority opinion is wrong that *Alexander v. Sandoval*, 532 U.S. 275 (2001), counsels against finding an implied cause of action in the Act. My colleagues may recall that our Court was reversed in *Sandoval*. I fear that the lesson of that reversal still has not been learned by some.

We interpret statutes with a presumption against, not in favor of, the existence of an implied right of action. Scalia & Garner, *Reading Law* § 51, at 313. The Supreme Court made this principle clear in *Sandoval* when it said that it had "sworn off the habit of venturing beyond Congress's intent" by discovering implied rights of action in statutory texts. 532 U.S. at 287. If a statute passed by Congress does not "display[] an intent to create not just a private right but also a private remedy," then "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87. Moreover, if the "statutory structure provides a

discernible enforcement mechanism, *Sandoval* teaches that we ought not imply a private right of action because 'the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Love v. Delta Air Lines*, 310 F.3d 1347, 1353 (11th Cir. 2002) (alteration adopted) (quoting *Sandoval*, 532 U.S. at 290).

The dissents' criticisms of the majority opinion's application of *Sandoval* to the Act are puzzling. They spend 11 and 10 pages, respectively, explaining *Sandoval* in detail and arguing that the majority has misapplied it. Branch Dissenting Op. at 122–27, 142–46; Hull Dissenting Op. at 169–78. But they also contend that the Act expressly grants a private right of action. Branch Dissenting Op. at 121; Hull Dissenting Op. at 170, 176. If the Act expressly granted a private right of action, then *Sandoval* would be beside the point.

In addition to this schizophrenic line of attack, the dissents also misunderstand *Sandoval*. They contend that the Crime Victims' Rights Act is distinguishable from the statute at issue in *Sandoval* because it has "rights-creating language" and is addressed to crime victims instead of government agencies. Hull Dissenting Op. at 176 (internal quotation marks omitted). Never mind that the Act expressly provides for an administrative-enforcement mechanism by requiring the government to promulgate regulations for "receiv[ing] and investigat[ing] complaints" from crime victims and for "training" and "disciplin[ing]" government

65

employees. 18 U.S.C. § 3771(f)(1), (f)(2)(A)–(C). That fact alone should defeat the possibility of a pre-charge private right of action.

The dissents also wrongly assume that the Act's supposedly "rights-creating language" is concrete enough to be judicially enforceable. Hull Dissenting Op. at 173 (internal quotation marks omitted). The Supreme Court long ago explained that Congress sometimes uses language that is "intended to be hortatory, not mandatory." *Pennhurst*, 451 U.S. at 24. "A particular statutory provision, for example, may be so manifestly precatory that it could not fairly be read to impose a binding obligation on a governmental unit, or its terms may be so vague and amorphous that determining whether a deprivation might have occurred would strain judicial competence." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (alteration adopted) (citation and internal quotation marks omitted). Terms like "reasonable" and "sufficient," absent any statutory guidance as to how they are to be measured, are "far too tenuous to support the notion that Congress" meant to confer judicially enforceable rights on individuals. *Blessing v. Freestone*, 520 U.S. 329, 345 (1997); *see also Suter v. Artist M.*, 503 U.S. 347, 359–60 (1992). We expect Congress to "speak with a clear voice[] and [to] manifest[] an unambiguous intent to confer individual rights." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002) (alteration rejected) (internal quotation marks omitted).

66

"The reasonable right to confer with" a government attorney and "[t]he right to be treated with fairness and with respect" do not provide the kind of administrable language that the Supreme Court has said—time and again—is required of judicially enforceable rights. 18 U.S.C. § 3771(a)(5), (a)(8). It is one thing to say that these vague "rights" are enforceable in the context of a pending criminal action where the crime victim already has far more specific rights, such as protection from the accused, *id.* § 3771(a)(1), accurate and timely notice of court proceedings, *id.* § 3771(a)(2), the opportunity to be heard, *id.* § 3771(a)(4), and restitution, *id.* § 3771(a)(6). But it is implausible that the Act creates judicially enforceable "rights" to confer reasonably and to be treated with fairness and respect in a standalone civil suit.

\*     \*     \*

One final point merits a response. The dissents remind us that "our role as judges is to interpret and follow the law as written, regardless of whether we like the result." Branch Dissenting Op. at 155 (alteration rejected) (quoting *Bostock*, 140 S. Ct. at 1823 (Kavanaugh, J., dissenting)). Respectfully, readers of today's opinions can judge for themselves who is faithfully interpreting the Act and who, if anyone, is allowing their policy preferences to influence their judgment.

67

NEWSOM, Circuit Judge, concurring:

When I authored the now-vacated panel opinion denying Ms. Wild's mandamus petition, I expressed my "sincere[] regret" that the decision had left her "largely emptyhanded." *In re Wild*, 955 F.3d 1196, 1220 (11th Cir. 2020), *reh'g en banc granted, opinion vacated*, 967 F.3d 1285 (11th Cir. 2020). Even as the en banc Court vindicates and reaffirms that decision today, I am filled with the same sense of sorrow. As our opinion summarizes, Ms. Wild "suffered unspeakable horror" at the hands of Jeffrey Epstein, one of this era's most infamous child predators. Maj. Op. at 2. Then, adding insult to an already grievous injury, government prosecutors (by their own admission) affirmatively misled Ms. Wild—and dozens of others like her—regarding the status of their criminal investigation. Shameful all the way around. The whole thing makes me sick.

But—and it's a big "but"—my job, as a judge, isn't to dispense "justice," in the abstract, as I see fit. My role in our tripartite form of government is, as relevant here, to faithfully interpret and apply the laws that Congress has passed in accordance with the precedents that the Supreme Court has established. Sometimes I'll like the results; sometimes I won't. But adherence to the rule of law requires a certain outcome-blindness—or at least outcome-agnosticism. That constraint—that fact of being bound by rules that others have made—is what separates judges from elected politicians in our constitutional system. On days like

this—when my heart breaks for one of the parties before me—it's also what makes being a judge particularly tough.

So, about today's decision, I'll simply say the same thing I said last go-round: "It's not a result [I] like, but it's the result [I] think the law requires." *In re Wild*, 955 F.3d at 1198. And my obligation—my oath—is to the law.

TJOFLAT, Circuit Judge, with whom WILLIAM PRYOR, Chief Judge, and WILSON, NEWSOM, and LAGOA, Circuit Judges, join, concurring:

I concur wholeheartedly in the majority's opinion. I write separately to elaborate on the untoward effects a pre-charge CVRA model would have on the fairness of our courts and on the separation of powers. My concurrence proceeds in three parts. First, I will outline the litigation models Judge Branch's dissent[1] and the majority propose: one conferring judicially enforceable rights to crime victims pre-charge, and one conferring such rights to crime victims post-charge. Then, I will identify two fairness concerns the dissent's pre-charge model would raise. Finally, to bring us home, I will expand on the majority's discussion of the separation of powers doctrine and elaborate on why a pre-charge CVRA model would impermissibly drag federal courts into the business of prosecution. By laying these problems out in simple terms, my hope is that readers of today's decision will understand precisely why we are compelled to deny Ms. Wild's petition.

## I.

To orient the reader, I will begin with a brief overview of the pre- and post-charge CVRA litigation models.

---

[1] Although I recognize that more than one dissenting opinion was written in this case, because multiple judges concurred in Judge Branch's opinion, I will refer to her dissent as "the dissent" throughout my concurrence.

A.

Let's start with the dissent's pre-charge model.[2]  For now, I will keep the analysis high-level, as I will walk through the problems with this model in detail in parts II and III.

If a victim's CVRA rights are judicially enforceable pre-charge, then any pre-charge efforts to vindicate those rights must begin, as the majority opinion explains, with a freestanding civil lawsuit against the United States Attorney[3] for the district in which the alleged crime was committed.  In his civil complaint, the victim would need to allege that there is probable cause to believe that a specific person—for shorthand, "the accused"—committed a specific federal crime, and that the victim is indeed a "crime victim" as defined by 18 U.S.C. § 3771(e)(2).[4]

---

[2] It is worth noting at the outset that I believe the pre-charge model would likely be used most frequently in complex cases—think wire fraud, financial fraud, etc.  There is little need for CVRA enforcement of a victim's rights in a one-on-one crime, as the victim will almost certainly have been contacted by federal investigators to assist in investigating the offense.  Indeed, it is likely that the attorney for the federal government would also be in contact with the victim prior to filing a criminal complaint or seeking an indictment, as the victim would presumably be a key trial witness.

[3] I refer to the United States Attorney here and throughout this concurrence for ease of analysis.  Of course, in the typical case, the victim would sue the specific attorney—typically an Assistant United States Attorney—in charge of the criminal investigation.

However, it is worth noting that, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475, 114 S. Ct. 996, 1000 (1994).  This presents an additional hurdle for the dissent's model, but because the Majority already ably discusses the sovereign immunity issue, Maj. Op. at 28–29 n.15, I will assume it is not a barrier to the victim's civil suit for the sake of analysis.

[4] That provision states: "The term 'crime victim' means a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia."  18 U.S.C. § 3771(e)(2)(A).

The complaint would also seek some relief, presumably an injunctive order requiring the United States Attorney to honor the victim's rights under 18 U.S.C. § 3771(a)(5)—the "reasonable right to confer"—and (a)(8)—the "right to be treated with fairness and with respect."

In response, the United States Attorney would file an answer[5] to the complaint. It stands to reason that, in the answer, the United States Attorney would prefer a general denial—pursuant to Federal Rule of Civil Procedure 8(b)(3)—to avoid revealing any specific information that could jeopardize an ongoing federal investigation. Any attempt to keep the investigation under wraps, however, would likely be thwarted by the victim's requests for discovery of information from the investigation that is relevant to the CVRA claim— specifically the issue of probable cause. *See, e.g.*, *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1546 (11th Cir. 1985) ("The law's basic presumption is that the public is entitled to every person's evidence. The Federal Rules of Civil Procedure strongly favor full discovery whenever possible." (citations omitted)). Indeed, it is entirely possible that the crime victim's civil discovery would eventually subject the federal investigators to depositions.

---

[5] The crime victim's complaint and the United States Attorney's answer—along with any accompanying discovery—would presumptively be accessible by the public, *see Wilson v. Am. Motors Corp.*, 759 F.2d 1568, 1571 (11th Cir. 1985) (per curiam), absent a successful motion to seal the docket by one of the parties. I discuss some issues this raises in part III.

Ultimately, while the federal investigation is still ongoing, the district court would be required to hold a bench trial to determine whether there is probable cause to believe a federal crime has been committed, and if so, whether the victim who filed the complaint is a "crime victim" under the CVRA. This trial would presumably include the presentation of discovered evidence, testimony from some witnesses, fact finding, and, in the end, legal determinations by the district court. Assuming the district court concludes that (1) there is probable cause to believe a federal offense was committed and (2) the victim was indeed a "crime victim" of that offense,[6] the court must then go about the task of crafting an injunctive order[7] that mandates the United States Attorney's compliance with 18 U.S.C. § 3771(a)(5) and (a)(8) during the ongoing criminal investigation.

## B.

Now, let's take a look at the majority's post-charge model. Under that model, a crime victim may seek to enforce his rights by filing a "motion" in a preexisting criminal action. *See* Maj. Op. at 26–27. The victim's motion would likely seek (among other things) an injunctive order requiring the United States

---

[6] Anything less than a finding that there is probable cause to believe the accused committed a federal crime and that the victim was harmed by that offense would render the pre-charge civil suit little more than a fishing expedition for information about an ongoing federal criminal investigation.

[7] *See infra* part III for a detailed discussion of the difficulties of constructing such an order.

Attorney to honor the victim's "reasonable right to confer" and "right to be treated with fairness and with respect"—just like the pre-charge model. But, under the post-charge model, there is no need to open a freestanding civil lawsuit, there is no need to interfere with the government's investigation, and there is no need to drag the United States Attorney into district court—the attorney is already before the court to prosecute the underlying criminal case. Instead, the post-charge model leaves only two narrow issues to be litigated in a hearing before the court: is the victim in fact a "crime victim" as defined in 18 U.S.C. § 3771(e), and if so, should an order issue to mandate the Government attorney's compliance with § 3771(a)(5) and (a)(8)?

Importantly, under this model, the crime victim's motion can be filed only *after* there has been a presumptive determination that a federal offense has been committed and that the accused is the one who committed it. To state the obvious, by the time a charge has been filed, the grand jury has already concluded that there is probable cause to believe that the accused committed the offense at issue.[8]

---

[8] The majority opinion suggests that the post-charge model is triggered by the levying of formal charges in an indictment. *See* Maj. Op. at 46–47 n.21. Though I take the majority's point on the meaning of the term "prosecution," *see id.*, I suggest that a finding of probable cause by a magistrate judge when issuing a warrant under Federal Rule of Criminal Procedure 4(a) or in a Rule 5.1 preliminary hearing would make the post-charge model operative as well. In both of those cases, the magistrate judge is asked to determine whether there is probable cause to believe that an offense has been committed and that the accused committed it. *See* Fed. R. Crim. P. 4(a), 5.1(e). For purposes of triggering the post-charge model, I see no reason why we should distinguish between a finding of probable cause made by the grand jury and the same finding made by a magistrate judge.

Indeed, in some instances, the accused may have already pled guilty by the time the crime victim files his motion, and thus any argument regarding the lack of probable cause would be waived. *See, e.g.*, *United States v. Pierre*, 120 F.3d 1153, 1155 (11th Cir. 1997) ("A defendant's unconditional plea of guilty, made knowingly, voluntarily, and with the benefit of competent counsel, waives all non-jurisdictional defects in that defendant's court proceedings." (alteration adopted)). As a result, there is no need in the post-charge model to determine whether probable cause exists to believe a crime that is currently being investigated was committed.

## II.

With these models in mind, I turn to two fairness concerns that accompany the dissent's pre-charge CVRA litigation model.

## A.

First, the dissent's pre-charge model raises the question of whether the individual accused of a federal crime must be joined in the crime victim's freestanding CVRA civil action. For a variety of reasons, I believe the answer must be "yes."

Rule 19 of the Federal Rules of Civil Procedure governs the joinder of parties. This Circuit has outlined a two-part test for determining "whether a party is indispensable" under Rule 19. *Focus on the Fam. v. Pinellas Suncoast Transit*

*Auth.*, 344 F.3d 1263, 1279 (11th Cir. 2003) (citation omitted). "First, the court must ascertain under the standards of Rule 19(a) whether the person in question is one who should be joined if feasible. If the person should be joined but cannot be (because, for example, joinder would divest the court of jurisdiction) then the court must inquire whether, applying the factors enumerated in Rule 19(b), the litigation may continue." *Id.* at 1280 (citation omitted).

Part one of our two-part Rule 19 test focuses on whether a person is a "required party." A person is a required party to a lawsuit when (1) "in that person's absence, the court cannot accord complete relief among existing parties," or (2) where the absent party claims an interest relating to the action, disposing of the action without the absent party may "as a practical matter impair or impede the person's ability to protect the interest; or leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(B)(i)–(ii).[9]

---

[9] The full text of Federal Rule of Civil Procedure 19(a)(1) states:

a) Persons Required to Be Joined if Feasible.

(1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

The second part of our test—drawn from Rule 19(b)—sets forth four nonexclusive factors "that must be examined in each case to determine whether, in equity and good conscience, the court should proceed without a party whose absence from the litigation is compelled." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109, 88 S. Ct. 733, 737–38 (1968). These four factors include "(1) how prejudicial a judgment would be to the nonjoined and joined parties, (2) whether the prejudice could be lessened depending on the relief fashioned, (3) whether the judgment without joinder would be adequate, and (4) whether the plaintiff would have any alternative remedies were the case dismissed for nonjoinder." *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999).

So, a district court faced with a pre-charge CVRA lawsuit would first be asked to determine whether the accused is a "required party." [10] To address this question, let's look at two examples. First, consider a case in which the accused has entered into a nonprosecution agreement with the United States Attorney. If

---

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

[10] The district court has a duty to join required parties on its own initiative. Fed R. Civ. P. 19(a)(2) ("If a person has not been joined as required, the court must order that the person be made a party.").

the crime victim's pre-charge suit ultimately seeks recission of the nonprosecution agreement between the accused and the government, it is abundantly clear that the accused is both a required *and* indispensable party. *See, e.g.*, Hon. William W. Schwarzer et al., Federal Civil Procedure Before Trial § 7:114 ("[A]ll parties to a contract and others having a substantial interest in it are indispensable in an action to rescind or set aside the contract." (quotation marks omitted)); *Enter. Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989) ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." (cleaned up)). If the accused—a party to the contract—is not required, how could the district court go about "accord[ing] complete relief among existing parties"? Fed R. Civ. P. 19(a)(1)(A). It would be a strange result indeed for the court to rescind a contract that one of the signatories was not permitted to defend.

Second, even in a case without a nonprosecution agreement, I am convinced that the accused would be a required party in the civil suit. Regardless of the remedy sought, a crime victim's pre-charge CVRA suit will necessarily require a determination by the district court that there is probable cause to believe a federal offense has been committed and that the accused committed it. *See supra* part I.A. This is *exactly* the same determination a magistrate judge is asked to make at a

78

Federal Rule of Criminal Procedure 5.1 preliminary hearing.  Fed. R. Crim. P.

5.1(e) ("If the magistrate judge finds probable cause to believe an offense has been

committed and the defendant committed it, the magistrate judge must promptly

require the defendant to appear for further proceedings.").[11]  It goes without saying

that a defendant's attendance is expected at the preliminary hearing, and the

defendant would be permitted to cross-examine adverse witnesses and present

evidence.  *Id.*  I see no reason that we should treat a pseudo-preliminary hearing in

a pre-charge CVRA civil action any differently.

Indeed, my position finds some support in the text of Rule 19(a)(1)(B)(i): "A

person who is subject to service of process and whose joinder will not deprive the

court of subject-matter jurisdiction must be joined as a party if . . . that person

claims an interest relating to the subject of the action and is so situated that

disposing of the action in the person's absence may . . . as a practical matter impair

or impede the person's ability to protect the interest."  Does the accused have an

"interest relating to the subject of the" pre-charge CVRA suit?  Undoubtedly.  The

pre-charge suit is litigating whether there is probable cause to believe that the

accused committed a federal crime, and any ruling by the court on that issue may

---

[11] Indeed, this is also the same determination a magistrate judge is asked to make when determining whether an arrest warrant should issue.  Fed. R. Crim. P. 4(a) ("If the complaint or one or more affidavits filed with the complaint establish probable cause to believe that an offense has been committed and that the defendant committed it, the judge must issue an arrest warrant to an officer authorized to execute it.").

ultimately affect the accused's rights. So then, would disposing of the action in the accused's absence impair the accused's ability to protect those rights? Of course. A district court allowing a crime victim to question witnesses adverse to the accused *in the accused's absence* stinks of unfairness.

Next, assuming the accused is a required party, the court must determine whether the accused is indispensable. *See Provident Tradesmens Bank & Trust Co*, 390 U.S. at 118–19, 88 S. Ct. at 742–43. In other words, the district court must decide whether the litigation may—"in equity and good conscience"—continue despite the accused's absence. Fed. R. Civ. P. 19(b). Surely it could not in the pre-charge suit. The first factor we have outlined in this consideration— "how prejudicial a judgment would be to the nonjoined and joined parties"—is nearly dispositive. *Laker Airways*, 182 F.3d at 848. A judgment in favor of the crime victim would necessarily entail a finding that there is probable cause to believe the accused committed a federal offense. As I will discuss *infra* part III, this determination places intense pressure on the United States Attorney to, at the very least, make an arrest of the accused.

The second factor—"whether the prejudice could be lessened depending on the relief fashioned"—militates for the same result. *Id.* Regardless of the relief fashioned, the district court, by rendering a judgment in favor of the crime victim, has already made a determination that there is probable cause to believe the

80

accused committed the offense.  There simply is no way to lessen that prejudice to

the accused, nor can the court lessen the pressure the decision places on the United

States Attorney.  So, although the third and fourth factors of the test—whether the

judgment without joinder would be adequate and whether the plaintiff would have

any alternative remedies were the case dismissed for nonjoinder—may, in some

instances, cut the opposite direction, I see no way that the balance of these

"pragmatic considerations" could ever weigh against a finding of indispensability.

*In re Torcise*, 116 F.3d 860, 865 (11th Cir. 1997).  As a result, the accused would

need to be joined in any pre-charge CVRA suit.[12]

### B.

With the accused's presence in the pre-charge civil suit secured, I turn

briefly to my concerns about the accused's representation in that suit.

Pursuant to the Sixth Amendment, *criminal* defendants are entitled to the

assistance of counsel.  *United States v. Garey*, 540 F.3d 1253, 1262 (11th Cir.

2008) (en banc).  That right attaches, for the purposes of the Sixth Amendment,

---

[12] Separately, I posit that the potential for unfairness to the accused in such a suit may require a judicially-created rule that the accused be permitted to attend the civil "preliminary hearing," regardless of the application of Rule 19.  Otherwise, I have grave concerns that the district court will appear biased against the accused and will give the public the appearance of impropriety.  *See* Code of Conduct for United States Judges Canon 2A (2019) ("An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired.  Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. . . .").

when "a prosecution is commenced." *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207 (1991). In other words, a criminal defendant is entitled to counsel "at or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, *preliminary hearing*, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 188, 104 S. Ct. 2292, 2297 (1984) (emphasis added) (citation omitted). But a *civil* litigant has no constitutional right to counsel, and while a court may appoint counsel for an indigent litigant, *see* 28 U.S.C. § 1915(e)(1),[13] the court has broad discretion in making this decision and should do so only in "exceptional circumstances," *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999).

Consider how the differing treatment of criminal defendants and civil litigants affects the majority's and dissent's positions. In the majority's post-charge model, the accused is a criminal defendant and thus has the right to counsel. *Garey*, 540 F.3d at 1262. But in the dissent's pre-charge model, the accused— assuming she must be joined in the suit—is no different than any other civil litigant and, as a result, has no right to counsel. This is an odd (and, I argue, unfair) result. In the criminal context, it is abundantly clear that a defendant is entitled to counsel at a preliminary hearing, consistent with the Sixth Amendment's "purpose of

---

[13] 28 U.S.C. § 1915(e)(1) specifically states that "[t]he court may request an attorney to represent any person unable to afford counsel."

protecting the unaided layman at critical confrontations with his adversary."
*Gouveia*, 467 U.S. at 189, 104 S. Ct. at 2298. And yet, in a civil suit litigating
*precisely* the same issue as a criminal preliminary hearing—that is, whether there
is probable cause to believe the accused committed a federal offense—the dissent's
model hangs the accused out to dry.

Now, one could argue that 28 U.S.C. § 1915(e)(1) provides a safety valve
for this type of situation. And while I concede that § 1915(e)(1) may, in some
circumstances, permit the district court to appoint counsel for a civil litigant, our
case law makes clear that this mechanism should be used sparingly: "The
appointment of counsel is . . . a privilege that is justified only by exceptional
circumstances, such as where the facts and legal issues are so novel or complex as
to require the assistance of a trained practitioner." *Dean v. Barber*, 951 F.2d 1210,
1216 (11th Cir. 1992) (quoting *Poole v. Lambert*, 819 F.2d 1025, 1028 (11th Cir.
1987) (citations omitted)). It is not immediately clear to me that a district court
would conclude that a civil CVRA suit is "so novel or complex" as to require the
appointment of counsel. And even if it were clear, an accused's request for court-
appointed counsel would be a litigable issue, and different courts could reach
different conclusions.

*          *          *

In short, I believe the operational difficulties that accompany a pre-charge civil CVRA suit open the door to rank unfairness. By litigating criminal law issues in a civil case, the dissent's model puts at risk the rights of the accused, rights that would otherwise be protected under the majority's post-charge criminal model. One can quibble with whether that *should* be the case as a theoretical matter, but our case law makes clear that it *cannot* be the case in practice. In any event, there is simply no way that Congress intended to create a freestanding cause of action that allows the rights of those accused of federal crimes to be litigated in civil cases in which they may not participate.

### III.

Now, to the heart of the matter—the separation of powers.

There can be no doubt that the Executive Branch has exclusive power over prosecutorial decisions. *See United States v. Nixon*, 418 U.S. 683, 693, 94 S. Ct. 3090, 3100 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case . . . ."); *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457, 19 L. Ed. 196 (1868) ("Public prosecutions, until they come before the court to which they are returnable, are within the exclusive direction of the district attorney . . . ."); *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S. Ct. 1649, 1656 (1985) ("[T]he decision of a prosecutor in the Executive Branch

not to indict . . . has long been regarded as [within] the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 3)).  This Executive Branch authority obviously includes the decision to investigate suspected criminal activity and whether to seek, or not seek, an indictment from the grand jury.

Federal courts may not arrogate the powers of the other branches of government.[14]  *Application of President's Comm'n on Organized Crime*, 763 F.2d

---

[14] Puzzlingly, the dissent states that we must enforce the plain meaning of the CVRA "even if the proper interpretation raises policy concerns."  Branch Dissenting Op. at 149 (citing *Eldred v. Ashcroft*, 537 U.S. 186, 222, 123 S. Ct. 769, 790 (2003)).  Of course, that is only true to the extent that the dissent's "plain meaning" interpretation of the CVRA does not render the statute unconstitutional; we will not enforce an unconstitutional statute.  *See, e.g.*, *Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 503, 127 S. Ct. 2652, 2686 (2007) (Scalia, J., concurring) (stating that when a statute creates an "unworkable and unconstitutional" regime, "it is our responsibility to decline enforcement").  For reasons I explain throughout part III, even if the dissent's read of the CVRA is correct, its arrogation of Executive Branch authority would nevertheless render the statute unconstitutional and thus unenforceable.

Of course, the dissent is correct that if the language of a statute is unambiguous, we will enforce the statute's plain meaning.  Branch Dissenting Op. at 149–50 n.29.  But "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice.  If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court."  *Clark v. Martinez*, 543 U.S. 371, 380–81, 125 S. Ct. 716, 724 (2005).  It is thus no answer to say that the separation of powers problems might not apply to Ms. Wild's case, *see* Branch Dissenting Op. at 153 n.30, or that we should consider the issue on an as-applied, case-by-case basis, *see id.* at 149–50 n.29, because we must consider the constitutional issues whether or not they apply to the specific facts of Ms. Wild's case, *Clark*, 543 U.S. at 380, 125 S. Ct. at 724.  This is not some groundbreaking method of statutory interpretation—it is simply the canon of constitutional avoidance.

Now, if one believes that the CVRA unambiguously grants a crime victim a pre-charge freestanding cause of action, or if one believes the pre-charge model does not raise "serious constitutional problems," there is no issue.  *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S. Ct. 1392, 1397 (1988)).  But I do not

1191, 1195 (11th Cir. 1985) ("What the separation of powers has been construed to prohibit is those arrogations of power to one branch of government which 'disrupt[] the proper balance between the coordinate branches.'" (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443, 97 S. Ct. 2777, 2790 (1977))).  So, to maintain the separation of powers—which is based on "Montesquieu's view that the maintenance of independence as between the legislative, the executive and the judicial branches" was essential to the preservation of liberty, *Myers v. United States*, 272 U.S. 52, 116, 47 S. Ct. 21, 25 (1926)—federal courts must stay out of the prosecution business.  But despite repeated admonitions on this point from both the Supreme Court and this Court, the dissent's pre-charge CVRA litigation model would inevitably embed federal courts in the United States Attorney's investigation and prosecution of the case.

*          *          *

First, consider the issue of confidentiality.  As I discussed in part I.A, there is a presumption that a crime victim's pre-charge civil action will be a matter of public record.  *Wilson*, 759 F.2d at 1571 (stating that denying the public access to litigation records must be necessitated by a compelling governmental interest, and the denial must be narrowly tailored to that interest).  This presents a very real

---

believe the text is so clear, and—as I discuss below—I believe the separation of powers concerns that accompany the pre-charge model are severe.  As a result, I am convinced that we are compelled to adopt the majority's post-charge model.

problem for the United States Attorney.  In a high-profile case, the press will undoubtedly be active, and there is no guarantee in an unsealed case that witnesses—or even the crime victim—would not disclose confidential information. The disclosure of any confidential information regarding the government's ongoing investigation could derail the investigation and have serious detrimental effects on the well-being of informants and cooperating witnesses.[15]  Indeed, witnesses called in the pre-charge civil case—whose testimony is now public— may become worthless to the United States Attorney in the subsequent criminal proceeding.

To this, one may say that district court judges should simply seal these pre-charge cases as a matter of course, or perhaps that we should treat them as we would a grand jury proceeding.  I have two points in rebuttal.  The first proposal— a presumption of sealing—is directly contrary to our precedent.  *See id.* (discussing the "presumption of openness to civil proceedings").  It would be an extreme deviation from our caselaw and tradition to find a freestanding right of action in the CVRA and only then try to shut Pandora's box by kicking the presumption of

---

[15] For example, we have stated that, in the context of grand jury proceedings, secrecy is paramount to "encourage[] full and frank testimony on the part of witnesses." *Pitch v. United States*, 953 F.3d 1226, 1229 (11th Cir.), *cert. denied*, 141 S. Ct. 624 (2020).  If witnesses in these pseudo-preliminary hearings thought their testimony—which could be released to the public— carried with it the threat of harm, it is difficult to imagine that they would ever be completely candid.

public access to the curb.[16]  And while the second proposal—a grand-jury like

proceeding—may have some appeal, grand jury secrecy is ensured by the Federal

Rules of Criminal Procedure.  *See* Fed. R. Crim. P. 6(e)(2)(b).[17]  There is no such

rule in the Federal Rules of *Civil* Procedure, and it is not clear to me that the

judiciary could impose one.

*          *          *

Next, consider the catch-22 the crime victim's complaint creates for the

United States Attorney.  The government has two options when responding to the

---

[16] As the Fifth Circuit has put it:

> Legal arguments, and the documents underlying them, belong in the public
> domain.  American courts are not private tribunals summoned to resolve disputes
> confidentially at taxpayer expense.  When it comes to protecting the right of
> access, the judge is the public interest's principal champion.  And when the
> parties are mutually interested in secrecy, the judge is its only champion.

*Binh Hoa Le v. Exeter Fin. Corp.*, No. 20-10377, 2021 WL 838266, at *8 (5th Cir. Mar. 5, 2021)
(footnote omitted).

[17] Federal Rule of Criminal Procedure 6(e)(2)(B) reads:

> B) Unless these rules provide otherwise, the following persons must not disclose a
> matter occurring before the grand jury:
>
>> (i) a grand juror;
>>
>> (ii) an interpreter;
>>
>> (iii) a court reporter;
>>
>> (iv) an operator of a recording device;
>>
>> (v) a person who transcribes recorded testimony;
>>
>> (vi) an attorney for the government; or
>>
>> (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or
>> (iii).

complaint: it can either admit that there is probable cause to believe the accused committed the crime, or it can deny.  Both present serious problems.

If the United States Attorney concedes that there is probable cause, the public—and the crime victim—will reasonably wonder why the accused has not already been arrested or indicted.  Of course, there are good reasons that the United States Attorney would prefer to continue investigating despite the existence of probable cause.  Most obviously, probable cause is only enough for an indictment, not a conviction.  To secure a conviction, the United States Attorney must gather enough evidence to overcome the presumption of innocence and prove guilt *beyond a reasonable doubt*.  *See In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970).  In addition, it may be that the accused is being investigated for more than one crime.  So, while the United States Attorney may hope to gather enough evidence to indict the accused on multiple crimes, the dissent's pre-charge model would have the government show its hand before it has fully built its case.  The pressure this places on the government to seek an indictment or to make an arrest prematurely short circuits our system of justice.

Alternatively, what if the United States Attorney denies that there is probable cause to believe the accused committed a federal crime?  On this point, I see two potential scenarios unfolding.  On the one hand, the district court may— over the United States Attorney's denial—find probable cause, thereby influencing

the government's decision whether to file a complaint under Federal Rule of Criminal Procedure 3 or to seek an indictment. This plainly places federal courts in the prosecution business, and the public would surely see the outsized sway the court holds over the prosecutor's discretion.

On the other hand, the district court may agree with the United States Attorney and find no probable cause.[18] If the government then proceeds with its investigation and later indicts the accused on the same crime the crime victim's complaint alleged, what is the public left to think? In the pre-charge civil suit, the United States Attorney—wanting to continue its investigation unimpeded—is incentivized to make its *worst* case for probable cause. For example, the government may deny that certain evidence points to probable cause, or perhaps the government would take it easy on witnesses called by the crime victim in the civil case. But then, when the United States Attorney goes to indict, she would argue that the evidence *does* indicate that there was probable cause. Likewise, at

_____

[18] Because the issue of probable cause would be tried as a bench trial, and not before a jury, the district court would be required to enter findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1). As a result, there is simply no way that the district court can avoid making determinations regarding the existence—or non-existence—of probable cause and the facts that support that conclusion. To shirk this Rule 52(a)(1) responsibility would essentially preclude meaningful appellate review.

Of course, once the district court has made its findings and conclusions, the court's decision becomes a final, appealable order pursuant to 28 U.S.C. § 1291. The fact that the victim could appeal the district court's denial of probable cause—further protracting the pre-charge litigation—only increases the publicity drawn to the case and the potential for outside interference with the government's investigation.

the criminal trial, the United States Attorney would pull out all the stops when questioning the same witnesses she only lightly examined in the civil case.[19] Those paying careful attention would reasonably conclude that the government sandbagged in the civil case so that it could better prosecute the criminal one.

Unfortunately, the dissent's model leaves the United States Attorney with little room to maneuver. The government can (1) admit that there is probable cause and face the wrath of the public for failing to seek an indictment; (2) deny that there is probable cause, lose in the civil case, and still be expected by the public to prosecute the accused in a half-baked case; or (3) deny that there is probable cause, win in the civil case, be expected to prosecute the accused, go forward with the prosecution, argue that there is probable cause, and thus give the appearance of sandbagging.[20] Two rocks on one side, a hard place on the other.

---

[19] At the criminal trial, the United States Attorney would be prepared with additional ammunition to question these witnesses: their testimony from the civil trial. So long as the parties agree to the authenticity of the civil trial transcripts, the witnesses' prior testimony would be admissible as impeachment evidence. This could be very beneficial for the government. For example, if a cooperating witness's—who may have been somehow involved in the federal crime—testimony at the civil trial suggested the accused's guilt, the United States Attorney is equipped to impeach the cooperating witness should he attempt to flip his story at the criminal trial.

[20] There is, of course, a fourth scenario: the district court finds no probable cause, and the United States Attorney does not go on to prosecute the accused. I see little problem with that case, though one could express concern that a freestanding CVRA cause of action provides a platform for members of the public to falsely accuse individuals of committing federal crimes under the guise of filing a lawsuit.

\*          \*          \*

Finally, consider how the pre-charge civil CVRA suit would likely proceed in practice. The crime victim would file suit alleging that the United States Attorney failed to honor 18 U.S.C. § 3771(a)(5)—the "reasonable right to confer"—and (a)(8)—the "right to be treated with fairness and with respect." After some motions, some discovery, and a pseudo-preliminary hearing, the parties would wind up before the district judge for a bench trial to determine whether the victim's CVRA rights have been violated. Assuming the court rules in favor of the victim, it must then craft a remedy—an injunction requiring the attorney to confer with the victim and to treat the victim with respect. This injunction poses two major problems for the dissent's model.

To start, how could a district judge craft an injunction that complies with Federal Rule of Civil Procedure 65? Under that rule, the order must be "specific[]" and "describe in reasonable detail . . . the act . . . required." Fed. R. Civ. P. 65(d)(1)(B)–(C). These requirements serve three purposes. First, they provide notice to the enjoined party of precisely what it must do to avoid being held in contempt—the party cannot be left guessing. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1311 (11th Cir. 1998). Second, a specific and reasonably detailed order is easy to enforce, while a vague order is not. *See Wynn Oil Co. v. Purolator*

92

*Chem. Corp.*, 536 F.2d 84, 86 (5th Cir. 1976)[21] (stating that "(l)oose injunctive orders are neither easily obeyed nor strictly enforceable" (quoting 7 J. Moore, Federal Practice P 65.11, at 65-103 (2d ed. 1975) (alteration in original))). Third, an injunction that does not meet these requirements breeds disrespect for the courts and the rule of law.

In these pre-charge civil CVRA suits, an injunction requiring the attorney to "confer" with the victim and treat him "fairly" would be wide open to interpretation. It stands to reason that the United States Attorney would interpret the injunction as narrowly as possible—perhaps it only requires a short conversation with the victim about the investigation—while the victim would construe it as broadly as possible—perhaps it compels the government to cede to his wishes and rescind a nonprosecution agreement. Put simply, the parties would be left guessing about what the injunction required—such an injunction simply does not satisfy Rule 65. *See Robertson*, 147 F.3d at 1311.

But even if the district court could craft an adequately specific injunction, there is a second problem: compelling compliance with the injunction. Let's assume, for example, that the injunction requires the United States Attorney to attend an in-person meeting with the victim to discuss the criminal investigation.

---

[21] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

After the meeting, the crime victim may feel as though the United States Attorney is stalling a charging decision, or the victim may feel—for any number of reasons—that he was not treated fairly during the meeting. The victim could then return to the district court in which the civil action was filed and seek an order requiring the United States Attorney to show cause as to why she should not be held in contempt—and perhaps sanctioned—for failing to comply with the injunction. At the show-cause hearing, the United States Attorney would again have to explain why the investigation is being conducted a certain way or why certain information could not be disclosed to the crime victim. The district court would then need to dig around in the United States Attorney's investigation—potentially revealing confidential information—to discover exactly what had and had not been disclosed to the crime victim.[22] Ultimately, it is entirely possible that the district court would influence the course of the United States Attorney's investigation or order disclosure of otherwise confidential information to the crime victim.

---

[22] This is, in my view, the most serious interference with the executive branch's discretion. Before a magistrate judge has found probable cause in the criminal case—either under Federal Rule of Criminal Procedure 4(a) or Rule 5.1—the district court in the pre-charge civil case is being led on a fishing expedition by the victim to "discover" probable cause. Of course, even after probable cause has been found in the pre-charge suit, the district court is still required to poke around in the government's investigation to craft and enforce the injunctive relief requested by the victim. As the saying goes: "Once the camel gets its nose in the tent, the body will soon follow."

This contempt problem is not a one-and-done ordeal, either. At any step in the government's investigation, the crime victim could call upon the district court to meddle in the case. That problem is only compounded by large-scale cases in which multiple victims could—pursuant to the injunction—seek to have the United States Attorney conduct the investigation in conflicting ways.[23] This would essentially transform federal courts from impartial arbiters to prosecution micromanagers.

Plainly, such interference is unacceptable. The notion that a district court could have *any* input on a United States Attorney's investigation and decision whether to file a complaint or bring a case to the grand jury is entirely incompatible with the constitutional assignment to the Executive Branch of exclusive power over prosecutorial decisions. *Nixon*, 418 U.S. at 693, 94 S. Ct. at 3100. Additionally, it is hard to imagine a bigger intrusion on executive autonomy than the possibility that a United States Attorney will be held in contempt for

---

[23] The dissent makes much out of the fact that an Assistant United States Attorney acknowledged that Ms. Wild and others were "crime victims," arguing that this proves that crime victims will be readily identifiable and that my "parade of horribles" is actually a very manageable set of procedures. *See* Branch Dissenting Op. at 152–53. Not so fast. As an initial matter, the majority is correct to point out that "a prosecutor doesn't 'impair [her own] discretion' by sending a victim-notification letter." Maj. Op. at 35 n.17. The Assistant United States Attorney's actions do nothing to alleviate the separation of powers concerns the dissent's model raises. And, in any event, the dissent misses the point: we are not only deciding Ms. Wild's case today. The majority's opinion will set precedent for how CVRA suits will proceed in the Eleventh Circuit. The mere fact that an Assistant United States Attorney *in this case* recognized certain individuals as victims says nothing about how prosecutors and victims will act *in future cases*.

violating an injunction if her investigation is not handled as the victim and district court see fit.

Given the separation of powers problems the dissent's pre-charge model raises, and given that the majority's post-charge model avoids those problems, the Court is compelled by the canon of constitutional avoidance to adopt the latter model. *See Gomez v. United States*, 490 U.S. 858, 864, 109 S. Ct. 2237, 2241 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question."). This conclusion is bolstered by the language of the CVRA, which explicitly states that none of the statute's provisions should be read to diminish prosecutorial discretion: "Nothing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6).

IV.

So, for all the reasons stated in the majority's opinion, and for the fairness and separation of powers reasons I have outlined above, I believe the Court is required to deny Ms. Wild's petition.

96

BRANCH, Circuit Judge, joined by MARTIN, JILL PRYOR, and HULL, Circuit Judges, dissenting:

This petition for a writ of mandamus presents important issues of first impression regarding the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, that affect all crime victims in this Circuit. After over a decade of litigation, the Majority holds that Jeffrey Epstein's victims were not authorized to bring this petition because the CVRA does not permit stand-alone suits, and, therefore, it should have been dismissed at the very outset back in 2008. I respectfully dissent because (1) the plain text of the CVRA grants crime victims two "pre-charge" rights—the "reasonable right to confer with the attorney for the Government" and the "right to be treated with fairness"—and (2) it provides crime victims with the statutory private remedy of judicial enforcement of those rights "if no prosecution is underway" by filing a motion for relief "in the district court in the district in which the crime occurred." *See* 18 U.S.C. § 3771(a)(5), (a)(8), (d).

As background, a prior panel of this Court decided that the CVRA grants no crime victim any rights in the "pre-charge" period before an indictment. Thus, because the government never indicted Jeffrey Epstein, the panel held that his victims never had any CVRA rights. *In re Wild*, 955 F.3d 1196, 1219 (11th Cir. 2020). One member of the panel dissented, pointing out how (1) the plain text of the CVRA does not contain the requirement of a preexisting indictment or court

97

proceeding, and (2) the panel's holding materially rewrote the statute and gutted victims' rights under the CVRA. *Id.* at 1223–25 (Hull, J., dissenting).

Petitioner Wild filed a petition for rehearing *en banc*, which was granted. After vacating the panel opinion, we ordered briefing and oral argument on two issues:

1. Whether the [CVRA] . . . grants a crime victim any statutory rights that apply before the filing of a formal criminal charge by the government prosecutor?

2. If a crime victim has statutory rights under the CVRA that apply pre-charge, does the CVRA also grant a crime victim a statutory remedy to enforce a violation of their statutory rights?

The Majority now changes course and avoids the first issue completely, stating that "we needn't decide whether, in the abstract, the rights to confer and to be treated with fairness might attach prior to the formal commencement of criminal proceedings."

In answering only the second question, the Majority assumes implicitly, albeit in a cursory manner, that victims' rights "might attach" during the "pre-charge" period. But the Majority then holds that the CVRA does not give crime victims a private right to enforce their CVRA rights judicially unless the government decides to indict and commence court proceedings.[1] In other words,

---

[1] Because the prior panel held the victims had no pre-charge CVRA rights, it did not decide whether the victims had a statutory remedy to enforce any CVRA rights.

rather than discuss the "rights-creating" language in the CVRA and its relevance to the remedy issue, the Majority avoids the first *en banc* issue. *See Alexander v. Sandoval*, 532 U.S. 275, 288 (2001) (noting that the presence or absence of "'rights-creating' language" in a statute is "critical to the Court's analysis" of whether Congress intended to provide a private right of action to a particular benefitted class). The Majority then, in essence, adds a new requirement to the text of the CVRA—that there must be a preexisting indictment and ongoing court proceeding before a crime victim may file a motion for relief under § 3771(d). I dissent because the Majority errs in failing to enforce the plain text of the CVRA and in concluding that this case should have been dismissed at the outset in 2008.

My dissent proceeds in five parts. First, I review the facts surrounding the plea deal with Epstein. Second, I review the procedural history. Third, I turn to how Congress granted expressly to crime victims in § 3771(a)(5) and (a)(8) a "reasonable" right to confer and a right to be treated fairly and those rights attach pre-charge. Fourth, I review (A) how the Majority has misapplied and misinterpreted the Supreme Court's *Sandoval* decision; (B) how the CVRA text in § 3771(d) expressly provides victims who believe their CVRA rights were violated pre-charge with a statutory remedy—a private right to seek judicial enforcement of their statutory rights in § 3771(a)—when no prosecution is underway; (C) how the statutory interpretation errors in the Majority's reading of § 3771(d) and (f) leads it

99

to the opposite conclusion; and (D) how even under the Majority's analysis, the existence of the administrative remedy in § 3771(f) does not make the express judicial remedy in § 3771(d) unavailable to the victims, much less show that Congress did not intend a judicial remedy for crime victims in the "pre-charge" period. Fifth, I discuss why the CVRA plainly precludes any interference with prosecutorial discretion.

## I.    FACTS

As recounted by the Majority, following a 2005 report by the parents of a 14-year-old girl that then 52-year-old billionaire Jeffrey Epstein sexually abused their daughter, local Florida authorities—and later the FBI—began investigating Epstein. That investigation revealed that, between approximately 1999 and 2007, Epstein and multiple co-conspirators assembled a network of more than 30 underage girls whom he sexually abused at his mansion in Palm Beach, Florida. The victims included one of the initial petitioners in this case, Courtney Wild (Jane Doe 1), who was 15 years old when Epstein first sexually abused her.

Following the FBI's investigation, the U.S. Attorney's Office for the Southern District of Florida accepted the case for prosecution and assigned specific federal prosecutors to handle the case. The lead Assistant U.S. Attorney ("AUSA"), A. Marie Villafaña, sent a letter to the identified victims, informing each victim that she was protected by, and had rights under, the CVRA.

For example, in 2006, the U.S. Attorney's Office wrote petitioner Wild, stating that: (1) "you have a number of rights" under the CVRA, including "[t]he reasonable right to confer with the attorney for the United States in the case," "[t]he right to be treated with fairness," and "the right to petition the Court for relief" if Wild believed her CVRA rights were being violated; (2) "the U.S. Department of Justice and other federal investigative agencies, including the [FBI], must use their best efforts to make sure that these rights are protected"; and (3) "[y]ou also are entitled to notification of upcoming case events" and "[a]t this time, your case is under investigation." *See* 18 U.S.C. § 3771(a), (d)(3). In March 2007, the U.S. Attorney's Office began sending these letters to Epstein's other victims.

By May 2007, the U.S. Attorney's Office had completed an 82-page prosecution memo and a 53-page draft indictment against Epstein, charging him with federal crimes related to the sex trafficking of minor victims. The prosecutors were prepared and ready to indict Epstein.

Meanwhile, for over nine months in 2007 (from January to September), the U.S. Attorney's Office secretly engaged in discussions with Epstein's defense team regarding the forthcoming federal criminal charges. During this time, Epstein's defense team made multiple unsuccessful presentations to convince the U.S. Attorney's Office not to prosecute Epstein, maintaining he committed no federal

crimes. However, following a September 7, 2007 meeting with Epstein's defense team, U.S. Attorney Alexander R. Acosta[2] notified Epstein's team that "our Office [has] decided to proceed with the indictment."[3]

Despite this statement, the former U.S. Attorney subsequently changed his position for reasons not apparent from the record. Specifically, rather than pursue the indictment, the U.S. Attorney's Office entertained a non-prosecution agreement, whereby the U.S. Attorney's Office would defer federal prosecution of Epstein and his co-conspirators if Epstein pleaded guilty to two state prostitution-solicitation charges. And on September 24, 2007, the U.S. Attorney's Office and Epstein signed a seven-page agreement, entitled "Non-Prosecution Agreement," documenting the government's charging decision and Epstein's agreement with it.

The Agreement identified the federal crimes of Epstein and his co-conspirators[4] and provided that the U.S. Attorney's Office agreed that "prosecution in th[e] District for these offenses shall be deferred" provided that

---

[2] From June 2005 to June 2009, Acosta was the U.S. Attorney for the Southern District of Florida.

[3] At that time, the State of Florida had already charged Epstein with one count of solicitation of prostitution.

[4] The Agreement listed the following federal crimes: (1) using and conspiring to use a facility of interstate commerce to persuade, induce, or entice minors to engage in prostitution, in violation of 18 U.S.C. §§ 2422(b), 371, and 2; (2) traveling and conspiring to travel in interstate commerce for the purpose of engaging in illicit sexual conduct with minors, in violation of 18 U.S.C. § 2423(b) and (e); and (3) recruiting, enticing, and obtaining a minor to engage in a commercial sex act, in violation of 18 U.S.C. §§ 1591(a)(1) and 2.

Epstein met certain conditions.  Additionally, the Agreement extended immunity to Epstein's named co-conspirators, "Sarah Kellen, Adriana Ross, Lesley Groff, [and] Nadia Marcinkova," as well as "any potential co-conspirators" of Epstein's.  In return for federal immunity, Epstein agreed to plead guilty to two low-level state solicitation of prostitution charges and serve 18 months in the county jail.[5]

A core term of the Agreement was that it remain secret from the public, even after it was finalized.  The Agreement specifically provided that "[t]he parties anticipate that this agreement will not be made part of any public record," and that, should the United States receive "a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure."[6]

The victims were not notified of the executed Agreement.  Instead, for nine months after the September 2007 execution of the Agreement, the U.S. Attorney's Office continued to negotiate with Epstein's defense team about the extent of

---

[5] The Agreement also provided that the ongoing grand jury proceedings would be suspended.  Epstein also agreed to pay for a government-selected attorney for those specific individuals that the government had already identified as "victims" under 18 U.S.C. § 2255, and to not contest jurisdiction, liability, or damages (up to an agreed-upon amount) should any of the identified victims elect to file suit for restitution pursuant to § 2255 (so long as the victim elected to proceed exclusively under § 2255, as opposed to a civil damages action).

[6] As the Agreement was being signed, Epstein's attorney Jay Lefkowitz e-mailed AUSA Villafaña, requesting: "Marie - *Please do whatever you can to keep this [Agreement] from becoming public*." (emphasis added).  AUSA Villafaña assured Lefkowitz that the Agreement would be kept confidential.

crime victim notifications—a course of action which the U.S. Attorney's Office

now admits is a deviation from the government's standard practice.  Epstein's

attorneys opposed any victim notifications, but the U.S. Attorney's Office

insistently and repeatedly told Epstein's attorneys that it was statutorily obligated

under the CVRA to notify and confer with the victims about the Agreement and

upcoming events, including Epstein's state plea.[7]

Nevertheless, for still unknown reasons, the U.S. Attorney's Office

acquiesced to the demands of Epstein's attorneys and did not notify all of the

victims of the Agreement.  Rather, the U.S. Attorney's Office affirmatively misled

victims for months concerning the Agreement and the resolution of the federal

case.  For example, on January 10, 2008, the government sent Epstein's victims

---

[7] For example, in a December 6, 2007 letter, AUSA Villafaña informed Lefkowitz that "***[s]ection 3771 . . . commands that 'employees of the Department of Justice . . . engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a)***.'"  (emphasis added) (second ellipsis in original).

AUSA Villafaña went on to note that the "Non-Prosecution Agreement resolves the federal investigation by allowing Mr. Epstein to plead to a state offense.  The victims identified through the federal investigation ***should be appropriately informed, and our . . . Agreement does not require the U.S. Attorney's Office to forego its legal obligations.***"  (emphasis added)

AUSA Villafaña also sent Lefkowitz a draft of the Victim Notification Letter.  She stated that the U.S. Attorney's Office would "not remove the language about contacting AUSA Villafaña or Special Agent Kuyrkendall with questions or concerns."  Again, AUSA Villafaña wrote that "***federal law requires that victims have the 'reasonable right to confer with the attorney for the Government in this case.' 18 U.S.C. § 3771(a)(5)***."  (emphasis added).

In a subsequent letter to Epstein's counsel, dated December 19, 2007, U.S. Attorney Acosta again addressed "the issue of victim's [*sic*] rights pursuant to Section 3771."  U.S. Attorney Acosta stated: "***I understand that the defense objects to the victims being given notice of [the] time and place of Mr. Epstein's state court sentencing hearing. . . .  We intend to provide victims with notice of the federal resolution, as required by law.***"  (emphasis added).

more letters, this time misrepresenting that "[t]his case is currently under investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation." Further, on January 31, 2008, Wild met with AUSA Villafaña, FBI agents, and another federal prosecutor, provided additional details of Epstein's sexual abuse of her, and expressed her hope that Epstein would be prosecuted. During that meeting, however, the federal prosecutors and FBI agents still did not disclose the Agreement to Wild. Then, in mid-June of 2008, Bradley Edwards, the attorney for Wild and several of Epstein's other victims, discussed with AUSA Villafaña the possibility of federal charges being filed against Epstein in the future. AUSA Villafaña failed to mention the Agreement or its terms.

On June 30, 2008, Epstein pleaded guilty in Florida state court to (1) solicitation of prostitution and (2) procuring a person under the age of 18 for prostitution. That same day, the state court sentenced Epstein to 18 months' imprisonment in the county jail.

Having still not been informed of the resolution of Epstein's federal case, on July 3, 2008, attorney Edwards sent a letter to the U.S. Attorney's Office communicating the victims' wishes that federal charges be filed against Epstein.

## II.    PROCEDURAL HISTORY

Because no prosecution was underway for years and lacking any information about the case, on July 7, 2008, Courtney Wild (proceeding as "Jane Doe 1") filed an emergency petition in "the district court in the district in which the crime occurred." *See* 18 U.S.C. § 3771(d)(3) ("The rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred.").

Wild's petition alleged that she was a victim of Epstein's federal crimes and that the U.S. Attorney's Office had violated her CVRA rights (1) to confer with federal prosecutors, (2) to be treated with fairness, (3) to receive timely notice of relevant court proceedings, and (4) to receive information about restitution. Another of Epstein's victims identified as Jane Doe #2 later joined the petition.

Once the victims filed the petition in the district court, the U.S. Attorney's Office reversed course, contradicting what it had stated expressly in multiple earlier letters to the victims. The U.S. Attorney's Office now claimed that the CVRA rights never attached "pre-charge," and, therefore, because there was no criminal indictment (or information or complaint) ever filed, Epstein's victims never had any CVRA rights in the first place. It was only in the U.S. Attorney's Office's July 9, 2008, responsive pleading in the district court that Wild learned

106

that, over nine months earlier in September 2007, the U.S. Attorney's Office had signed an agreement with Epstein not to prosecute him for federal crimes if Epstein pleaded guilty to two state charges.

In August 2008, pursuant to a court order, the victims finally obtained a copy of the Agreement. What followed was more than a decade of contentious litigation between the victims, the government, and Epstein, who was allowed to intervene to oppose the victims' discovery requests. *See Doe No. 1 v. United States*, 749 F.3d 999, 1003 (11th Cir. 2014).

## A. District Court's 2011 and 2013 Orders: Victims Have CVRA Rights That Attach "Pre-Charge"

During the district court proceedings, the government argued that "as a matter of law the CVRA does not apply before formal charges are filed, *i.e.*, before an indictment or similar charging document." *Does v. United States*, 817 F. Supp. 2d 1337, 1341 (S.D. Fla. 2011). The district court, in a published order, rejected this argument, holding that "the statutory language [of the CVRA] clearly contemplates pre-charge proceedings," and, therefore, "those rights must attach before a complaint or indictment formally charg[ing] the defendant with the crime" is filed. *Id.* at 1341–42.

Furthermore, in examining the statutory text and structure of the CVRA, the district court interpreted the CVRA as permitting a crime victim to initiate a freestanding cause of action to enforce the victim's CVRA rights where no

107

prosecution is underway—just as Wild did here. *Id.* at 1340–41. Specifically, citing § 3771(d)(3), the district court explained that "[i]f a prosecution is underway, the CVRA grants victims standing to vindicate their rights in the ongoing criminal action. If, however, a prosecution is not underway, the victims *may initiate a new action* under the CVRA in the district court of the district where the crime occurred." *Id.* (internal citation omitted). Having determined that the CVRA rights could attach pre-charge, the district court deferred ruling (pending discovery) on the issue of whether the particular rights asserted by the victims here—the rights to confer and to be treated fairly—attached, and, if so, whether the U.S. Attorney's Office violated those rights. *Id.* at 1343.

Thereafter, in a published order denying the government's subsequent motion to dismiss the action, the district court held that the "'reasonable right to confer . . . in the case' guaranteed by the CVRA at § 3771(a)(5) is properly read to extend to the pre-charge stage of criminal investigations and proceedings, certainly where—as here—the relevant prosecuting authority has formally accepted a case for prosecution." *Doe v. United States*, 950 F. Supp. 2d 1262, 1267 (S.D. Fla. 2013) (alteration in original).[8]

---

[8] For a number of years, discovery disputes continued. The district court ordered that the U.S. Attorney's Office disclose its correspondence with Epstein's defense counsel to the victims. Epstein, as an intervenor, appealed that order. *Doe No. 1 v. United States*, 749 F.3d 999 (11th Cir. 2014). In 2014, our Court heard that appeal. In affirming the discovery order (and finding that we had appellate jurisdiction), we noted that this very case was "*a proceeding ancillary to a*

**B.    District Court's February 2019 Order: Government Violated Victims' Rights**

After years of litigation, in February 2019, the district court ruled that the U.S. Attorney's Office had violated the victims' CVRA rights to confer and to be treated fairly. *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1218–22 (S.D. Fla. 2019). The court found that the U.S. Attorney's Office not only entered into the Agreement without conferring with the victims but also decided to "conceal the existence of the [Agreement] and mislead the victims to believe that federal prosecution was still a possibility."[9] *Id.* at 1218–19.

The district court directed the parties to brief potential remedies. *Id.* at 1222. Wild proposed several remedies, including an order scheduling a victim-impact hearing and a meeting between the victims and the prosecutors, the release of certain documents concerning the prosecutors' decision to enter into the Agreement, the recission of the Agreement, and the discovery of other materials.

**C.    District Court's September 2019 Order Closing Case**

---

*criminal investigation*," wherein the victims had brought this lawsuit to enforce their rights under the CVRA. *Id.* at 1001–04.

[9] Although the February 2019 order did not specifically mention the right to be treated fairly, the district court later clarified, in its order denying as moot Wild's requested remedies, that the petitioners' "right[s] to be treated with fairness and to receive notice of court proceedings . . . flow from the right to confer and were encompassed in the Court's ruling finding a violation of the CVRA." *Doe 1 v. United States*, 411 F. Supp. 3d 1321, 1329 (S.D. Fla. 2019) (footnote omitted). The government does not dispute that it never conferred with the victims and kept the Agreement secret. *See* Gov't En Banc Brief at 5.

Epstein was found dead in his prison cell of an alleged suicide on August 10, 2019.[10]  On September 16, 2019, the district court entered an order closing the case.  As to Epstein, the district court determined that "there is no longer an Article III controversy" given his death.  As to the co-conspirators, the district court found it lacked jurisdiction over them.

## D.    Wild's Petition for Mandamus in this Court

Thereafter, on September 30, 2019, Wild filed a petition for writ of mandamus with this Court, seeking review of the district court's September 2019 order closing the case.  *See* 18 U.S.C. § 3771(d)(3) ("If the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus.").  Her petition set forth various types of relief sought under the CVRA and explained why the petition was not moot.

The government opposed Wild's arguments on the merits and argued, in relevant part, that: (1) the action was moot because any rights the victims had already had been or would be vindicated; (2) the victims had no rights under the

---

[10] In July 2019, the U.S. Attorney's Office for the Southern District of New York ("SDNY") had unsealed an indictment charging Epstein with a sex-trafficking conspiracy and substantive sex trafficking involving conduct *that occurred in New York* (and Florida to some extent).  While he was in custody on these charges, Epstein was found dead.  Statement of Attorney General William P. Barr on the Death of Jeffrey Epstein (Aug. 10, 2018), available at https://www.justice.gov/opa/pr/statement-attorney-general-william-p-barr-death-jeffrey-epstein.  In June 2020, the SDNY U.S. Attorney's Office indicted Ghislaine Maxwell for her participation with Epstein in the sexual abuse of numerous minor girls in New York and elsewhere.  That case remains pending.

CVRA because the government never filed formal federal charges against Epstein in a court; and (3) the CVRA did not authorize the victims to file this case or authorize their requested remedies.

On April 14, 2020, a divided panel of this Court denied Wild's mandamus petition. A majority of the panel agreed with the government that the CVRA rights did not attach "pre-charge" and that the victims never had any statutory rights under the CVRA in the first place. *In re Wild*, 955 F.3d at 1219. The dissent disagreed, discussing why the victims had CVRA rights under the plain text of the statute. *Id.* at 1223–25 (Hull, J., dissenting). All agreed that if the victims had CVRA rights "pre-charge," the prosecutors egregiously violated them. Wild petitioned this Court for rehearing *en banc*. On August 7, 2020, this Court granted the petition, vacated the panel opinion, and directed the parties to brief two issues, which I discuss in turn.

### III.   CRIME VICTIMS' RIGHTS "PRE-CHARGE"

The first issue on which we ordered *en banc* briefing is whether the CVRA grants crime victims the rights to confer and be treated fairly prior to the filing of an indictment. This question is about the timing of when CVRA rights attach, not the scope of the rights. This issue, which was the basis of the prior panel's decision, is an important legal question of first impression in our Circuit. Nevertheless, the Majority declines to address it in its *en banc* decision. Because

111

the first question of whether the CVRA grants crime victims any rights prior to the filing of an indictment is inextricably intertwined with the second question of whether the CVRA grants crime victims a statutory remedy to enforce violations of those rights, I will address both in order.[11]

The CVRA grants "crime victims"[12] the following rights:

> (1)    The right to be reasonably protected from the accused.

---

[11] Chief Judge Pryor's concurrence asserts that addressing the first en banc question results in an impermissible advisory opinion. It is well-established that "[t]he exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). Thus, "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." *Id.* (quotation omitted). Rather, a federal court's judgments must resolve "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* (quotation omitted). Whether Epstein's crime victims had any CVRA rights that attached pre-charge was—and continues to be—a live controversy in this case. Indeed, the prior panel decision resolved this case on that very question. Consequently, addressing the first question issued by this *en banc* court does not result in an impermissible advisory opinion. *See id.* In any event, because I conclude that the CVRA grants crime victims a statutory remedy to enforce violations of their CVRA rights via a freestanding motion for relief under § 3771(d)(3) if no prosecution is underway, I must necessarily answer the first question—whether the CVRA grants crime victims any rights that attach pre-charge.

Chief Judge Pryor's concurrence contends that the dissents respond to the advisory opinion concern "by turning it into a jurisdictional issue" or advocating for an alternative holding. Similarly, he questions our purported "motivations" for answering the first *en banc* question. Lest there be any confusion, my response to the advisory opinion concern expressed in his concurrence is not cast in jurisdictional garb. Rather, as explained in the previous paragraph, because I conclude that the CVRA grants crime victims a statutory remedy to enforce violations of their CVRA rights via a freestanding motion for relief under § 3771(d)(3) if no prosecution is underway, I must necessarily answer the first question. Thus, my motivation for answering the first *en banc* question derives solely from a plain-text application of the statute.

[12] The CVRA defines a crime victim as "a person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e). The government agreed, during the course of the district court proceedings and on appeal, that petitioner Wild qualifies as a "crime victim" for purposes of the CVRA.

112

(2)　　The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3)　　The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

(4)　　The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5)　　The reasonable right to confer with the attorney for the Government in the case.

(6)　　The right to full and timely restitution as provided in law.

(7)　　The right to proceedings free from unreasonable delay.

(8)　　The right to be treated with fairness and with respect for the victim's dignity and privacy.

18 U.S.C. § 3771(a) (2008).[13] In this case, there are only two CVRA rights at issue: the conferral right set forth in subsection (a)(5) and the right to be treated with fairness and respect set forth in subsection (a)(8).

In determining when the statutory rights granted to crime victims in the CVRA attach, "[o]ur starting point is the language of the statute itself." *EEOC v.*

---

[13] These eight rights have not changed from 2004 to the present. However, in 2015, Congress added a ninth and tenth right to the CVRA. *See* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, § 113(a)(1), 129 Stat. 227, 240.

*STME, LLC*, 938 F.3d 1305, 1313 (11th Cir. 2019) (quotation omitted).  When "the language at issue has a plain and unambiguous meaning," we "need go no further." *United States v. St. Amour*, 886 F.3d 1009, 1013 (11th Cir. 2018) (quoting *United States v. Fisher*, 289 F.3d 1329, 1337–38 (11th Cir. 2002)); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). Furthermore, in determining the meaning of a statute, we "assume that Congress used the words of the statute as they are commonly and ordinarily understood and must construe the statute so each of its provisions is given full effect." *United States v. McLymont*, 45 F.3d 400, 401 (11th Cir. 1995).  Therefore, "[w]e do not look at one word or term in isolation, but instead we look to the entire statutory context." *STME*, 938 F.3d at 1314 (quotation omitted).

Additionally, under the conventional rules of statutory construction, when Congress has used a more limited term in one part of a statute, *but left it out of other parts*, courts should *not* imply the term where it has been excluded.  *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation omitted)); *Russello v. United States*,

114

464 U.S. 16, 23 (1983) (declining to read a term appearing in two subsections of a statute to have the same meaning where there is "differing language" in the subsections). Thus, our statutory analysis begins (and ultimately ends) with the language of § 3771(a)(5) and (a)(8).

The plain language of § 3771(a)(5) and (a)(8) makes it clear that the rights attach prior to the filing of any indictment. Unlike the rights described in § 3771(a)(2), (a)(3), and (a)(4), which contain temporally-limiting language that ties those rights to post-indictment court proceedings, § 3771(a)(5) and (a)(8) contains no such language. The presence of temporally-limiting language in certain subsections of the CVRA and its absence in others demonstrates that when Congress wants to limit crime victims' rights to post-indictment court proceedings, it knows how to do so and does so expressly. *See Va. Uranium, Inc. v. Warren*, 587 U.S. ___, 139 S. Ct. 1894, 1900 (2019) (explaining that "in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 182 (2012) ("The familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation has full force here. The silence of Congress is strident." (quoting *Comm'r of Internal Revenue v. Beck's Est.*, 129 F.2d 243, 245 (2d Cir. 1942))). Where, as here, the language Congress used is clear and unambiguous, our inquiry is complete. *CBS Inc. v.*

115

*PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001).  We are bound

to "presume that Congress said what it meant and meant what it said."  *Id.* (quoting

*United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (*en banc*)); *see also*

*Keene Corp.*, 508 U.S. at 208.  Therefore, under the plain language of the CVRA,

the rights set forth in subsections (a)(5) and (a)(8) attach pre-charge.

Indeed, the remainder of the CVRA is structured in acknowledgement of the

fact that the plain language of the CVRA provides that certain rights attach pre-

charge.  *See Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. __, __, 139 S. Ct. 1743,

1748 (2019) ("It is a fundamental canon of statutory construction that the words of

a statute must be read in their context and with a view to their place in the overall

statutory scheme." (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809

(1989))); *Johnson v. United States*, 559 U.S. 133, 139 (2010) ("Ultimately, context

determines meaning.").  Specifically, subsections (c) and (d) expressly refer to the

rights in subsection (a) and further bolster the conclusion that certain rights

afforded to crime victims in subsection (a) attach pre-charge.

Section 3771(c), titled "[b]est efforts to accord rights," instructs that the

Justice Department and "other departments and agencies of the United States

engaged in the *detection, investigation, or prosecution of crime* shall make their

best efforts to see that crime victims are . . . accorded[] the rights described in

subsection (a)."  18 U.S.C. § 3771(c)(1) (emphasis added).  There would be no

116

reason to mandate that federal agencies involved in crime "detection" or "investigation" ensure that crime victims are accorded their CVRA rights if those rights did not exist "pre-charge." Rather, the use of disjunctive wording in subsection (c)—the "or"—indicates agencies that fit either description must comply, even though in some circumstances the investigatory and prosecution phases may overlap. Furthermore, if victims have CVRA rights only *after* an indictment is filed, the other "departments and agencies" would then necessarily be involved, to some extent, with the "prosecution of [the] crime," and the use of the term "prosecution" would be sufficient to sweep in all relevant actors, making the "detection" and "investigation" language in subsection (c) superfluous. *See* Scalia & Garner, *supra*, at 176 ("If a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision . . . , and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred.").

Additionally, § 3771(d)(3) provides that "*if no prosecution is underway,*" crime victims can assert the rights described in subsection (a) "in the district court in which a defendant is being prosecuted for the crime or, in the district court in the district in which the crime occurred." 18 U.S.C. § 3771(d)(3) (emphasis added). Thus, the plain statutory language of subsection (d)(3) demonstrates that the CVRA grants crime victims' rights that apply prior to formal charges being filed.

117

It is noteworthy that the only other circuit court to address whether the statutory rights under the CVRA attach pre-indictment has reached the same conclusion, holding that "'[t]here are clearly rights under the CVRA that apply before any prosecution is underway.' Logically, this includes the CVRA's establishment of victims' 'reasonable right to confer with the attorney for the Government.'" *See In re Dean*, 527 F.3d 391, 394 (5th Cir. 2008) (per curiam) (internal citation and quotation omitted). Notably, the facts of *In re Dean* are similar to the facts in this case. Specifically, after an explosion at a refinery owned and operated by BP Products North America Inc. ("BP") killed 15 people and injured more than 170, the Department of Justice ("DOJ") investigated and decided to bring federal charges against BP. *Id.* at 392–93. However, prior to the filing of an indictment or information, the government filed a sealed *ex parte* motion with the district court, advising the court that a plea agreement was imminent and requesting an order outlining the procedure it should follow under the CVRA. *Id.* at 392. The government indicated that due to the large number of victims, consulting the victims prior to finalizing the plea agreement was impracticable as were victim notifications of the pending agreement because media coverage could disrupt the plea negotiations and potentially prejudice the case. *Id.* Based on the government's concerns and its proposed recommendation for what would constitute a reasonable procedure under the CVRA given the circumstances, the

118

district court entered an *ex parte* order that prohibited the government from notifying the victims of a potential plea agreement until after one was executed. *Id.* at 393.

Thereafter, the government filed a criminal information under seal, and within days, the government and BP signed the plea agreement.[14]  *Id.*  Upon the signing of the plea agreement, the criminal information was unsealed, the plea agreement was announced, and notices were mailed to the victims "advising of scheduled proceedings and of their right to be heard."  *Id.*  Numerous victims came forward prior to, and at, the plea hearing and requested that the plea agreement be rejected based on the violations of their rights as crime victims under the CVRA. *Id.*  The district court rejected the victims' request, and the victims filed a petition for a writ of mandamus in the U. S. Court of Appeals for the Fifth Circuit, pursuant to § 3771(d)(3).  *Id.*  Upon review, the Fifth Circuit concluded, as discussed above, that "'[t]here are clearly rights under the CVRA that apply before any prosecution is underway.' . . . includ[ing] the CVRA's establishment of victims' 'reasonable right to confer with the attorney for the Government.'"  *Id.* at 394.  The Fifth

---

[14] It is true that, unlike in this case, a criminal information was filed in *In re Dean*.  527 F.3d at 393.  That point is a distinction without a difference, however, because in *In re Dean*, the court addressed the issue of the victims' CVRA rights prior to the filing of the criminal information.

119

Circuit also concluded, based on the unique facts of that case, that the government violated the victims' right to confer under § 3771(a)(5). *Id.*

We should join the Fifth Circuit in holding that under the plain language of the CVRA victims have a pre-charge right to confer with prosecutors. Since the government admits that it never conferred at any time with the victims, I also conclude under the factual circumstances of this case that the victims' conferral right was violated. However, I express no opinion as to the scope of the conferral right or at what precise point that right was violated in this case. I need go no further. As explained above, under the CVRA, the Epstein crime victims had a reasonable right to confer with the attorney for the United States and a right to be treated with fairness and these rights attach prior to any indictment or formal charges being filed and were violated. Accordingly, I now turn to the second question before this *en banc* court—whether the CVRA grants crime victims a statutory remedy to enforce a violation of their statutory rights.

## IV.    VICTIMS' STATUTORY REMEDY

As posited by the Majority, the second *en banc* issue requires us to determine whether Congress created in the CVRA "a private right of action"—*i.e.*, a statutory remedy in the form of a freestanding lawsuit to enforce a victim's CVRA rights prior to the commencement of formal criminal proceedings. The Majority and I agree that "[l]ike substantive federal law itself, private rights of

action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S. at 286. Thus, our "judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Our inquiry must focus on the "text and structure" of the statute. *Id.* at 288.

Applying *Sandoval* and its progeny to the CVRA, the Majority holds that, while Congress created a statutory remedy in § 3771(d) for crime victims to enforce their statutory CVRA rights by filing a motion for relief in an ongoing criminal proceeding, Congress did not authorize a freestanding private right of action outside the context of ongoing criminal proceedings. In other words, the Majority holds that when CVRA violations occur pre-charge, crime victims have no statutory remedy.

I disagree because, under the plain language of § 3771(d) and the CVRA's structure as a whole, Congress granted the victims a statutory remedy—a right to file a freestanding "[m]otion for relief" in "the district court in the district in which the crime occurred" when "no prosecution [is] underway." 18 U.S.C. § 3771(d)(3). Congress created an express right of action in § 3771(d)(3) and our inquiry should begin and end with the plain text of the CVRA. In holding otherwise, the Majority ignores the ordinary and common meaning of the statutory language in the CVRA and misapplies *Sandoval*. Because the Majority's holding

121

is premised on its application of *Sandoval*, I begin with a discussion of that decision and the flaws in the Majority's interpretation.

## A.    *Sandoval* and its application to the CVRA

As the Majority recognizes, in determining whether the CVRA authorizes crime victims to file a freestanding suit to enforce their CVRA rights outside of an ongoing criminal proceeding, *Sandoval* directs us to examine the text and structure of the statute for evidence of congressional "intent to create not just a private right but also a private remedy."  532 U.S. at 286; *Love v. Delta Air Lines*, 310 F.3d 1347, 1351–52 (11th Cir. 2002) (explaining that "legislative intent to create a private right of action [is] *the* touchstone of [the] analysis").

Two statutes were at play in *Sandoval*—§ 601 and § 602 of Title VI of the Civil Rights Act of 1964.  Section 601 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  And § 602 provides that:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of [§ 601] of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute

122

authorizing the financial assistance in connection with which the action is taken. . . .

*Id.* § 2000d-1.

Under § 602, the DOJ enacted a federal regulation that forbid federal funding recipients from using "criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin. . . . " 532 U.S. at 278 (quoting 28 C.F.R. § 42.104(b)(2) (2000)). The Alabama Department of Public Safety accepted federal funding from the DOJ thereby subjecting itself to the provisions of Title VI. *Id.* Therefore, when the Alabama Department of Public Safety changed its policy and started administering written driver's license tests only in English, Sandoval (a Spanish speaker), on behalf of a proposed class, sued seeking to enjoin the English-only policy, arguing that it violated DOJ's regulation because it had the effect of discriminating against non-English speakers based on their national origin. *Id.* at 279. The district court concluded that Sandoval could sue under § 602 of to enforce the non-discrimination regulation and enjoined the English-only policy. *Id.* at 279. We affirmed. *Id.* Reversing, the Supreme Court held that § 602 created no private right of action to enforce the regulations promulgated under § 602 of Title VI. *Id.* at 281.

In reaching its decision, the Supreme Court explained that, despite the absence of express authorization in § 601, it was clear from the rights-creating

123

language in § 601 that Title VI provided for a private cause of action for individuals to enforce the statutory rights guaranteed to them in § 601 through which they could obtain injunctive relief and damages.[15]  *Id.* at 279–80.  But as the Supreme Court noted, § 601 did not apply to the issue raised in Sandoval's case.[16]  *Id.* at 285.  Thus, the issue in *Sandoval* was whether individuals had a private cause of action under § 602 to enforce violations of agency regulations.  *Id.* at 286.

The *Sandoval* Court first looked to the language of § 602 for "rights-creating language"—*i.e.*, whether the statutory text evinced an intent on Congress's part to benefit a particular class of persons.  *Id.* at 288–89.  The *Sandoval* Court concluded that § 602 contained no "rights-creating" language.  *Id.*  The Supreme Court explained that "[s]tatutes that focus on the person regulated *rather than the individuals protected* create 'no implication of an intent to confer rights on a

---

[15] This conclusion flowed in part from the Supreme Court's earlier decision in *Cannon*, which in addressing § 901 of Title IX—which is patterned after § 601 of Title VI—recognized that both § 601 and § 901 contained "rights-creating" language that benefited a particular class of persons. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 683, 689–93 (1979).  The Supreme Court concluded that, although nothing in the text of § 601 or § 901 authorized a private cause of action for a violation of the statute, the "rights-creating" language in the statutes demonstrated clear congressional intent to provide for a statutory remedy to enforce the rights guaranteed in § 601 and § 901.  *Id.* at 694–703, 717.  And, as noted in *Sandoval*, "Congress has since ratified *Cannon*'s holding."  532 U.S. at 280.

[16] The Supreme Court explained that § 601 forbid only intentional discrimination, not disparate impact discrimination.  *Sandoval*, 532 U.S. at 280–81.  Thus, it was "clear . . . that the disparate-impact regulation[] [at issue did] not simply apply [the provision] of § 601—since [the regulation] indeed forbid conduct that § 601 permits—and therefore [it was also] clear that the private right of action to enforce § 601 [did] not include a private right to enforce these regulations."  *Id.* at 285–86.  Accordingly, the Supreme Court explained that a right to enforce the regulations "must come, if at all, from the independent force of § 602."  *Id.* at 286.

124

particular class of persons.'" *Id.* at 289 (emphasis added) (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). Section § 602 authorized federal agencies to issue regulations and empowered the agencies to enforce those regulations by terminating funding or "by any other means authorized by law." *Id.* at 289 (quoting 42 U.S.C. § 2000d-1). Thus, § 602—which "limit[ed] *agencies* to 'effectuat[ing]' rights already created by § 601"—was "yet a step further removed" from the types of statutes in which rights and private causes of action had been found because § 602 "focuse[d] neither on the individuals protected nor . . . on the funding recipients being regulated, but on *the agencies* that [would] do the regulating." *Id.* (emphasis added). The *Sandoval* Court also concluded that § 602's method "for enforcing its authorized regulations," such as withholding funding, similarly manifested no intent on Congress's part to create a private right of action under § 602 for individual persons to enforce agency regulations. *Id.* Rather, the Court reasoned that § 602's "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* at 290.[17]

---

[17] Further, § 602 provided numerous barriers even to an agency enforcement action, including that the agency must first notify the violators of their failure to comply with regulations and determine that compliance cannot be obtained by voluntary means. *Sandoval*, 532 U.S. at 289–90. These "elaborate restrictions on agency enforcement . . . tend to contradict a congressional intent to create privately enforceable rights through § 602 itself." *Id.* at 290. Because § 602 did not include any "rights-creating" language at all, there was no need for the Supreme Court to address "whether § 602's remedial scheme [could] overbear other evidence of congressional intent." *Id.* at 291.

We have emphasized that (1) *Sandoval* "clearly delimits the sources that are relevant to our search for legislative intent," and (2) "[f]irst and foremost, we look to the statutory text for 'rights-creating' language." *Love*, 310 F.3d at 1352 (quotation omitted).  Thus, in order to determine whether Congress intended for crime victims, like Wild, to have a statutory remedy to enforce their CVRA rights outside the context of an ongoing criminal proceeding, we must apply the principles from *Sandoval* to the CVRA.

Under *Sandoval*, we must look for rights-creating language in the CVRA. *See Sandoval*, 532 U.S. at 288–89; *Love*, 310 F.3d at 1352 ("'Rights-creating language' is language 'explicitly confer[ing] a right directly on a class of persons that include[s] the plaintiff in [a] case,' or language identifying 'the class for whose especial benefit the statute was enacted.'" (citation omitted) (quoting *Cannon*, 441 U.S. at 690 n.13, and *Tex. & Pac. Ry. Co. v. Rigsby*, 241 U.S. 33, 39 (1916)).  And it is clear that the rights-creating language that was lacking in § 602 is patently present in § 3771(a) of the CVRA.  *See Sandoval*, 532 U.S. at 288 ("It is immediately clear that the 'rights-creating' language so critical to the Court's analysis in *Cannon* of § 601 is completely absent from § 602." (citation omitted)).  The CVRA states that "[a] crime victim has the following *rights*," and goes on to list "[t]he reasonable *right* to confer with the attorney for the Government in the case," and "[t]he *right* to be treated with fairness and with respect for the victim's

126

dignity and privacy." 18 U.S.C. § 3771(a)(5), (8) (emphasis added). Accordingly, the CVRA's statutory language, with its clear and unmistakable focus on "the individuals protected" (crime victims), evinces Congress's clear "intent to confer rights on a particular class of persons." *See Sandoval*, 532 U.S. at 289 (quotation omitted). In other words, the text of the CVRA "expressly identifies the class Congress intended to benefit"—crime victims—and grants them certain statutory "rights." *Cannon*, 441 U.S. at 690.

And "it is a general and indisputable rule[] that where there is a legal right, there is also a legal remedy." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (quoting 3 William Blackstone, *Commentaries* *23). I agree with the Majority, however, that the presence of rights-creating language alone does not establish that crime victims have a statutory remedy. *Sandoval* made clear that the statute must "display[] an intent to create not just a private right but also a private remedy." 532 U.S. at 286 (emphasis added). Fortunately, unlike in *Sandoval*, in which the statute in question did not provide expressly for a private cause of action and the Court had to decide whether one should be implied—we need not concern ourselves with implying any remedy here. Rather, Congress's intent to provide crime victims with a private statutory remedy is crystal clear because it expressly provided for such a remedy in § 3771(d)—the ability to file a freestanding motion

127

for relief when no prosecution is underway to enforce applicable rights under § 3771(a).

## B.  Section 3771(d) expressly provides for a statutory remedy

Section 3771(d), entitled "Enforcement and limitations," provides as follows:

> **(d) Enforcement and limitations.**—
>
> **(1) Rights.**--The crime victim . . . may assert the rights described in subsection (a).
> . . .
> **(3) Motion for relief and writ of mandamus.**--The rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime *or, if no prosecution is underway, in the district court in the district in which the crime occurred*.  The district court shall take up and decide any motion asserting a victim's right forthwith.

18 U.S.C. § 3771(d) (emphasis added).  In the clear and unambiguous text of § 3771(d), Congress created a legal mechanism for crime victims to enforce their CVRA rights (*i.e.*, statutory remedy) whenever a violation of such rights might occur.  Specifically, crime victims who believe that a violation of their statutory rights under the CVRA has occurred may file a motion for relief (1) "in the district court in which a defendant is being prosecuted for the crime," or (2) "*if no prosecution is underway*, in the district court in the district in which the crime occurred."  *Id.* § 3771(d)(3) (emphasis added).  As explained further below, read most naturally, the phrase "if no prosecution is underway" refers to situations in

which formal court proceedings have not yet begun—which is precisely what Epstein's victims faced.[18]  This reading of the CVRA is the only one that gives full effect to the plain statutory text.

Notwithstanding the clear "rights-creating" language in the CVRA and Congress's express inclusion of a judicial mechanism to enforce those rights even "if no prosecution is underway," the Majority points to § 3771(d) and asserts that there is no "*Sandoval*-qualifying" clear expression of congressional intent to authorize a private right of action to enforce CVRA rights until after an indictment is filed.  The Majority contends that this conclusion is compelled by the remaining structure of the CVRA for the following reasons: (1) § 3771(d)(3) authorizes a crime victim to file a "[m]otion for relief," and a "motion" cannot initiate a freestanding cause of action; (2) the phrase "if no prosecution is underway" in § 3771(d)(3) is best understood to refer to motions filed after the prosecution is completed—*i.e.*, post-judgment motions; and (3) § 3771(d)(6)—which states that "[n]othing in this chapter shall be construed to authorize a cause of action for damages" and "[n]othing in this chapter shall be construed to impair the

---

[18] The Majority expresses concern repeatedly that (1) the Epstein victims, like the plaintiffs in *Sandoval*, are trying to "*imply*" a cause of action where Congress has not expressly created one, and (2) *Sandoval* precludes "implying" a private right of action here.  There is no need to "imply" a private right of action here because the CVRA expressly creates a judicial enforcement mechanism: a "[m]otion for relief" filed in "the district court in the district in which the crime occurred."  18 U.S.C. § 3771(d)(3).  We can, and should, end our analysis with the plain text of the CVRA statute.

prosecutorial discretion of the Attorney General or any officer under his direction"—demonstrates that Congress did not intend to authorize a freestanding lawsuit outside the context of ongoing criminal proceedings.  As explained further, contrary to the Majority's contention, nothing in the CVRA compels the conclusion that Congress did not intend to authorize a private statutory remedy outside the context of ongoing criminal proceedings.[19]  Rather, for the reasons that follow, the CVRA as a whole supports the conclusion that Congress intended—and meant what it said—when it authorized expressly a private right of action for judicial enforcement of a crime victims' statutory rights set forth in subsection (a) if no prosecution is underway by the filing of a motion for relief in the district court in the district in which the crime was committed.  *See* 18 U.S.C. § 3771(d)(3), (6).

## C.   Errors in the Majority's statutory interpretation of § 3771(d)

**1.    Failure to honor common, ordinary definition of "motion for relief" in § 3771(d)(3)**

---

[19] I agree that statutory interpretation "requires paying attention to the whole law, not homing in on isolated words or even isolated sections.  Context always matters.  Let us not forget, however, *why* context matters: It is a tool for understanding the terms of the law, not an excuse for rewriting them."  *King v. Burwell*, 576 U.S. 473, 500–01 (2015) (Scalia, J., dissenting).  As explained further in this opinion, the Majority's purportedly whole-text reading not only renders certain portions of the statute superfluous, but impermissibly rewrites the statute by adding to the text the following requirements: (1) all motions for relief must be filed in a preexisting court proceeding (or after an indictment is filed); and (2) a crime victim can never file a freestanding motion for relief.

The Majority insists that the term "[m]otion for relief" can mean only "a request filed within the context of a preexisting judicial proceeding." The common legal definition of "motion," however, is more general and broader than the definition the Majority ascribes to it. Specifically, a motion is "[a] written or oral application requesting a court to make a specified ruling or order." *Motion*, *Black's Law Dictionary* (11th ed. 2019); *see also Motion*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/motion (last visited March 16, 2021) (defining "motion" as "an application made to a court or judge to obtain an order, ruling, or direction"). This general definition encompasses a motion *initiating* a new proceeding, as well as one filed mid-proceeding, and the Majority's demand that we ascribe *only* a more specific, narrow definition to the word "motion" violates basic canons of statutory interpretation. *See* Scalia & Garner, *supra*, at 69 ("Words are to be understood in their ordinary, everyday meanings—unless context indicates that they bear a technical sense."); *see also In re Walter Energy*, 911 F.3d 1121, 1143 (11th Cir. 2018) ("To determine the ordinary meaning of a term, we often look to dictionary definitions for guidance.").

Further, although the Majority contends that "motion" can mean only a request filed in an ongoing judicial proceeding, the federal rules and statutes provide for quite a few motions that can be filed outside of an *ongoing* proceeding as free-standing motions. *See, e.g.*, 28 U.S.C. § 2255 (motions to vacate or correct

131

sentences); 28 U.S.C. § 1361 (mandamus proceedings are initiated as a new lawsuit); *see also In re Stewart*, 552 F.3d 1285, 1288 (11th Cir. 2008) ("The mandamus proceeding before us is a *free standing cause of action*, brought by persons claiming to be CVRA victims against the district judge who denied them the right to appear and be heard." (emphasis added)); Fed. R. Crim. P. 41(g) (motions to return property); Fed. R. Crim. P. 17(c) (motion to quash a grand jury subpoena). Often, such motions, like the motion authorized under the CVRA, exist to provide third parties a vehicle to assert and protect their rights in the course of a criminal investigation to which they are not themselves a party.

For example, Federal Rule of Criminal Procedure 41(g), entitled "Motion to Return Property," provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may *move* for the property's return," and it instructs an aggrieved party to file "[t]he *motion . . . in the district where the property was seized*." Fed. R. Crim. P. 41(g) (emphasis added). Thus, Rule 41(g) authorizes third parties to file a freestanding "motion" to enforce their rights even before a prosecution is initiated, and the filing of such a motion is a separate enforcement action.

Another pertinent example is a motion to quash a grand jury subpoena under Fed. R. Crim. P. 17(c)(2). Motions under Rule 17(c)(2)—at least those directed at quashing subpoenas issued by a federal grand jury—are often filed prior to the

132

initiation of any formal court proceeding, *i.e.*, "pre-charge," because the subpoenas in question are usually issued by a grand jury during the course of an *investigation*.[20]  And while federal grand juries are called into existence by order of the district court, *see* Fed. R. Crim. P. 6(a)(1), they operate more as instrumentalities of the U.S. Attorney's Office, *see* Wright & Miller § 101 ("In short, in the grand jury room it is the prosecutor who runs the show, a fact that has led some courts to observe that grand juries are for all practical purposes an investigative and prosecutorial arm of the executive branch of government." (quotation marks omitted)).  Further, as we explained in *United States v. Eisenberg*, "[u]ntil an indictment is returned and a case presented to the United States District Court, the responsibility for the functioning of the grand jury is largely in the hands of the U.S. Attorney."  711 F.2d 959, 965 (11th Cir. 1983). However, the fact that the prosecutor exercises a lot of control over the grand jury "does not mean that the court cannot redress abuses by either the grand jury or a U.S. Attorney." *Id.*  Rather, by filing a Rule 17(c) motion, an individual or company may ask the district court to quash an "unreasonable or oppressive" subpoena issued by the grand jury or to otherwise rein in perceived abuses by the grand jury or prosecutors.  Fed. R. Crim. P. 17(c).

---

[20] Grand jury proceedings, by their very nature, occur *prior to the filing of charges*, as their purpose is to determine whether to bring charges is the first place.  *See* 1 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 101 (4th ed. 2020).

133

In other words, Rule 17(c) authorizes an individual to file a freestanding motion to quash a subpoena, which essentially asks the district court to step in to ensure that the rights of third parties are respected, despite the fact that there is no ongoing court proceeding.[21]  *See In re Grand Jury Proceedings*, 832 F.2d 554, 554 (11th Cir. 1987) (considering a third party's "claim of privilege to prevent disclosure of their state grand jury testimony").  The motion to quash need not— and in most cases could not—be filed in any ongoing court proceeding because in most instances no formal charges have been brought.  *See, e.g.*, *id.* at 555; *In re Grand Jury Matter No. 91-01386*, 969 F.2d 995, 996 (11th Cir. 1992); *In re Grand Jury Subpoena*, 831 F.2d 225, 226 (11th Cir. 1987).  Rather, motions to quash subpoenas are filed in the district court overseeing the grand jury.  In short, nothing precludes a "motion" from initiating a separate enforcement action.

The Majority also asserts that a reading of § 3771(d) that permits victims to file a freestanding motion for relief would cause the word "motion" to have two different meanings: (1) a freestanding motion; and (2) a motion filed in a preexisting judicial case.  Wild's asserted interpretation of the statute, however, does not create this so-called dual meaning of motion.  Rather, the common,

---

[21] In a prior interlocutory appeal in this case, we recognized the similarity between an action to quash a grand jury subpoena and an action to enforce CVRA rights, noting that "the victims' petition, like a grand jury proceeding, is ancillary to a criminal investigation."  *Doe No. 1 v. United States*, 749 F.3d 999, 1005 (11th Cir. 2014).

134

general definition of the word motion is "[a] written or oral application requesting a court to make a specified ruling or order." *Motion*, *Black's Law Dictionary* (11th ed. 2019). While the CVRA may permit motions to be filed in either the district where the crime occurred or the district where the defendant is being prosecuted, the existence of alternative venues does not change the fundamental, ordinary, and common meaning of the word motion. That ordinary meaning—"a written or oral application requesting a court to make a specified ruling or order"—is consistent in both contexts. The text of the CVRA authorizes a motion for relief and specifically contemplates the filing of such a motion both before and after the initiation of a court proceeding. *See* 18 U.S.C. § 3771(d)(3). The controlling statutory interpretation "principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written." *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992). The Majority can point to no canon of statutory construction that would justify deviating from the plain and ordinary meaning of the statute.[22]

---

[22] Chief Judge Pryor's concurrence asserts that the alleged dual meaning of motion demonstrates that I have failed to apply the whole-text canon and have erroneously read § 3771(a)(5), (a)(8), and (d)(3) in isolation. I disagree. As explained above, the meaning of the word "motion" remains the same regardless of whether the judicial enforcement mechanism is available pre- or post-charge. Furthermore, "[t]he whole-text canon refers to the principle that, when interpreting the meaning of a statute, the court should "consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Scalia & Garner, *supra*, at 167. Many other canons are derived from the whole-text canon, including the surplusage canon. *Id.* at 168. Reading the CVRA as (1) providing crime victims with certain rights that attach pre-charge and (2) authorizing a private right of action to judicially enforce those rights

Moreover, as previously explained, there are other instances in the federal rules where the single word "motion," using its general, ordinary meaning, encompasses either a filing in an ongoing court proceeding or a freestanding filing in a district court outside the context of a court proceeding. *See* Fed. R. Crim. P. 41(g) ("A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return."); Fed. R. Crim. P. 17(c) ("On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive."); *see also United States v. R. Enters.*, 498 U.S. 292, 297–98 (1991) (distinguishing the standard for judicial review of motions to suppress subpoenas issued pursuant to Rule 17 by a grand jury versus those "issued in the context of a prospective criminal trial").

Consequently, for the above reasons, the Majority errs in holding that a "motion for relief," as contemplated by § 3771(d)(3), must be filed in an ongoing court proceeding and cannot initiate a freestanding enforcement action.

### 2. Misinterpretation of "if no prosecution is underway" in § 3771(d)(3)

Additionally, the Majority asserts that the phrase "if no prosecution is underway" in subsection (d)(3) is best understood to refer to motions filed after the

---

when no prosecution is underway adheres faithfully to the whole-text canon as it is the only one that gives full effect to the plain statutory text of the CVRA as a whole, while simultaneously avoiding rendering portions of the statute superfluous and impermissibly adding words to the text.

prosecution is completed—*i.e.,* post-judgment motions. This reading of § 3771(d)(3) is strained and does not comport with how the word "underway" is ordinarily or commonly understood. As the Majority acknowledges implicitly, in everyday parlance, if "a process, project, [or] activity" is not "underway," we generally understand that it has not yet begun. It therefore is not credible to say that the phrase "if no prosecution is underway" is just as likely to be commonly or ordinarily understood to refer to a post-prosecution scenario—*i.e.*, a judicial proceeding that has not only begun, but has fully completed.

Further, the Majority's reading of the CVRA—as requiring that the "[m]otion for relief" be filed only in an ongoing proceeding—creates two statutory interpretation problems. First, it effectively reads the phrase "if no prosecution is underway" out of the statute—a highly disfavored practice. *See* Scalia & Garner, *supra*, at 174 ("The surplusage canon holds that it is no more the court's function to revise by subtraction than by addition. . . . As Chief Justice John Marshall explained: 'It would be dangerous in the extreme to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation.'" (quoting *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 202 (1819))).

Second, the Majority's reading also impermissibly adds to the text of the statute the following requirements: (1) all motions for relief must be filed in a

137

preexisting court proceeding (or after an indictment is filed); and (2) a crime victim

can never file a freestanding motion for relief. *See Friends of Everglades v. S. Fla.*

*Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009) ("[W]e are not allowed

to add or subtract words from a statute; we cannot rewrite it."); *see also Blount v.*

*Rizzi*, 400 U.S. 410, 419 (1971) ("[I]t is for Congress, not this Court, to rewrite the

statute.").

Moreover, § 3771(d)(3) directs that "if no prosecution is underway" a

motion for relief must be filed "in the district court in the district in which the

crime occurred." *See* 18 U.S.C. § 3771(d)(3). This directive reveals the flaw in

the Majority's interpretation of the phrase "if no prosecution is underway."

Specifically, reading § 3771(d)(3)'s "if no prosecution is underway" language to

refer only to post-judgment proceedings might require a victim to file a motion for

relief in the district where the crime occurred in which there is no pending or

closed court proceeding because the defendant was prosecuted in a different

district. In other words, the motion for relief would initiate a freestanding cause of

action, something the Majority insists the statute does not authorize. The Majority

contends that this "supposed oddity" is alleviated because, under the Sixth

Amendment, the district where the crime occurred will "almost always" be the

district in which the defendant is charged and prosecuted. *See* U.S. Const. amend.

VI (granting the accused the right to be tried "by an impartial jury of the State and

138

district wherein the crime shall have been committed."). But this explanation falls short.

First, had Congress intended the phrase "if no prosecution is underway" to mean that victims shall file a post-judgment motion for relief in the district court in which the defendant was charged or prosecuted, it could easily have said so explicitly.

Second, there are numerous circumstances—such as continuing offenses and offenses consisting of several transactions—in which a defendant is prosecuted in a different district than the one in which the crime occurred, notwithstanding the Sixth Amendment. *See* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."); Advisory Committee's Notes on 1944 Adoption of Fed. R. Crim. P. 18.[23]

In short, when engaging in statutory interpretation, we abide by the maxim that "[w]here the language Congress chose to express its intent is clear and unambiguous, that is as far as we go to ascertain its intent because we must

---

[23] The Advisory Committee Notes to Rule 18 state that "numerous statutes have been enacted to regulate the venue of criminal proceedings, particularly in respect to continuing offenses and offenses consisting of several transactions occurring in different districts. These special venue provisions are not affected by the rule" and are consistent with the Sixth Amendment. Advisory Committee's Notes on 1944 Adoption of Fed. R. Crim. P. 18 (citations omitted).

presume that Congress said what it meant and meant what it said." *United States v. Strickland*, 261 F.3d 1271, 1274 (11th Cir. 2001) (quoting *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc)). The Majority's insistence that the CVRA's language—"motion for relief" and "if no prosecution is underway"—*could* be read to refer only to post-judgment proceedings turns this fundamental tenet of statutory interpretation on its head. Rather, we must presume that Congress "meant what it said," which is that in cases like this one where a prosecution is not yet "underway," victims are able to assert their "pre-charge" rights in motion for relief filed "in the district court in the district in which the crime occurred," which is what Wild did here.[24]

_____

[24] Alternatively, the Majority suggests subsection (d)(3)'s "no prosecution is underway" language could also be read to refer specifically to the time between the filing of informal criminal charges—by way of, for example, a criminal complaint—and "the levying of formal charges in an indictment." Meaning, according to the Majority, that "even if Ms. Wild and the district court were correct that the 'no prosecution is underway' clause meant that CVRA rights apply—and that a freestanding lawsuit may be initiated—before formal charges are filed, they may yet be incorrect that those rights can be judicially enforced during a pre-complaint investigation." In support of this reading, the Majority points to the Sixth Amendment right to counsel, which is triggered when "a prosecution is commenced" by, at a minimum, a suspect's "initial appearance before a judicial officer." *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 199 (2008). There is, of course, no such temporal limitation in the plain language of § 3771(d)(3). And this reading suffers from the same logical flaw as the Majority's primary alternative reading: if Congress meant to instruct victims to file a motion for relief in the district in which a defendant has been informally charged, it would have said so.

Furthermore, it is also not readily apparent why we should look to the Sixth Amendment right to counsel for our construction of "prosecution" and not instead to the Sixth Amendment's speedy trial right, which "may attach before an indictment and as early as the time of arrest and holding to answer a criminal charge." *Gouveia*, 467 U.S. at 190.

### 3.      Misapplication of § 3771(d)(6)

In further support of its interpretation of § 3771(d)(3)'s "motion for relief" and "no prosecution is underway" language, the Majority emphasizes that § 3771(d)(6) explicitly precludes causes of action "for damages," which also supposedly demonstrates that Congress did not intend for a "motion for relief" to initiate a freestanding private cause of action.  *See* 18 U.S.C. § 3771(d)(6) ("Nothing in this chapter shall be construed to authorize a cause of action for damages . . . .").  But § 3771(d)(6) actually supports the remedy pursued in this case.

Notably, the statute says nothing about the sort of declaratory or injunctive relief the victims sought here.  While we generally "do not expect Congress to 'expressly preclude' remedies," *Christ v. Beneficial Corp.*, 547 F.3d 1292, 1298 (11th Cir. 2008), it follows necessarily that where Congress has done so, as in the CVRA, courts should be hesitant to exclude other remedies not listed in the preclusive language.  *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) ("[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 66 (1992) ("[W]e presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise.").  To be sure, if Congress intended to preclude

141

all causes of action regardless of the relief sought, it would have been unnecessary to carve out money damages explicitly from the panoply of potential relief. *See Delgado v. U.S. Att'y Gen.*, 487 F.3d 855, 862 (11th Cir. 2007) ("[W]here Congress knows how to say something but chooses not to, its silence is controlling." (quotations omitted)). Thus, because Congress precluded causes of action for damages expressly, but did not mention declaratory or injunctive relief, there is no basis for concluding that Congress intended to preclude such other forms of relief.[25]

## D. Misapplication of *Sandoval* to the administrative-enforcement scheme in § 3771(f)

I now turn to the Majority's argument that, under *Sandoval*, the existence of the administrative-enforcement scheme in § 3771(f) counsels against and

---

[25] In addition to its discussion of § 3771(d)(3) and (d)(6), the Majority also briefly notes that § 3771(b), the only other provision of the CVRA that explicitly mentions judicial enforcement of CVRA rights, does not authorize a cause of action and, in fact, suggests that the judiciary is responsible for enforcement only within the confines of a preexisting "proceeding." Subsection (b) specifies that "the court shall ensure that the crime victim is afforded the rights described in subsection (a)" "[i]n any court proceeding involving an offense against a crime victim." 18 U.S.C. § 3771(b). Thus, the Majority reasons that the fact that § 3771(b) directs a district court presiding over a court proceeding to "ensure" that crime victims are afforded their rights in the context of that proceeding necessarily precludes the enforcement of those same rights outside that context. I disagree because, if anything, § 3771(b) reinforces the separate and important role that § 3771(d) plays.

Subsection (b) simply makes clear that once a court proceeding has commenced, the district court has an ongoing duty to ensure that crime victims are accorded their rights, independent of whether a victim has filed a motion to enforce those rights. This duty is reinforced by the statute's prescription of a mechanism—in subsection (d)—for victims to enforce their rights that exist separate and apart from the district court's independent duty to ensure those rights are enforced in a proceeding over which it is presiding. 18 U.S.C. § 3771(d).

"undermines any suggestion that (without saying so) [Congress] intended to authorize crime victims to file stand-alone civil actions in federal court." I disagree because nothing in the administrative-enforcement scheme evidences any congressional intent to preclude the availability of the statutory legal mechanism Congress expressly provided for in § 3771(d)(3) where "no prosecution is underway." Moreover, as explained further, crime victims whose rights are violated in the pre-charge phase cannot avail themselves of the administrative scheme.[26]

Section § 3771(f) directs the Attorney General to "promulgate regulations to enforce the rights of crime victims and to ensure compliance by responsible officials with the obligations" set out by statute. 18 U.S.C. § 3771(f)(1). Following this directive, DOJ adopted administrative regulations, codified at 28 C.F.R. § 45.10, that set forth an administrative "[c]omplaint process" and state that a victim's complaint "shall contain . . . [t]he district court case number" and "[t]he

---

[26] The Majority asserts that in addressing the fact that the administrative remedy in § 3771(f) is not available to crime victims who believe they have suffered a violation of their statutory rights under the CVRA during the pre-charge phase, I am somehow reasoning that "if there is no visible remedy, courts should fashion one." To be clear, that is not the basis of my reasoning. It is of course the task of the legislature to create a private remedy and, as explained previously, Congress created such a remedy expressly and unequivocally in § 3771(d)(3)—a "[m]otion for relief" filed in "the district court in the district in which the crime occurred." While the existence of an administrative remedy in *Sandoval* counseled against *implying* a private cause of action, we are not faced with an implied remedy case. We can, and should, end our analysis with the plain text of the CVRA statute and enforce the express private cause of action Congress authorized in § 3771(d)(3).

name of the defendant in the case." 28 C.F.R. § 45.10(c)(2)(iii)–(iv). If CVRA violations are found, DOJ officials may impose "disciplinary sanctions" and "[a] complainant may not seek judicial review of the [DOJ's] determination regarding the complaint." *Id.* § 45.10(c)(8).

The Majority argues that the regulations create a "robust administrative-enforcement scheme" which "undermines" any possibility that Congress intended to allow victims to file a stand-alone action to enforce any pre-charge rights the CVRA might grant them. In support of its position, the Majority primarily points to *Sandoval*'s statement that "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." 532 U.S. at 290. The Majority's reasoning is flawed.

First, the Majority misunderstands the breadth of the holding in *Sandoval*. *Sandoval* involved private plaintiffs seeking to enforce agency regulations under § 602 which contained no rights-creating language and set forth a comprehensive enforcement scheme for agencies to enforce their own regulations. *Sandoval*'s recognition that the administrative enforcement scheme set forth in § 602 undermined any "congressional intent to create privately enforceable rights" under § 602 did not alter its parallel recognition that plaintiffs had a private right of action to enforce their statutory rights under § 601—which contained rights-creating language similar to the CVRA. It follows, therefore, that notwithstanding

144

the existence of the enforcement scheme in § 3771(f), nothing precludes crime victims from pursuing the judicial enforcement mechanism set forth in § 3771(d)(3) to enforce their CVRA rights.

Indeed, under the Majority's own analysis, the CVRA expressly grants two possible remedial paths to crime victims post-indictment: *both* administrative and judicial enforcement of CVRA rights. Specifically, the Majority admits that if the government files an indictment, victims can file a motion for relief in a district court in that ongoing court proceeding or an administrative complaint filed with the DOJ under § 3771(f). Therefore, under the Majority's own analysis, the existence of the administrative remedy in § 3771(f) does not preclude the express judicial remedy in § 3771(d), much less show Congress intended to preclude that judicial remedy in favor of the § 3771(f) administrative scheme for crime victims whose rights have been violated in the pre-charge context.

Second, and perhaps most critically, the Majority's analysis forecloses all remedial paths to crime victims pre-indictment because the administrative-enforcement scheme in the CVRA is not available to the victims in this case. In *Sandoval*, it was not just that § 602 provided an alternative means to enforce the regulations; it was that the alternative means were actually *available* to enforce the regulation that the plaintiffs sought to enforce. In other words, the Supreme Court's ruling in *Sandoval* did not leave the government free to run afoul of

145

regulations promulgated under § 602, it simply recognized that the statute prescribed a different enforcement mechanism to address the government's violation. 532 U.S. at 290–91. But the administrative remedy in § 3771(f) requires that a victim's complaint contain a "district court case number" and "[t]he name of the defendant." 28 C.F.R. § 45.10(c)(2)(iii)–(iv). Therefore, crime victims, like those in this case, who suffer violations of their CVRA rights in the pre-charge period when there is no prosecution underway, would not be able to avail themselves of this administrative remedy.[27]

The Majority also argues that our post-*Sandoval* decision in *Love v. Delta Air Lines* supports the conclusion that the creation of the administrative scheme in § 3771(f) undermines any possibility that Congress intended for crime victims to be able to file freestanding actions to enforce their CVRA rights, but the Majority's reliance on *Love* is misplaced. In *Love*, we held that no implied private cause of action existed under the Air Carrier Access Act of 1986 ("ACAA"), 49 U.S.C. § 41705, for disabled individuals alleging a violation of the ACAA's anti-

---

[27] The Majority itself never says that these victims can vindicate their rights through the administrative process in § 3771(f). Rather, the Majority states that the victims' rights "*might be enforceable* through, say, political or administrative channels." (emphasis added). But given the language of the administrative scheme—which requires a victim's complaint to contain a district court case number—it is unclear to what political or administrative channels the Majority refers.

discrimination provision.[28]   310 F.3d at 1358–59.  In reaching this holding, we applied the principles set forth in *Sandoval*, emphasizing that the focus was on interpreting the ACAA to determine whether it displayed a congressional "intent to create not just a private right but also a private remedy."  *Id.* at 1352 (quotation omitted).  We noted that it was "indisputable that the ACAA d[id] not expressly provide a private entitlement to sue in district court," and, therefore, if there was a private remedy, it would be an implied remedy.  *Id.* at 1354.  However, "the surrounding statutory and regulatory structure create[d] an elaborate and comprehensive enforcement scheme that belie[d] any congressional intent to create a private remedy."  *Id.*  Specifically, § 41705 provided for "three separate enforcement mechanisms": (1) individuals could file an administrative complaint with the Department of Transportation ("DOT"), and DOT was required to investigate all complaints with its broad sanction powers; (2) the air carriers were required to have internal dispute resolution mechanisms; and (3) individuals "with a substantial interest in a DOT enforcement action" could seek judicial review of the DOT decision in a United States Court of Appeals.  *Id.* at 1354–57.  We concluded that the two administrative enforcement mechanisms *paired with the right to seek judicial review* "strongly undermine[d] the suggestion that Congress

---

[28] The ACAA provides, in pertinent part, that "[i]n providing air transportation, an air carrier . . . . may not discriminate against an otherwise qualified individual on" certain grounds related to that individual's "physical or mental impairment."  49 U.S.C. § 41705(a).

147

also intended to create by implication a private right of action in a federal district court but declined to say so expressly." *Id.* at 1357.

This case is materially different from *Love*. First, unlike the ACAA, the CVRA expressly grants crime victims a right to file a motion for relief directly in a district court. *See* 18 U.S.C. § 3771(d)(3). Thus, the question in *Love*—whether there was an *implied* private remedy available for violations of the ACAA—is materially different from the question in this case. Second, under the administrative enforcement scheme of the ACAA, individuals who believed they were discriminated against had a right to file an administrative complaint and to seek judicial review of the final administrative decision. Here, it is clear that the CVRA grants crime victims certain rights that attach pre-charge, but, as discussed previously, crime victims cannot seek to vindicate violations of those rights through the administrative scheme in § 3771(f). This difference makes it clear that *Love*—and *Sandoval* for that matter—are distinguishable.

Moreover, because the administrative-enforcement scheme in § 3771(f) is not available to the victims here, the Majority's ruling—that the CVRA does not authorize a freestanding cause of action—leaves Epstein's victims completely without a remedy for the violation of their CVRA rights, despite the existence of rights-creating language in the CVRA and Congress's creation of a judicial remedy even when there is "no prosecution underway."

148

Accordingly, as explained previously, the Majority's misapplication of *Sandoval* and its flawed statutory interpretation of the CVRA as a whole results in its erroneous holding that there is no "*Sandoval*-qualifying" clear expression of congressional intent to authorize a private right of action to enforce CVRA rights until after an indictment is filed. Contrary to the Majority, I would hold that the CVRA's plain text, structure, and "the physical and logical relation of its many parts" provides crime victims with a clear statutory remedy to seek to enforce their statutory rights "pre-charge." *See* Scalia & Garner, *supra*, at 167.

## V.    PROSECUTORIAL DISCRETION

In an attempt to overcome the plain language of the CVRA, the Majority emphasizes policy concerns that permitting victims to file a motion for relief in a federal district court—in the absence of a preexisting indictment or court proceeding—would result in a number of ills, chief among them "unduly impairing prosecutorial discretion." But statutory interpretation begins and ends with the plain language of the statute, and we are required to enforce that plain meaning even if the proper interpretation raises policy concerns. *See Eldred v. Ashcroft*, 537 U.S. 186, 222 (2003). "The wisdom of Congress' action . . . is not within our province to second guess." *Id.*[29] But even assuming *arguendo* that such policy

---

[29] I am not in any way suggesting that we ignore constitutional concerns. Such concerns, however, are simply not present in this case nor has the government raised any as-applied challenge to the constitutionality of the statute. Similarly, because I would hold that the statutory

concerns could justify abandoning the plain text of the statute, the Majority's concerns fall apart upon closer inspection.

For example, the Majority and Judge Tjoflat's concurring opinion explain that enforcing victim's rights pre-charge would require judges to identify victims and would risk judicial interference with ongoing "law-enforcement raids, warrant applications, arrests, witness interviews, lineups, and interrogations." In other words, pre-charge enforcement would permit victims and/or judges to exert "undue influence" over each step of criminal investigations and the government's charging decisions. I disagree because the text of the CVRA alleviates any concern that pre-charge enforcement would unduly impair prosecutorial discretion.

As an initial matter, the Majority, Judge Tjoflat's concurring opinion, and I agree that the Executive has exclusive and complete authority over charging decisions. *See United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to

___

text is clear and unambiguous, the canon of constitutional avoidance discussed in Judge Tjoflat's concurring opinion never comes into play. *See Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019) (explaining that this canon "has no application absent ambiguity" (quotation omitted)).

Judge Tjoflat's concurring opinion argues that we are just deciding the case before us but are setting precedent for how the CVRA will be applied and such suits will proceed in the future. True to some extent. But there are any number of instances where the attachment and enforcement of the CVRA's conferral right pre-charge will not impair prosecutorial discretion. The fact that there may be some hypothetical future cases in which the application of the CVRA rights pre-charge *might* possibly intrude on prosecutorial discretion is not a basis for ignoring the plain language of the statute. Rather, the vehicle for addressing any risk to prosecutorial discretion by the parade of horribles posited by the Majority and Judge Tjoflat's concurring opinion is through an as-applied constitutional challenge—which the government is free to bring in a future case should such concerns arise.

prosecute a case . . . ."); *see also Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("[T]he decision of a prosecutor in the Executive Branch not to indict . . . has long been regarded as [within] the special province of the Executive Branch."). Section 3771(a)(5) in no way undercuts this fundamental precept.

First, § 3771(d)(6) expressly prohibits interference with prosecutorial discretion by mandating that nothing in the Act "shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6).

Second, the plain language of § 3771(a)(5) similarly makes it clear that no such intrusion on prosecutorial discretion will occur. Specifically, § 3771(a)(5) does not simply grant victims an unfettered conferral right. Rather, it merely grants a "*reasonable*" conferral right, and reasonableness is a common and forceful limiting principle that is familiar throughout the legal field. *See, e.g., Hardy v. Cross*, 565 U.S. 65, 69–70 (2011) (explaining that for purposes of the Sixth Amendment's Confrontation Clause, the "lengths to which the prosecution must go to produce a witness" is a "question of reasonableness"); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("We have long held that the 'touchstone of the Fourth Amendment is reasonableness.'"); *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) (prison regulations affecting the sending of publications to prisoners must be analyzed under a reasonableness standard); *Strickland v. Washington*, 466 U.S.

151

668, 688 (1984) ("The proper measure of attorney performance" under the Sixth Amendment "remains simply reasonableness under prevailing professional norms."); *Hensley v. Eckerhart*, 461 U.S. 424, 426 (1983) (explaining that "in federal civil right actions the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" (quotation omitted)).

Furthermore, equally as limiting as the reasonableness principle is that the conferral right granted to victims in § 3771(a)(5) is limited to conferral "*with the attorney for the Government in the case*"—not with police or investigators. *See* 18 U.S.C. § 3771(a)(5). And nothing in the CVRA suggests any steps or decisions that a prosecutor must take or make in his charging decision. Thus, a plain reading of the statute indicates that there will be no judicial interference with a prosecutor's decision. If a prosecutor, after speaking with the victim, decides not to prosecute or take the case to a grand jury, there will be no violation for the district court to remedy.

The Majority's and Judge Tjoflat's concurring opinion's parade of horribles about mini-trials to identify crime victims and conferral "pre-charge" are red herrings. In the mine-run of cases that have advanced to the stage where a government attorney is assigned, it will be obvious—as it was in this case—who the identifiable victims are. The government's actions in this case prove this point:

152

AUSA Villafaña acknowledged the status of petitioner and others as "victims" of Epstein and sent them a letter stating that "as a victim . . . of a federal offense, you have a number of rights," including "[t]he reasonable right to confer with the attorney for the United States in the case" and "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy."  AUSA Villafaña had no trouble identifying Epstein's victims as "crime victims" under the statute and treating them as such.[30]

Moreover, the Majority's concern about impairment of prosecutorial discretion applies equally post-indictment.  Specifically, the Majority does not dispute that, post-indictment, the conferral right in § 3771(a)(5) attaches and is

---

[30] The Majority and Judge Tjoflat's concurring opinion vigorously argue that identifying who is a crime victim pre-charge presents "three intractable problems": (1) courts, not prosecutors, deciding if any offense occurred; (2) the need for a "mini-trial" to figure out whether a federal offense occurred and who was a victim; and (3) courts exerting pressure on the government's charging decision by conducting such mini-trials.  Yet the CVRA's definition of a crime victim is straightforward: a "crime victim" is "a person directly and proximately harmed as a result of the commission of a Federal offense."  18 U.S.C. § 3771(e).  Even in this massive sex-trafficking case in which no formal charges were ever filed, the prosecutors had no trouble determining that a federal offense had occurred and identifying 30 crime victims.

Judge Tjoflat's concurring opinion expresses concern that the fact that the government in this particular case was able to identify victims does not establish necessarily that the government will be able to do so in future cases.  Nevertheless, the concerns identified by the Majority and Judge Tjoflat's concurring opinion surrounding the identification of victims are undermined by the fact that in the many years since the Fifth Circuit's opinion in *In re Dean* and the district court here ruled that crime victims have rights pre-charge, the government has not presented any evidence suggesting any difficulties in identifying crime victims of federal offenses or of mini-trials to do so.  I stand by my conclusion that both the attachment pre-charge of crime victims' rights to reasonable conferral and to be treated fairly and with respect and the enforcement of those rights through a freestanding cause of action via a motion for relief if no prosecution is underway—as authorized expressly by Congress—do not impair prosecutorial discretion in this case.

enforceable via a motion for relief under § 3771(d)(3).  Given the number of

discretionary post-indictment decisions a prosecutor may make—reducing charges,

upgrading charges, dismissing charges, and granting immunity—it is unclear how

the mere filing of an indictment alleviates the concerns about "unduly impairing

prosecutorial discretion."  Rather, the same concerns set forth by the Majority are

present regardless of whether a motion for relief is filed in the pre-charge phase or

the post-indictment phase, which leads to the conclusion that these prosecutorial

discretion concerns are overblown.  Therefore, concerns about undue interference

with prosecutorial discretion exist regardless of whether a motion for relief under

§ 3771(d)(3) is filed pre- or post-indictment.  In any event, the CVRA expressly

precludes such interference; thus, this concern certainly provides no basis for

ignoring the plain language of the statute.  Accordingly, in enforcing the plain

language of the CVRA, prosecutorial discretion is in no way compromised.

## VI.  CONCLUSION

I would decide both *en banc* issues and hold that the CVRA's plain text:

(1) granted the crime victims two statutory rights that attached in the "pre-charge"

period—the reasonable right to confer with the attorney for the Government and

the right to be treated with fairness and respect; and (2) granted the crime victims a

statutory remedy—a private right to seek judicial enforcement of their statutory

rights.  *See* 18 U.S.C. § 3771(a)(5), (a)(8) and (d)(3).  Therefore, I would remand

the case back to the panel to address in the first instance the issue raised in the original mandamus petition in this Court: whether the district court correctly concluded that, given Epstein's death, no remedy was available.

The Majority admits that it is drawing a "line limiting judicial enforcement to the post-charge phases of a prosecution"—one that "marks a clear and sensible boundary on the prosecutorial-discretion spectrum" and "squares with the background expectation of judicial involvement."  The flaw is that the Majority's line-drawing is of its own making and does violence to the statutory text.  *See Bostock v. Clayton Cty., Georgia*, 590 U.S. ___, 140 S. Ct. 1731, 1823 (2020) (Kavanaugh, J., dissenting) ("[O]ur role as judges is to interpret and follow the law as written, regardless of whether we like the result . . . [it] is not to make or amend the law"); *See Harbison v. Bell*, 556 U.S. 180, 199 (2009) (Thomas, J., concurring) (A statute's "silence with respect to a [temporal or procedural] limitation in no way authorizes [courts] to assume that such a limitation must be read into [the] subsections . . . in order to blunt the slippery-slope policy arguments of those opposed to a plain-meaning construction of the provisions under review.").

For all of these reasons, I respectfully dissent.

155

HULL, Circuit Judge, dissenting:

Respectfully, I join Judge Branch's Dissent in full.  I write separately to add five points.  To start, I discuss how the Majority skips over the first en banc issue and why we should answer whether the Epstein victims' statutory conferral rights in § 3771(a) attached pre-charge.  That issue was the basis of the Panel opinion and was briefed and argued en banc.  It involves an important legal issue of first impression in our Circuit.  Significantly too, deciding whether under § 3771(a) Ms. Wild had statutory conferral rights pre-charge that were violated is integral to this ongoing dispute and the proper statutory interpretation of whether the remedy provision in § 3771(d) applies pre-charge.

Second, as to the merits of that first en banc issue, I agree with Judge Branch's Dissent that under the plain language of the CVRA victims have reasonable rights to confer with prosecutors and these rights attach pre-charge, and that the Epstein victims' rights were violated.  Branch Dissenting Op. at 120.

Yet, to the extent one credits the Majority's concerns about prosecutorial discretion, I set forth a narrow "conferral right" ruling in Section II.A., which holds that after the government signed the Agreement, the Epstein victims had conferral rights under § 3771(a)(5).  Once the ink was dry on the Agreement, the U.S. Attorney had exercised his discretion and made his charging decision.  The government's post-Agreement misconduct—not conferring and telling the victims

156

about the Agreement, its terms, and upcoming state court events for nearly a year—alone is sufficient to establish CVRA violations. While not all the conferral rights that the victims request, this narrower ruling would decide the merits of the first issue and tee up concretely the second issue.

Third, as to the second issue, I discuss Sandoval in detail because the Majority uses snippets out of context and fails to tell the whole Sandoval story. In Sandoval there was no statute granting a private right of action, and the Sandoval inquiry was whether to imply a private right of action for Ms. Sandoval to enforce agency regulations. Here, though, the question is whether a specific statute, § 3771(d) enacted by Congress, expressly grants Ms. Wild, as a crime victim, a private right of action to enforce her own CVRA statutory rights (not agency regulations). I explain how the Majority misapplies Sandoval.

Fourth, I review the Amicus Brief of three U.S. Senators that also supports Judge Branch's conclusion that the CVRA's plain text does not condition a victim's rights and remedy upon a preexisting indictment. Fifth, I discuss why the Majority's ruling has far-reaching consequences beyond the Epstein case.

## I. FIRST EN BANC ISSUE: CONFERRAL RIGHTS

The conferral-right issue is an important legal question of first impression in our Circuit. But the Majority blithely skips over the issue, although it was the basis of the Panel opinion and is now the first en banc issue briefed and argued.

157

Indeed, the Panel opinion squarely held: "We hold that at least as matters currently stand—which is to say at least as the CVRA is currently written—rights under the Act do not attach until criminal proceedings have been initiated against a defendant, either by complaint, information, or indictment." In re Wild, 955 F.3d 1196, 1198 (11th Cir. 2020).  The Panel later stated: "[W]e hold that the CVRA does not apply before the commencement of criminal proceedings—and thus, on the facts of this case, does not provide the petitioner here any judicially enforceable rights." Id. at 1220.  The Panel reasoned: "The facts that the CVRA (1) does not sanction freestanding suits and (2) does prescribe mid-proceeding "motion[s]" combine—especially in conjunction with subsection (a)'s enumeration—to indicate that the Act's protections apply only after the initiation of criminal proceedings." Id. at 1210 (alteration in original).

The Majority now says "we needn't decide whether, in the abstract, the rights to confer and to be treated with fairness might attach prior to the formal commencement of criminal proceedings." Maj. Op. at 13.  Good gracious, there's nothing abstract about this case.  The Majority admits that the facts are "beyond scandalous" and  the victims were not only "left in the dark," but "affirmatively misled" by government attorneys.  Maj. Op. at 2–3.  To add insult to injury, the Majority refuses to answer the first en banc question as to whether the Epstein victims had any CVRA rights that attached pre-charge.

158

Moreover, that first en banc question—whether the CVRA in § 3771(a) granted victims rights that attach pre-charge—is an integral part of the proper statutory interpretation of the remedy provision in § 3771(d), which refers back to those § 3771(a) rights. Indeed, both the Majority and Chief Judge Pryor's concurrence examine the CVRA as a whole and look to various subsections of the CVRA to support their conclusion that § 3771(d) does not grant Ms. Wild a private cause of action. Pryor Concurring Op. at 159–64 ("We Construe Statutes by Reading the Whole Text, Not Individual Subsections in Isolation."); Maj. Op. at 30–33, 39–44 (examining other subsections of § 3771 and concluding they support its statutory interpretation of § 3771(d)(3)). Yet they refuse to decide whether the subsection (a)(5) and (8) rights apply "pre-charge." If the CVRA grants the victims rights that do attach pre-charge—as the plain language of § 3771(a)(5) and (a)(8) suggests—that would also support Judge Branch's conclusion that § 3771(d) provides Ms. Wild a private cause of action to enforce those rights in the pre-charge period before an indictment.

We should also decide the first issue as to pre-charge rights, given: (1) the Epstein victims' perseverance in litigating the rights issue for a decade and obtaining en banc review of the rights issue, that was forthrightly decided by the Panel opinion; (2) the seriousness of the federal sex-trafficking crimes against petitioner Wild and the other 30-plus minor victims; (3) the government's

159

egregious misconduct; and (4) the fact that if the Epstein victims' CVRA rights attached pre-charge, the government's misconduct undisputedly violated them. It defies basic fairness for the Majority, at this late stage, to avoid answering whether the Epstein victims had any CVRA rights pre-charge.

Chief Judge Pryor's concurrence alleges that our answering the first question would be issuing "an advisory opinion" to the Executive Branch. Pryor Concurring Op. at 54–59. Invoking Article III of the Constitution, his concurrence states that (1) an advisory opinion is one "that interpret[s] laws without resolving cases or controversies": (2) "[n]o principle is more fundamental to the judiciary's proper role in our system of government" than the "constitutional limitation" imposed by Article III; and (3) the "prohibition against advisory opinions is the oldest and most consistent thread in the federal law of justiciability." Pryor Concurring Op. at 55–56 (quotation marks omitted). His theory seems to be that the victims-rights issue became non-justiciable the moment a majority of this Court concluded the CVRA did not provide Ms. Wild with a pre-charge remedy for any violation of her statutory rights. This advisory-opinion theory is flawed, disregards the live controversy between the Epstein victims and the government as adverse parties, and disrespects the concrete injury to those victims.

Article III of the Constitution grants our Court the power to decide "Cases" or "Controversies." U.S. Const. art. III, § 2. That constitutional phrase "require[s]

160

that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." Carney v. Adams, 592 U.S. ___, 141 S. Ct. 493, 498 (2020).  As the Supreme Court has explained, this "longstanding legal doctrine" prevents courts from (1) "providing advisory opinions at the request of one who, without other concrete injury, believes that the government is not following the law," and (2) ruling on hypothetical legal issues, the answers to which have no effect on the relationship between the parties before them.  Id. at 501 (emphasis added); see also Flast v. Cohen, 392 U.S. 83, 96–97, 88 S. Ct. 1942, 1951 (1968) (noting that suits in which courts are asked to render advisory opinions "are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaced situation embracing conflicting and demanding interests" (quoting United States v. Fruehauf, 365 U.S. 146, 157, 81 S. Ct. 547, 554 (1961)).[1]

Contrary to the concurrence, the first issue remains justiciable, and answering it would not be an advisory opinion.  There is and has been a live controversy between Ms. Wild and the government as to the scope of her conferral

---

[1]Federal courts cannot issue advisory opinions because of the Constitution's case or controversy requirement.  Thus, to be justiciable, the first issue must involve a genuine live controversy involving a present claim by one party and another party disputing it that can be determined judicially.  See Carney, 592 U.S. at ___, 141 S. Ct. at 498.  Whether the Epstein victims had conferral rights that the government violated is justiciable and should be decided for the reasons outlined above.

161

right under the CVRA and the government's violations of her rights.  That genuine controversy did not end simply because the Majority decided to dispose of her lawsuit on a procedural ground without deciding the rights issue.

The concurrence also alleges (1) "our answer to the first question would be an alternative holding only if we . . . concluded that the Act does not confer any pre-charge rights, judicially enforceable or otherwise"; but (2) if we "say that the Act does confer pre-charge rights, those rights would not be judicially enforceable and our resolution of this petition for a writ of mandamus would not change," and thus our ruling on the rights issue would be an advisory opinion.  But the justiciability of both merits and procedural issues depend on whether an underlying case or controversy exists and remains—not on the outcome the court reaches as to either issue.  The federal law is replete with cases in which courts address two issues in the alternative, ruling alternatively on both the merits and procedural issues in cases, even though the resolution of the appeal or petition does not change.  See, e.g., Riechmann v. Fla. Dep't of Corr., 940 F.3d 559, 580 (11th Cir. 2019) ("Although we conclude that the district court properly determined that Riechmann's Brady claim was procedurally defaulted, we will briefly address the substance of the underlying Brady claim, which we alternatively find lacks merit."); Echols v. Lawton, 913 F.3d 1313, 1323 (11th Cir.), cert. denied, 139 S. Ct. 2678 (2019) (concluding that while a plaintiff's "complaint state[d] a claim of

162

retaliation under the First Amendment," the defendant was nonetheless entitled to qualified immunity because he did not violate a First Amendment right that was clearly established); Dukes v. Deaton, 852 F.3d 1035, 1041 (11th Cir. 2017) ("Although we conclude that [the officer's] conduct violated the Fourth Amendment, qualified immunity protects him from suit because his violation was not clearly established in law when he acted."); Grider v. City of Auburn, Ala., 618 F.3d 1240, 1266–67 (11th Cir. 2010) (concluding, as to qualified immunity, that (1) no constitutional violation occurred, and (2) "[a]lternatively, at a minimum, Plaintiffs have not shown [the defendant] violated clearly established federal law"); Bundy v. Dugger, 850 F.2d 1402, 1414 (11th Cir. 1988) ("Alternatively, if the procedural default doctrine did not preclude us from examining the merits of the Faretta inquiry claim, we would conclude that [petitioner] was not entitled to relief on this ground."); Smith v. Local No. 25, Sheet Metal Workers Int'l Ass'n, 500 F.2d 741, 744–45 (5th Cir. 1974) (reviewing a court's order of "dismissal for lack of subject matter jurisdiction or alternatively a grant of summary judgment on the merits").[2]  Furthermore, "in this circuit additional or alternative holdings are

---

[2]See also Hamm v. Comm'r, Ala. Dep't of Corr., 620 F. App'x 752, 782 (11th Cir. 2015) ("[W]e conclude that [the petitioner's] Brady claim here is procedurally defaulted and that a merits review is precluded.  Alternatively, we find the claim to be without merit." (emphasis added)); Harris v. Goderick, 608 F. App'x 760, 764 (11th Cir. 2015) ("[E]ven assuming, arguendo, that [plaintiff's] false arrest claims are not barred by the statute of limitations, each non-immune defendant arguably possessed probable cause for actions taken in the course of prosecuting [plaintiff] for his probation violation . . . ."); Davies v. Former Acting Dist. Dir.-Orlando, 484 F. App'x 385, 389 & n.5 (11th Cir. 2012) (affirming the dismissal of a Bivens

not dicta, but instead are as binding as solitary holdings." Bravo v. United States, 532 F.3d 1154, 1162 (11th Cir. 2008).

The mere fact that a court has decided one issue—procedural or otherwise—that is capable of resolving a case on its own does not mean that no case or controversy exists and remains as to the other issue. The Panel opinion's holding—that Ms. Wild's CVRA rights did not attach pre-charge—was not an advisory opinion. And that holding alone resolved the case at the Panel stage. It makes no sense to conclude that this Court at the Panel stage properly decided the justiciable issue of whether Ms. Wild's rights under the CVRA attached pre-charge only up and until it concluded at the en banc stage that the Congress provided her with no cause of action to enforce any rights she might have.

Perhaps it's strategic to bypass the rights issue altogether, as the Majority does, rather than to hold Ms. Wild has CVRA rights that were violated but no remedy as to the government's misconduct. But it is wrong and a disservice to suggest that our Court's ruling on whether Ms. Wild had conferral rights pre-charge would constitute an impermissible advisory opinion.[3]

---

claim as barred by the applicable statute of limitations but noting that, "[e]ven assuming arguendo that the statute of limitations did not bar this case . . . . it is apparent that Defendants would in any event be entitled to qualified immunity").

[3]As a separate and different argument, the Majority opinion likens its avoiding the victims' rights question (the first en banc issue) to qualified immunity cases, in which a court may bypass the antecedent constitutional-rights question. Maj. Op. at 14 n.9. But when a court skips over a constitutional issue, two things happen. First, the court avoids making any

164

## II.  NARROW RULING: TIME PERIOD **AFTER** THE AGREEMENT

Judge Branch's Dissent ably discusses why the CVRA's § 3771(a)(5) grants crime victims a "reasonable" conferral right with "the attorney for the Government" and how that conferral right attaches pre-charge and is not textually conditioned on a preexisting indictment or formal charge.  I agree with her plain-text reading and that the government violated the Epstein victims' rights.

In addition, I already expressed my view that after the prosecutors concluded their investigation, drafted a 53-page indictment against Epstein, and began plea negotiations with Epstein's defense team, they had a legal obligation under the CVRA to confer with the victims before executing the secret plea Agreement.  See In re Wild, 955 F.3d at 1250.  Requiring an "attorney for the Government" to merely speak with a victim pre-charge in no way interferes with prosecutorial discretion.  After speaking with a victim, the prosecutor retains exclusive

---

precedent as to the constitutional violation, and the 42 U.S.C. § 1983 plaintiff in the next case will still have no clearly established law to cite.  Second, the government officials will not be on notice that certain conduct is a constitutional violation.  The fact that a court may elect to skip over an individual-rights question does not mean that a court should do so.

Indeed, for years in qualified immunity cases, the Supreme Court required lower courts to decide the constitutional question and stop avoiding it because otherwise the law would never be clearly established.  See Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).  Although the Supreme Court has now relaxed this rule, the fact remains that the first question as to the victims' rights—like that of individual rights in qualified immunity cases—is an important legal question that should be answered here for the reasons articulated above.  See Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009) (holding that the two-step sequence from Saucier "should not be regarded as mandatory in all cases," but recognizing that it is "often beneficial" and "appropriate" and that "the Saucier Court was certainly correct in noting that the two-step procedure promotes the development of constitutional precedent").

discretion over whether to indict or grant immunity. If a prosecutor confers, there is then no CVRA violation for a victim to complain about in a court.

But to the extent one nonetheless credits the Majority's concerns about possible interference with prosecutorial discretion, I set forth below a narrow conferral-right ruling based on only the time period after the prosecutor exercised his discretion, made his charging decision, and executed the Agreement.

## A.     Alternative Ruling: Conferral Right After the Agreement's Execution

The Majority concedes that: (1) after the Agreement's execution, the "prosecutors worked hand-in-hand with Epstein's lawyers . . . to keep the [September 2007] NPA's existence and terms hidden from victims"; (2) the government's efforts graduated to "active misrepresentation"; and (3) "it wasn't until July 2008—during the course of this litigation—that Ms. Wild learned of the NPA's existence, and until August 2008 that she finally obtained a copy of the agreement." Maj. Op. at 5–7. Once the Agreement was signed, the U.S. Attorney had exercised his prosecutorial discretion and was required to confer with and tell the victims. The prosecutors well knew this, writing Epstein's defense team that they must notify the victims about the Agreement and upcoming state plea.

Thus, as an alternative merits ruling on the first en banc issue, I would hold that after the prosecutor executed the Agreement with Epstein, (1) his victims had a reasonable right to confer with the prosecutor under § 3771(a)(5), and (2) the

166

government violated their rights by not disclosing the Agreement, its terms, and upcoming state court events, and by misrepresenting the case status. Such a narrow ruling is alone sufficient to establish the merits of Ms. Wild's conferral-right claim, and permits her claim to proceed.

## B.    Majority Repositions Its Blanket Post-Indictment Restriction from Conferral Right to Private Right of Action

It is telling too that, at the panel stage, the Panel Majority added a blanket post-indictment restriction to the conferral-right text in § 3771(a)(5) and held victims had no conferral rights before an indictment was filed. In re Wild, 955 F.3d at 1198. The Panel Majority feared that recognizing a conferral right pre-indictment created these problems: (1) undue interference with prosecutorial discretion; (2) the need for mini-trials to identify the victims and the federal offenses committed; and (3) federal judges' "injunctions requiring (for instance) consultation with victims before raids, warrant applications, arrests, witness interviews, lineups, and interrogations." Id. at 1216–18.

Now the en banc Majority (1) bypasses the conferral-rights issue altogether, (2) transposes those exact same fears over to the second issue as to a private right of action, and (3) adds the blanket post-indictment restriction to the private-right-of-action text in § 3771(d). It repositions the same arguments from the conferral-right issue to the private-right-of-action issue. Even if one credits those concerns, they evaporate under my narrow holding in Section II.A. that after the U.S.

167

Attorney signed the Agreement, the victims had conferral rights that the government violated.[4]

## C.    A Holding Limited to the Facts Before Us

The Majority and concurring opinions posit multiple operational difficulties if victims may file a freestanding motion in future cases.  Although the CVRA expressly allows a motion for relief when "no prosecution is underway," 18 U.S.C. § 3771(d)(3), their opinions add a blanket post-indictment restriction to the statute and conclude a motion may be filed only when a formal prosecution is already underway.  See Maj. Op. at 2–3, 44; Tjoflat Concurring Op. at 84.

Judicial restraint counsels against fashioning a blanket rule against all applications of the CVRA statute pre-charge; yet the Majority does that here.  There is no ambiguity in the CVRA's statutory text, and there is no ambiguity as to how the CVRA's terms apply to the facts before us.  Holding that the CVRA <u>as applied in this particular case</u> does not interfere with the prosecutor's discretion is all we need to say.  How constitutional doctrines protecting prosecutorial discretion interact with the CVRA in other factual scenarios are questions for future cases.  See <u>Bostock v. Clayton Cty., Ga.</u>, 590 U.S. ___, ___, 140 S. Ct.

---

[4]This narrow conferral-right ruling limited to the post-Agreement time frame also pretermits any need to draw a line marking a precise point when the conferral right attaches. And because the prosecutor had made his charging decision and executed the Agreement, this eliminates debate about § 3771(d)(6)'s proscription against impairing prosecutorial discretion. See 18 U.S.C. § 3771(d)(6).

168

1731, 1749, 1753–54 (2020) (stating that "no ambiguity exists about how Title VII's terms apply to the facts before us" and that while "the [defendant] employers fear that complying with Title VII's requirement in cases like ours may require some employers to violate their religious convictions," how "doctrines protecting religious liberty interact with Title VII are questions for future cases"). On these facts, the victims' CVRA rights were violated.[5]

## III.  PRIVATE RIGHT OF ACTION & SANDOVAL

As to the second en banc issue, I join Judge Branch's holding that the CVRA's text in § 3771(d)(3), as written by Congress, expressly granted Ms. Wild a private right of action to file a "[m]otion for relief" to enforce CVRA rights "in the district court in the district in which the crime occurred" when "no prosecution is underway." 18 U.S.C. § 3771(d)(3). Because the CVRA expressly grants a judicial enforcement mechanism, I need not and do not seek to imply a cause of action.

---

[5]Although Judge Tjoflat's concurring opinion invokes the canon of constitutional avoidance, it does not apply here because there is no ambiguity in the CVRA text. See United States v. Stevens, 559 U.S. 460, 481, 130 S. Ct. 1577, 1591–92 (2010) (providing that courts cannot "rely upon the canon of construction that 'ambiguous statutory language [should] be construed to avoid serious constitutional doubts'" unless the statute is first ambiguous (alteration in original)). As the Supreme Court recently explained, "[s]potting a constitutional issue does not give a court the authority to rewrite a statute as it pleases." Jennings v. Rodriguez, 538 U.S. ___, ___ 138 S. Ct. 830, 843–44 (2018) (declining to apply the canon of constitutional avoidance because the statutory language at issue was not ambiguous). To that end, the Supreme Court has cautioned that, "rewrit[ing] a . . . law to conform it to constitutional requirements . . . would constitute a serious invasion of the legislative domain." Stevens, 559 U.S. at 481, 130 S. Ct. at 1592 (second alteration in original) (citations and quotation marks omitted).

Furthermore, the Majority and concurring opinions heavily rely on Sandoval where the inquiry was whether to imply a private right of action for Ms. Sandoval to enforce agency regulations. Here, though, the question is whether a specific statute, § 3771(d) enacted by Congress, expressly grants Ms. Wild, as a crime victim, a private right of action to enforce her own CVRA statutory rights (not agency regulations). Because the Majority uses snippets of Sandoval out of context, I carefully walk the reader step-by-step through the Sandoval decision and then discuss Sandoval's meaning for this case.

## A.    Sandoval

**Sandoval's facts.**  Alabama changed its written driver's license tests to English only.  Alexander v. Sandoval, 532 U.S. 275, 278–79, 121 S. Ct. 1511, 1515 (2001).  Federal regulations forbid federal funding recipients, like Alabama, from using procedures that had discriminatory effect.  Id. at 278, 121 S. Ct. at 1515.  Ms. Sandoval (a Spanish speaker) filed a lawsuit, as a class representative, to enjoin the English-only policy as discriminatory.  Id. at 279, 121 S. Ct. at 1515. The Supreme Court held Ms. Sandoval did not have a private right of action to enforce the agency's regulations that forbid Alabama from using policies with discriminatory impact.  Id. at 281, 285, 293, 121 S. Ct. at 1517, 1519, 1523.  Only the agency could enforce its regulations.  Sandoval discussed two statutes: §§ 601 and 602 of the Civil Rights Act.

170

**Sandoval's § 601 ruling.** Sandoval recognized that under § 601, individuals had a private right of action to enforce their statutory rights. Id. at 279–80, 121 S. Ct. at 1516. The Sandoval Court, citing Cannon[6] and the parties' concessions, took it as a given that individuals would have a private right to enforce their statutory rights in § 601. Id. But Ms. Sandoval was seeking to enforce agency regulations under § 602. Id. at 270, 121 S. Ct. at 1515.

**Sandoval's § 602 ruling.** The debated question in Sandoval was about the § 602 statute, which authorized federal agencies to issue regulations as follows:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of [§ 601] of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.

42 U.S.C. § 2000d-1. Section 602 has no language about "rights" and no text authorizing a private right of action. Sandoval's no-right-of-action holding was only about whether § 602 authorized Ms. Sandoval to privately sue to enforce agency regulations. See Sandoval, 532 U.S. at 285–86, 121 S. Ct. at 1519.

Indeed, the § 602 inquiry in Sandoval was whether to imply a private cause of action for Ms. Sandoval to enforce the agency's regulations. See id. at 284–88,

---

[6]Cannon v. Univ. of Chicago, 441 U.S. 677, 99 S. Ct. 1946 (1979).

171

121 S. Ct. at 1518–20.  The Sandoval Court concluded: (1) § 602 contained no "rights-creating" language; (2) instead § 602 merely authorized federal agencies to issue regulations to effectuate the provisions of § 601; and (3) thus § 602 evinced no intent on Congress's part to create an individual private right of action to enforce the agency's regulations.  Id. at 288–89, 121 S. Ct. at 1520–21.

The Sandoval Court found § 602's lack of any "rights-creating" language highly relevant, noting that statutes that "focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."  Id. at 289, 121 S. Ct. at 1521 (emphasis added).  The statutory language in § 602 did not focus "on the individuals protected . . . but on the agencies that will do the regulating."  Id. at 289, 121 S. Ct. at 1521.

The Sandoval Court also discussed how § 602's method for enforcing regulations included the agency's "terminating funding to the particular program," such as funding recipient Alabama.  Id. at 289–91, 121 S. Ct. at 1521–22 (quoting 42 U.S.C. § 2000d-1).  The Supreme Court reasoned that § 602's "*express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others*."  Id. at 290, 121 S. Ct. at 1521–22 (emphasis added).

Four times, the Majority cites this italicized statement from Sandoval and argues the existence of the CVRA's administrative scheme in § 3771(f) suggests Congress intended to preclude a crime victim's private cause of action in

§ 3771(d). Maj. Op. at 21, 30, 41, 42. But as my detailed account of Sandoval demonstrates, the Majority is using this italicized statement wholly outside of its actual factual context in the Sandoval decision and summarily applying it to a materially different statutory text and structure.

Summarizing, in Sandoval the § 602 statute contained no language or any evidence of congressional intent to create either a private right or a private remedy for Ms. Sandoval. Thus, the Supreme Court in Sandoval held Ms. Sandoval could not sue. So what is Sandoval's meaning for this case that involves a materially different statute? Sandoval tells us what we must do: examine the text and structure of the CVRA for evidence of congressional intent to create both a private right and a private remedy, which I do below.

**B.     CVRA § 3771(d)**

In stark contrast to the § 602 text, the CVRA text, enacted by Congress, includes exactly the sort of "rights-creating" language and private cause of action that the Sandoval Court found was absent from § 602. See id. at 288, 121 S. Ct. at 1521; see also Love v. Delta Air Lines, 310 F.3d 1347, 1352 (11th Cir. 2002) ("Rights-creating language is language explicitly confer[ing] a right directly on a class of persons that include[s] the plaintiff in [a] case, or language identifying the class for whose especial benefit the statute was enacted." (citation and quotation marks omitted) (alterations in original)).

173

The CVRA statute is replete with "rights-creating" language, such as "[a] crime victim has . . . [t]he reasonable right to confer with the attorney for the Government" and "[t]he right to be treated with fairness." 18 U.S.C. § 3771(a)(5), (8). The CVRA text, with its emphasis on a discrete class—crime victims—shows Congress's clear "intent to confer rights on a particular class of persons." See Sandoval, 532 U.S. at 289, 121 S. Ct. at 1521 (quotation marks omitted); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284, 122 S. Ct. 2268, 2275 (2002) (concluding the statute at issue was "phrased 'with an unmistakable focus on the benefited class.'" (quoting Cannon, 441 U.S. at 691, 99 S. Ct. at 1955)).

As to enforcement of those statutory rights, Sandoval tells us that the presence of this "rights-creating language" in a statute—here the CVRA—evinces an intent on Congress's part to create a private right of action to enforce those individual statutory rights. See Sandoval, 532 U.S. at 288, 121 S. Ct. at 1521. To be clear, though, we need not, and should not, imply a private right of action here. And we do not rely solely on the rights-creating language in § 3771(a)(5) and (8). As the Supreme Court notes, "[w]hen Congress intends private litigants to have a cause of action to support their statutory rights, the far better course is for it to specify as much when it creates those rights." Cannon, 441 U.S. at 717, 99 S. Ct. at 1968.

174

That is exactly what Congress did in the CVRA. In § 3771(d), Congress expressly provided a private right of action: a victim should "assert the rights described in subsection (a)" via a "[m]otion for relief" filed "in the district court in which a defendant is being prosecuted for the crime <u>or, if no prosecution is underway, in the district court in the district in which the crime occurred</u>." 18 U.S.C. § 3771(d)(1), (3). This sentence is written in clear English prose. Further, Congress in the same sentence <u>expressly differentiated</u> between when a defendant is being prosecuted and when no prosecution is underway. It is linguistically implausible to read this text as always requiring Ms. Wild to file her motion for relief in a preexisting and ongoing criminal proceeding. The Majority's counterarguments cannot overcome Judge Branch's natural reading of this sentence or the clear commands of § 3771(d)'s text and statutory context.

## C.    Errors in Majority's Analysis About <u>Sandoval</u>

In my view, the Majority errs in its <u>Sandoval</u> analysis in several ways. First, the Majority endlessly voices concern that (1) the Epstein victims, like the <u>Sandoval</u> plaintiff, are trying to "<u>imply</u>" a cause of action where Congress has not expressly created one, and (2) <u>Sandoval</u> precludes "implying" a private right of action here. Maj. Op. at 19–22, 29–33, 39–44. The Majority opinion references implied causes of action four times. Maj. Op. at 20, 30, 32, 41. Chief Judge

Pryor's concurring opinion references implied rights of action six times.  Pryor Concurring Op. at 54, 64–65.

Here, we need not, and do not, "imply" a private right of action because the CVRA expressly creates a judicial enforcement mechanism: a "[m]otion for relief" filed in "the district court in the district in which the crime occurred."  18 U.S.C. § 3771(d)(3).  Our Court can, and should, stop at the plain text of the CVRA and the most natural reading of that text.

Second, the Majority keeps repeating: (1) "we find no clear evidence" that Congress intended crime victims to file this case, and (2) we find no "Sandoval-qualifying clear expression of congressional intent."  Maj. Op. at 22, 27–28 n.13, 30, 44, 45, 51.  The Majority ignores that Sandoval's finding of no congressional intent to grant Ms. Sandoval a private right of action was based on these key textual clues: (1) the § 602 statute had no "rights-creating language"; (2) the § 602 statute contained no text creating a judicial enforcement mechanism; (3) the § 602 statute only empowered the agency to promulgate regulations and was not enacted to benefit a discrete class of persons; and (4) the § 602 statute focused on the agencies that will do the regulating, not on the individuals protected.  Precisely what was missing in § 602 is fully present in § 3771(a) and (d).  And that statutory text in § 3771(a) and (d), enacted by Congress, expressly grants the Epstein victims a private right of action when no prosecution is underway.

176

Third, the Majority and Judge Tjoflat's opinions advance policy reasons for the Majority's bright-line rule that are untethered from Sandoval's analytical framework.  To avoid impairing prosecutorial discretion, the Majority says we need a "line limiting judicial enforcement to the post-charge phases of a prosecution."  Maj. Op. at 37.  The Majority also contends that "[i]nterpreting the CVRA to authorize judicial enforcement only in the context of a preexisting proceeding . . . squares with the background expectation of judicial involvement" in a prosecutor's case.  Id. at 37–38.  The Majority concludes that "[r]eading the Act to provide a private right of action for pre-charge judicial enforcement, by contrast, contravenes the background expectation of executive exclusivity."  Id. at 38.  The Majority shuts the courthouse door to the Epstein victims by adding a strict preexisting indictment requirement to § 3771(d)(3) when none exists in the text of that section.

As Judge Branch's Dissent explains, this is not a straightforward, plain-text interpretation of § 3771(d)(3).  Even the Majority admits it is "reading the Act" in a "practical" way to avoid judicial interference with prosecutorial discretion and "the background expectation of judicial involvement." [7]  Id. at 36, 38, 44.

_____

[7]Judge Branch's Dissent dismantles the Majority's tortured construction of § 3771(d)(3)'s terms, like "motion" and "no prosecution is underway."  Her Dissent reviews how the Majority eschews the common, ordinary, everyday meaning of the word "motion," and wrongly defines "motion" to require a preexisting underlying court proceeding.  Her Dissent explains the common meaning of "motion" and how federal law authorizes a "motion" to be filed

Simply put, we are not asked, as in <u>Sandoval</u>, to authorize an implied private right of action that is nowhere to be found in a statute.  Rather, we are asked to give effect to the CVRA's plain text without adding words to the statute.  The Majority accuses the Dissent and Ms. Wild of creating a remedy out of whole cloth because that outcome is "desirable" from a policy standpoint.  Maj. Op. at 42.  Yet it's the Majority who ignores the CVRA text in pursuit of its own policy concerns and preferred bright-line restriction of victims' rights to a post-indictment period.[8]

## IV.  U.S. SENATORS' AMICUS BRIEF

While the text controls, the legislative history of the CVRA is consistent with its plain text.  See <u>CBS Inc. v. PrimeTime 24 Joint Venture</u>, 245 F.3d 1217,

---

freestanding in numerous other areas of criminal law.  I agree and need not cover this territory.  Rather, I show how the Majority strays from the plain text and muses about expectations.

[8]Chief Judge Pryor's concurrence points out that each dissent spends at least 10 pages discussing <u>Sandoval</u>, an implied cause of action decision, even though they contend that the CVRA grants a private right of action.  The concurrence describes the dissents as "puzzling" and "schizophrenic" for this reason: "If the Act expressly granted a private right of action, then <u>Sandoval</u> would be beside the point."  Pryor Concurring Op. at 65.

Although clever wordsmithing, this is a non sequitur. <u>Sandoval</u> is necessarily discussed.  First, the Majority and the concurring opinions rely heavily upon it; yet our explication of <u>Sandoval</u> reveals how they misconstrue <u>Sandoval</u>, an implied cause of action decision, and misapply it to the materially different statutory text and structure in the CVRA.  Second, as the most recent Supreme Court decision cited, <u>Sandoval</u> instructs that we examine the text and structure of the statute at issue for evidence of congressional intent to create <u>both</u> a private right and a private remedy.  But the Majority skips over the private rights issue altogether.  Third, our journey through <u>Sandoval</u> demonstrates that the evidence of congressional intent that was missing in the § 602 statute in <u>Sandoval</u> is patently present in the CVRA's statutory language.  Fourth, a full read of <u>Sandoval</u> is required to compare the § 602 text and the nature of the administrative enforcement scheme (with judicial review) available in that case with the CVRA text and wholly dissimilar administrative scheme (with no judicial review) unavailable to the victims here.

1229 n.7 (11th Cir. 2001) (recognizing the "bedrock principle" that there is no need to resort to legislative history where statutory text is clear, but nonetheless reviewing legislative history that "supports and complements the plain meaning of statutory language" (quotation marks omitted)); see also In re BFW Liquidation, LLC, 899 F.3d 1178, 1190 (11th Cir. 2018) (reasoning that legislative history "bolster[ed]" our reading of unambiguous statutory text).

Senator Diane Feinstein and former Senators Jon Kyl and Orrin Hatch filed an amicus brief in support of our Court's rehearing en banc the Panel's erroneous statutory interpretation of the CVRA. Senators Feinstein and Kyl drafted and, along with Senator Hatch, co-sponsored the CVRA. See Senators' Amicus Br. at 1. All three senators served on the Senate Judiciary Committee—with Senator Hatch as its chairman—when Congress passed the CVRA.

The Senators urge this Court to hold that the CVRA's plain text in § 3771(a) grants crime victims pre-charge rights to confer and be treated fairly, and in § 3771(d)(3) the right to enforce them, "if no prosecution is underway," by filing a motion for relief in the district court. See id. at 7–12 (citing 18 U.S.C. § 3771(a), (d)(3)). They urge fidelity to the CVRA's text as written and enacted by Congress, stressing that the CVRA's text does not contain a temporal limitation and does not depend upon the filing of an indictment:

Critically, as the panel majority acknowledged, its decision was not compelled by statutory text. 955 F.3d at 1205. That comes as no surprise to the amici

179

Senators who drafted that text. Two rights conferred by the Act—the right "to confer with the attorney for the Government" and the right "to be treated with fairness and with respect"—do not, by their text, depend upon the filing of formal charges. 18 U.S.C. § 3771(a)(5), (8).

Id. at 7. The Senators emphasize that, beyond the lack of any temporal limitation, two provisions—§ 3771(c)(1) and (d)(3)—"make clear that the Act's rights attach before formal charges are filed." Id. Section 3771(c)(1) requires that government employees "engaged in the detection, investigation, or prosecution of crime" shall make best efforts to accord victims their rights. See 18 U.S.C. § 3771(c)(1).

Next, the Senators submit that "if any doubts remain," about the pre-charge application of the CVRA, "the Act sweeps them away with its proviso [in § 3771(d)(3)] that the rights established by the Act may be asserted if no prosecution is underway, in the district court in the district in which the crime occurred." Senators' Amicus Br. at 7–8 (quotation marks omitted).

The Senators bolster their position by pointing to their statements in the Congressional Record at the time of the CVRA's enactment. Senators Feinstein and Kyl "emphasized that it 'is important for victims' rights to be asserted and protected throughout the criminal justice process'—and to do that, victims need to be 'heard at the very moment when their rights are at stake.'" Id. at 5 (quoting 150 Cong. Rec. 7294, 7304 (2004)). To accomplish that goal, the CVRA gives victims "the right to confer with the Government concerning any critical stage or disposition of the case." Id. at 6 (quoting 150 Cong. Rec. at 7302).

180

The Senators emphasize that the events giving rise to this litigation are "<u>precisely</u> the miscarriage of justice the Act was intended to—and contrary to the [Panel] majority decision, <u>does</u>—foreclose." Id. They express concern that our Court's erroneous decision limiting the CVRA to only the post-indictment phase of the criminal justice process "will undo decades of progress toward recognizing and vindicating the vitally important rights of crime victims." Id. at 11. No matter the Majority and concurring opinions' myriad policy concerns, Congress was entitled to grant crime victims conferral rights that do not depend upon the existence of a preexisting indictment or ongoing criminal proceeding. "Only that policy choice, embodied in the terms of the law Congress adopted, commands this Court's respect." Pereida v. Wilkinson, 592 U.S. ___, ___,141 S. Ct. 754, 767 (2021). This legislative history in the Senators' Amicus Brief also supports Judge Branch's natural reading of the CVRA's plain text.[9]

## V.  TWO-TIERED JUSTICE SYSTEM

---

[9]I appreciate my colleague's sincere "sense of sorrow," "heart break[]," and regret about the result reached in the Majority opinion authored by him. Newsom Concurring Op. at 68–69. But this personal consternation goes too far when it admonishes us that the job, as a judge, is "adherence to the rule of law," and the "obligation" and "oath" of a judge is to "the law" and implies that only the Majority opinion he has authored does that. Id.

If nothing else, we should all agree that each judge has taken the same oath and is attempting to honor the same obligation to the rule of law. The dissenters simply read the CVRA's plain statutory language quite differently. For what it's worth, the Senators read that text as the dissenters do. But I still don't believe any colleague has violated his or her oath.

The Majority's holding has far-reaching consequences in our Circuit.  The pre-charge period has become critical in white-collar cases.  Defense attorneys are hired to represent potential defendants pre-charge to negotiate and extract the best plea deal in advance of, or to forestall, any indictment.  The Majority's ruling—limiting judicial enforcement of CVRA violations to a formal post-charge period—leaves federal prosecutors free to engage in the secret plea deals and deception pre-charge that resulted in the travesty here.[10]

Over the last fifteen years, there has been a dramatic increase in the use of pre-indictment "alternative settlement vehicles" such as deferred prosecution

---

[10]The DOJ's failure to discipline its own prosecutors heightens the importance of the CVRA's private right of action.  The DOJ's Office of Professional Responsibility ("OPR") conducted a review of the Epstein case.  While the Report found that prosecutors exercised "poor judgment," it concluded they did not commit "professional misconduct" and did not recommend any sanctions or disciplinary actions.  See Department of Justice Office of Professional Responsibility Report, Executive Summary, at ix–xii (Nov. 2020).  The Report has been heavily criticized.  See, e.g., Kevin G. Hall, Jay Weaver & Ben Wieder, Senator rips finding that Acosta used 'poor judgment' but broke no rules in Epstein case, Miami Herald, Nov. 14, 2020, available at https://www.miamiherald.com/news/local/article247133141.html ("'Letting a well-connected billionaire get away with child rape and international sex trafficking isn't "poor judgment"—it is a disgusting failure. Americans ought to be enraged,' Nebraska Sen. Ben Sasse, chairman of the Senate Judiciary Oversight Subcommittee, said in a statement Thursday afternoon. . . . .'The DOJ's crooked deal with Epstein effectively shut down investigations into his child sex trafficking ring and protected his co-conspirators in other states. Justice has not been served,' Sasse added.").

OPR's Report is viewed as a "whitewash," "letting everyone off the hook," "offensive," "hurtful," and "like another slap in the face to the victims."  James Hill, Key takeaways from the Justice Department review of Jeffrey Epstein sweetheart deal, ABC News (Nov. 16, 2020), available at  https://abcnews.go.com/US/key-takeaways-justice-department-review-jeffrey-epstein-sweetheart/story?id=74222922.  Given the OPR Report, it is hardly surprising the victims continue to pursue this civil suit to discover and unravel the mystery of why the prosecutors not only signed such a sweetheart plea deal for the billionaire Epstein in the first place but did so in secret and then for nearly a year took great efforts to hide the Agreement by affirmative misrepresentations to the victims and their counsel too.

agreements and non-prosecution agreements to resolve federal crimes.  See Cindy R. Alexander & Mark A. Cohen, The Evolution of Corporate Criminal Settlements: An Empirical Perspective on Non-Prosecution, Deferred Prosecution, and Plea Agreements, 52 Am. Crim. L. Rev. 537, 537-40 & n.14 (2015).[11]  Under the Majority's ruling, victims have no CVRA remedy when a prosecutor secretly negotiates these pre-charge agreements in the absence of federal charges.

The Majority's ruling also exacerbates disparities between wealthy defendants and those who cannot afford to hire well-connected and experienced attorneys during the pre-charge period.  Most would-be defendants lack resources and usually have no counsel during this pre-charge period.  Consequently, they do not have the pre-charge opportunity to negotiate the kind of extremely favorable deal that Epstein received.  This sort of two-tiered justice system—one in which wealthy defendants hire experienced counsel to negotiate plea deals in secret and with no victim input—offends basic fairness and exacerbates the unequal playing field for poor and wealthy criminal defendants.

## VI.  CONCLUSION

---

[11]In 2020 alone, the DOJ executed 32 agreements to defer prosecution for corporate criminality.  See Duke University School of Law & University of Virginia's Legal Data Lab, Data and Documents, Corporate Prosecution Registry, https://corporate-prosecution-registry.com/browse/; see also 2019 Year-End Update on Corporate Non-Prosecution Agreements and Deferred Prosecution Agreements, Gibson Dunn (Jan. 8, 2020), https://www.gibsondunn.com/2019-year-end-npa-dpa-update/ (stating that the DOJ's use of NPAs and DPAs in white collar cases rose from 2 in 2000 to 31 in 2019 and has been normalized "[a]cross [a]gencies").

While the Majority laments how the national media fell short on the Epstein story, this case is about how the U.S. prosecutors fell short on Epstein's evil crimes. Mysteries remain about how Epstein escaped federal prosecution and why, for nearly a year, the government made affirmative misrepresentations to the Florida victims of his serious sex crimes and to the victims' counsel. The government egregiously violated Ms. Wild's CVRA rights. "Our criminal justice system should safeguard children from sexual exploitation by criminal predators, not re-victimize them," as the prosecutors did here. In re Wild, 955 F.3d at 1249–50 (Hull, J., dissenting).

The petition Ms. Wild filed in the district court was one that the CVRA expressly authorizes when no prosecution is underway. Ms. Wild has spent over ten years seeking to vindicate her statutory rights expressly created by Congress. Today, the Majority tells Ms. Wild and Epstein's other victims that all of that was for naught, since they never had the right to file their motion in the first place back in 2008. The Epstein victims have no remedy as to the government's appalling misconduct because the Majority rewrites the CVRA to add a blanket post-indictment limitation and reads out of the statute any ability for crime victims to judicially enforce their conferral rights outside of a preexisting criminal proceeding. The Majority's ruling eviscerates the CVRA and makes the Epstein case a poster child for an entirely different justice system for crime victims of

184

wealthy defendants. I respectfully dissent, once again. See id. at 1223–1250

(Hull, J., dissenting).